UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

THE MARTIN HILTI FAMILY TRUST,

                 Plaintiff,

      -against-

KNOEDLER GALLERY, LLC d/b/a
KNOEDLER & COMPANY, ANN
FREEDMAN, MICHAEL HAMMER,
8-31 HOLDINGS, INC., GLAFIRA
ROSALES, JOSE CARLOS
BERGANTINOS DIAZ and DOES 1-10,

                 Defendants.

-----------------------------------------------------------X

13 CV 0657

Index No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED JAN 29 2013 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff The Martin Hilti Family Trust ("Plaintiff"), by its attorneys, Pryor Cashman LLP, as and for its complaint against defendants Knoedler Gallery, LLC d/b/a Knoedler & Company ("Knoedler"), Ann Freedman, Michael Hammer, 8-31 Holdings, Inc., Glafira Rosales, Jose Carlos Bergantinos Diaz, and DOES 1-10 (collectively at times, "Defendants"), alleges as follows:

## NATURE OF ACTION

1.     This is an action arising out of the sale of forged art, a purported painting by the American modern master artist Mark Rothko ("Rothko") known as *"Untitled* (1956), Oil on canvas, 49" x 31" (the "Work"), by Knoedler to Plaintiff on or about November 6, 2002. Although Knoedler and its president, Ann Freedman ("Freedman"), repeatedly proclaimed the Work to Plaintiff to be a "fantastic Rothko," it was, in fact, a fake.

2.     Indeed, recent forensic analysis of the Work reveals that it includes, among other things, a particular red paint pigment known as "PR 170" that was not developed until the 1960s, years after the purported "1956" date of the Work.

1

3.    Knoedler first acquired the Work on consignment in or about 2001 from Glafira Rosales ("Rosales").  Unbeknownst to Plaintiff – because Knoedler and Freedman intentionally concealed this information in listing the Work's purported provenance – Knoedler later purchased the Work from Rosales in or about January 2002 for only $750,000 (a suspiciously low price for a "Rothko"), and then sold the Work without disclosing that Knoedler was the owner, for its own account, to Plaintiff in November 2002, for $5,500,000.

4.    Knoedler and Freedman concealed Knoedler's ownership of the Work to avoid questions they knew they could not credibly answer, such as when Knoedler bought the Work, from whom, for how much, and under what circumstances.  The answers to those questions would have undermined a sale.

5.    According to Knoedler, the Work was one of a collection of previously undiscovered modern masterworks by Rothko, Robert Motherwell, Jackson Pollock, Willem de Kooning, Barnett Newman, Clyfford Still, and Franz Kline (collectively, the "Enterprise Works").

6.    The Enterprise Works supposedly had all been acquired "directly from the artists" in the United States by an unknown owner, referred to privately by Defendants as "Mr. X," during the 1950s and early 1960s.

7.    Mr. X had supposedly kept the Enterprise Works in a "sealed" container in Mexico, thereby accounting for their "remarkably good condition" in the 2000s, when they were consigned and/or sold to Knoedler by and through Rosales.

8.    The Enterprise Works were made available to Knoedler by Rosales at bargain prices with the supposed "understanding" – which Defendants all knew to be false – that there was a Mr. X, who would remain forever unknown.

9.     At all relevant times, Defendants knew that the Mr. X story was untrue.  Indeed, Defendants privately equated Mr. X to the fictional "goose that laid the golden egg."

10.     Instead of telling their customers about Mr. X and the true provenance of the Enterprise Works, Knoedler, Hammer and Freedman concealed material information from their customers and did everything they could, for as long as they could, to create an appearance of legitimacy to their fraudulent dealings.

11.     Unbeknownst to Plaintiff, Defendants had participated in an ongoing scheme to sell the fakes.  Defendants' scheme spanned at least a decade and ensnared a number of victims in addition to Plaintiff under similar circumstances (the "Scheme").

12.     In furtherance of the Scheme, and in anticipation that Defendants might one day be caught, Freedman repeatedly prepared internal memos when presented with suspicious facts in order to make it appear that Defendants were acting in good faith in treating Rosales's story as the "truth" (the "Rosales File").

13.     In reality, the Rosales File was mere window-dressing for Defendants' fraudulent Scheme.  Freedman's constant updating of the Rosales File with increasingly preposterous memos reflects Defendants' consciousness of guilt.

14.     After selling the Work to Plaintiff, Freedman repeatedly tried to lull Plaintiff into believing it had made a great decision by purchasing the Work.

15.     On several occasions, Freedman described the Work to Plaintiff as a "fantastic Rothko" or a "great Rothko."  Freedman did so while concealing evidence that Rosales was selling fake paintings, all purportedly from the collection of the mysterious Mr. X.

16.     Hammer, the chairman of Knoedler who directed its operations, had personal knowledge of the Scheme and authorized it to occur with and through Knoedler.

17.     Perhaps the best illustration of Hammer's knowledge and participation (at least that is known to this point) occurred in 2003, when he acknowledged internally that an independent report that had exposed Rosales's story as a fiction would be material to potential customers of works being introduced into the market by Rosales.

18.     Nevertheless, as part of their window-dressing, he, Knoedler and Freedman ultimately shared the report only with one non-arm's length "customer" of an Enterprise Work (who actually co-invested with Knoedler and stood to benefit from the Scheme) and documented that fact in the Rosales File.

19.     Hammer, Knoedler and Freedman concealed the same report from future, arms-length customers of Enterprise Works.

20.     Knoedler earned unusual profits from the Rosales sales, and Hammer compensated Freedman handsomely based on those sales while also enjoying enormous profits for himself.

21.     Hammer eventually forced Freedman out the door, hoping that she could be the scapegoat for the Scheme were it ever exposed.

22.     Hammer later abruptly closed Knoedler overnight (in the middle of an exhibition and only shortly after having renovated Knoedler's gallery space), having gained millions of dollars resulting from the sales of fake masters.

23.     As alleged herein, Defendants are liable to Plaintiff under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"). Defendants are also liable for deceptive trade practices and false advertising pursuant to N.Y. Gen. Bus. Law §§ 349-350. Defendants are additionally liable for fraud and under various contractual theories of relief whose limitations periods have been extended by Defendants' fraudulent concealment.

## PARTIES

24. Plaintiff is a foreign trust organized under the laws of Liechtenstein and located in Liechtenstein. Plaintiff is a family trust for the well-known and respected Hilti family, whose members live in Liechtenstein and own 100% of Hilti Ltd., which is the parent entity of the Hilti group of companies that provide leading-edge technology to the global construction industry, and which employ more than 20,000 workers worldwide. Plaintiff supports a wide range of non-profit and charitable activities and institutions.

25. Upon information and belief, defendant Knoedler is a limited liability company organized under the laws of Delaware and principally located in New York, New York. Upon information and belief, Knoedler's sole member is a corporation known as 8-31 Holdings, Inc., which is a Delaware corporation that is principally located in New York, New York. Prior to its abrupt closing in November 2011, Knoedler had been one of the most established and reputable art galleries in the world.

26. Upon information and belief, defendant Freedman is an individual residing in New York, New York. Freedman is the former president of Knoedler.

27. Upon information and belief, Knoedler's sole member and managing member is defendant 8-31 Holdings, Inc. ("8-31"), which, upon further information and belief, is incorporated under Delaware law with a principal place of business in New York.

28. Upon information and belief, Michael Hammer is an individual residing in California who directs the operations of Knoedler and is the sole owner of 8-31.

29. Upon information and belief, defendant Rosales is an individual residing in Sands Point, New York.

30. Upon information and belief, defendant Jose Carlos Bergantinos Diaz ("Diaz") is an individual residing in Sands Point, New York with Rosales.

31. The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants sued herein as DOES 1 through 10 are presently unknown. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of DOES 1 through 10 when the same have been ascertained. Upon information and belief, each of the fictitiously-named defendants participated with the other defendants in the violations alleged in this Complaint, and performed acts and made statements in furtherance of those violations.

32. Upon information and belief, each of the defendants has acted as agent for, on behalf of, or in concert with some of the other defendants, and each of the defendants has undertaken, participated in, or ratified the acts and conduct hereinafter alleged.

## JURISDICTION & VENUE

33. Subject matter jurisdiction is proper pursuant to the RICO Act, 18 U.S.C. §§ 1964(a) and (c), and pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under laws of the United States, with supplemental jurisdiction over Plaintiff's related state law claims existing pursuant to 28 U.S.C. § 1367.

34. Subject matter jurisdiction is also proper under the diversity statute, 28 U.S.C. § 1332(a).

35. Venue is proper in this judicial district pursuant to the RICO Act, 18 U.S.C. §§ 1965(a) and (b), in that one or more of Defendants resides, is found, has an agent or transacts its affairs in this district, and in that the ends of justice require that other parties residing in any other district be brought before this Court.

36. Venue is also proper pursuant to 28 U.S.C. §§ 1391(b), (c) and (d).

## FACTS

A.     **The Basic Elements Of The Scheme**

37.     The Work is one of many works that Knoedler acquired from Rosales.

38.     The Enterprise Works that Rosales sold or tried to sell through Knoedler include works purportedly by Mark Rothko, Robert Motherwell, Jackson Pollock, Willem de Kooning, Barnett Newman, Clyfford Still, and Franz Kline.

39.     According to Rosales, an anonymous collector, Mr. X, purchased each of the Enterprise Works directly and "off the record" from the artists in New York. These transactions purportedly occurred either between the late 1950s and early 1960s, or between the late 1940s and 1964, depending on different versions of the story offered by Rosales. This information is reflected in internal memos in the Rosales File that Freedman prepared.

40.     The details kept within the Rosales File were not shared by Knoedler, Hammer or Freedman with Knoedler's customers, including Plaintiff.

41.     According to the Rosales File, Rosales claimed that no documentation of Mr. X's dealings survived because Mr. X's daughter (also unidentified) had destroyed all of the paperwork after Mr. X and his wife died, purportedly in 1983 and 1984, respectively.

42.     Rosales further claimed that the works from Mr. X's collection had never been displayed, and had been stored and wrapped since they were acquired, thereby accounting for their "remarkably good" condition (as reported in art conservator condition reports), when Mr. X's son (also unidentified except sometimes as "Mr. X, Jr.") and daughter decided to sell the collection anonymously through Rosales.

43.     These details underlay Defendants' Scheme throughout the decade, beginning approximately in or about 2001.

**B.     Defendants' Sale Of The "Levy Pollock" In 2001**

44.     In or about late 2001, Knoedler sold a work purportedly by Jackson Pollock called "*Untitled* (1949)," which Knoedler had acquired from Rosales as part of the Enterprise Works, to an individual named Jack Levy (the "Levy Pollock").

45.     The Levy Pollock was sold on the condition that an organization called the International Foundation for Art Research ("IFAR"), which evaluates the provenance and authenticity of works of art, issue a favorable report authenticating the Levy Pollock.

46.     Rosales claimed that Mr. X had obtained the Levy Pollock through a Filipino artist and well-known collector of Pollock's work named Alfonso Ossorio ("Ossorio").

47.     On or about October 9, 2003, IFAR issued its report finding, among other things, that it was "doubtful" that Ossorio would have played any role in the provenance of the Levy Pollock (the "IFAR Report").

48.     The IFAR Report also included strong negative comments by IFAR's team of specialists regarding the technique and style of the Levy Pollack.

49.     Freedman questioned the IFAR Report (in notes dated November 30, 2003), claiming that "[t]he circumstances under which Knoedler received the painting, and its relationship with the owner or consigner is not at issue."

50.     The sale of the Levy Pollock to Mr. Levy was cancelled due to the negative IFAR Report.

51.     Upon information and belief, the Levy Pollock is a fake.

52.     Hammer was aware of the IFAR Report and of the cancelled sale to Mr. Levy.

53.     The IFAR Report did nothing to diminish Knoedler's, Freedman's and Hammer's enthusiasm for trying to sell the Levy Pollock to another purchaser.

54.    Eventually Hammer, Freedman and Knoedler decided to co-invest in the Levy Pollock with a Canadian individual named David Mirvish ("Mirvish").

55.    To assist their window-dressing on that transaction, Hammer, Knoedler and Freedman documented that they made Mirvish aware of the IFAR Report, which they acknowledged was material information concerning Rosales's story.

56.    The Rosales File reflects that Mirvish (who stood to benefit from the Scheme by co-investing with Knoedler) purportedly was not dissuaded by the IFAR Report from investing in the Levy Pollock.

57.    Notwithstanding their private acknowledgement that the IFAR Report should be shown to a potential purchaser of a work being introduced into the market by Rosales, upon information and belief Hammer, Freedman and Knoedler concealed the IFAR Report from other potential purchasers of other Enterprise Works originating through Rosales.

**C.    Defendants' Sale Of The Work To Plaintiff In 2002**

58.    On or about May 26, 2001, Rosales consigned the Work (which was eventually sold to Plaintiff) to Knoedler at an agreed net return to Rosales of $775,000.

59.    On or about the same day, Rosales signed a statement which was placed in the Rosales File on Knoedler letterhead (the "Sham Statement") that she was "the authorized agent, as well as a close family friend, of a private collector residing in Mexico City and Zurich. For various personal reasons the owner prefers to remain strictly anonymous as the seller. The art works [sic.] were acquired by the current owner's father directly from the artist [sic.] and were passed by inheritance to his immediate heirs (son and daughter)." The Sham Statement further claimed "that the owner has absolute clear legal title to the [Work]."

60.     According to an internal memo prepared by Freedman for the Rosales File, also dated May 26, 2001, Rosales gave Freedman "some background information" about the source of the Work as well as other works that Rosales was trying to offer to or through Knoedler.

61.     Rosales claimed that the "[w]orks were acquired in the 1950s from Pollock, Rothko, Still, Kline, Motherwell, etc." directly.  Rosales claimed that "[a]ll purchases were paid for in cash" and that the substantiating paperwork "was probably lost or thrown out by the [unidentified] daughter [of Mr. X] after the deaths of her parents" because "[s]he had much of the paperwork."

62.     On or about October 1, 2001, Dana Cranmer of Cranmer Art Conservation ("Cranmer"), who is a former conservator of The Mark Rothko Foundation, Inc., issued a "Condition Report" for the Work.  That report began, ironically, as follows:  "The painting is in remarkably good condition, especially in view of its age and in comparison to other works by the artist from this era.  The freshness and intensity of the colors of the composition are exceptional." (Emphasis in original.)

63.     A little over seven months later, on or about January 8, 2002, Knoedler purchased the Work from Rosales, ending the consignment arrangement, for $750,000, payable as follows: $9,000 was paid by Knoedler in cash (upon information and belief, this amount was set to avoid the federal money laundering threshold of $10,000); $30,000 was paid by Knoedler in a check; and $711,000 was wire transferred by Knoedler.  Receipt of the full $750,000 was confirmed by Rosales on or about January 9, 2002, and Rosales also purported to warrant at that time that the Work was "authentic."

64.     Upon information and belief, Knoedler wire transferred the $711,000 amount to an individual named Jesus A. Bergantinos ("Bergantinos") in Spain.

65. Upon information and belief, Bergantinos is the brother of defendant Diaz.

66. Upon information and belief, Diaz assisted Rosales in her dealings with Knoedler.

67. Upon information and belief, Diaz has been accused in the past of trafficking in forged art in Spain.

68. Upon information and belief, Knoedler, Hammer and Freedman knew that Bergantinos was not Mr. X and did not represent Mr. X.

69. Upon information and belief, Knoedler, Hammer and Freedman knew that Rosales's story was incredible, and that a purported warranty from Rosales that the Work was authentic was not worthy of belief.

70. Knoedler, Hammer and Freedman understood that if they purported to rely on Rosales's "warranty" of authenticity, then they would likely also have to share the details of Rosales's unbelievable story, which was likely to repel potential buyers.

71. Knoedler, Hammer and Freedman did not disclose Rosales's story.

72. In light of the dubious provenance of the Work, and in order to make the Work appear genuine, Knoedler, Hammer and Freedman instead decided to have a sheet prepared stating that a number of individuals supposedly familiar with Rothko's works had purportedly "viewed" the Work (the "Viewing Sheet").

73. The purpose of the Viewing Sheet was to give the misimpression to potential purchasers that the Work had actually been authenticated or endorsed as genuine by a number of experts.

74. After purchasing the Work from Rosales, Knoedler, Hammer and Freedman also tried to create an aura of authenticity by exhibiting the Work in the Art Dealers Association of America's annual Art Show at the New York Armory between February 21-22, 2002, and at the

Beyeler Foundation's "Rothko Rooms" in Basel, Switzerland between June 15 – August 18, 2002.

75.     Upon information and belief, Knoedler, Hammer and Freedman conceived that the Viewing Sheet, combined with high profile exhibitions, together with Knoedler's venerable reputation, would be sufficient to deceive a potential purchaser into buying the Work, yielding Knoedler a multi-million dollar profit.

76.     Knoedler also prepared a writeup of the Work, calling it "extraordinary" and listing its provenance as follows: "The Artist; Private Collection, Switzerland (acquired directly from the artist through Alfonso Ossorio); By descent to current owner" (the "Writeup").

77.     Upon information and belief, Knoedler, Hammer and Freedman intentionally omitted including Knoedler's ownership in the Writeup's purported provenance of the Work.

78.     Had it been revealed that Knoedler was the actual seller, that information would have disclosed to Plaintiff (the buyer) that Knoedler and Plaintiff stood in an adversarial position, and would have raised questions concerning how much Knoedler paid for the Work, when it acquired the Work, and from whom.

79.     It was decided instead that Knoedler would play the role of a highly respected and honest intermediary that did not have a stake in the sale comparable to that of an owner.

80.     Knoedler exhibited the Work at the Beyeler Foundation in the summer of 2002.

81.     On or about October 24, 2002, one of the trustees of Plaintiff, Michael Hilti ("Hilti"), visited the Knoedler Gallery and met with Freedman in New York.

82.     Hilti told Freedman that he was interested in purchasing a painting by Sean Scully, but Freedman directed Hilti's attention to the Work, which Freedman described as a "fantastic

Rothko." Hilti recalled seeing the Work at the Beyeler Foundation's exhibition a few months earlier.

83.    Freedman provided Hilti with a photo of the Work to consider.

84.    In or about the following week, after Hilti had returned to Liechtenstein, Freedman offered by telephone to have the Work brought to Plaintiff's offices in Liechtenstein so that Plaintiff could "live with it" for a few days.

85.    On or about November 1, 2002, Knoedler's Vice President, Per Haubro Jensen ("Jensen"), delivered the Work to Plaintiff in Liechtenstein.

86.    Freedman told Hilti by phone that the Work had been in an anonymous private collection and an estate, that it had been kept in good storage and had never traveled, and that Christopher Rothko (Mark Rothko's son) had "seen" the Work.

87.    Christopher Rothko is not listed on the Viewing Sheet.

88.    Hilti told Freedman over the phone that Plaintiff would purchase the Work. Freedman replied that Plaintiff had "bought a fantastic painting."

89.    Plaintiff was unaware at the time that Knoedler actually owned the Work and was the seller; that Knoedler had purchased the Work for only $750,000; that Knoedler had purchased the Work from Rosales under suspicious circumstances; or any other details maintained in the Rosales File.

90.    Plaintiff acted in actual and justifiable reliance upon these material misrepresentations and omissions of fact.

91.    Knoedler sent its invoice for the Work to Plaintiff by facsimile on or about November 6, 2002 (the "Invoice").

92.  The Invoice falsely stated the following purported provenance: "The Artist; Private Collection, Switzerland (acquired directly from the artist); By descent to current owner."

93.  The Invoice did not state that Knoedler was the owner of the Work.

94.  On or about November 7, 2002 and again on or about November 8, 2002, Knoedler sent to Plaintiff by facsimile Knoedler's wire transfer information for payment.

95.  On or about November 12, 2002, Knoedler, in furtherance of receiving its $5.5 million payment from Plaintiff, sent to Plaintiff by facsimile a letter clarifying its payee information in order to clear the way for Plaintiff's wire transfer.

96.  On or about November 13, 2002, Plaintiff wire transferred $5.5 million to Knoedler's account.

97.  As alleged further below, the Work is a fake.

98.  Upon information and belief, Freedman relied on and publicized Plaintiff's purchase of the Work to try to give further credibility to other works that Defendants wanted to sell from the collection of Mr. X.

99.  Upon information and belief, Freedman later told the curator of the Beyeler Foundation, Oliver Wick ("Wick"), in connection with an article that Wick was writing about "Two Rediscovered Paintings" by Rothko, that Plaintiff had purchased the Work.

100.  In order to bolster the apparent credibility of Defendants' "Mr. X" story, Freedman, upon information and belief, embellished Defendants' story and told Wick, in sum, that the Work had belonged to a "collector, since deceased, [who] regularly travelled through the U.S. in the 1950s and acquired a small group of works by artists of the New York School. He was anything but a collector in the conventional sense. As he once explained, his purchases were motivated by a desire to help artists of his period to a humble livelihood. Yet rather than acting

on a philanthropic whim alone, he obtained professional advice from David Herbert ...[,] a leading figure on the New York art scene, especially between 1950 and 1960."

101.   Wick's article discussed another previously "unrecorded" purported Rothko painting, also called "*Untitled* (1956)," which was being displayed at the Beyeler Foundation and which Wick ironically described as having color that was "brilliantly fresh."

102.   As alleged below, upon information and belief, Knoedler sold the other Rothko "*Untitled* (1956)" to another unsuspecting victim, who has likewise ascertained that work to be a fake.

## D.   Defendants' Acts Of Concealment And Later Sales Of Fakes

### i.   Defendants' Attempt To Deceive Plaintiff Again In 2004

103.   After deceiving Plaintiff into buying the Work, Knoedler and Freedman repeatedly thereafter tried to persuade Plaintiff to buy other works from Knoedler while concealing the Rosales File and the information therein that would have shed light on Defendants' Scheme.

104.   During the June 2004 Basel Art Fair in Switzerland – only six months after the negative IFAR Report had been issued in connection with the Levy Pollock – Knoedler exhibited another purported work by Jackson Pollock called "*Untitled* (1950)," which Knoedler had also acquired from Rosales (and which, as alleged further below, was ultimately sold to an individual named Pierre Lagrange for $17 million (the "Lagrange Pollock")).

105.   Hilti attended the June 2004 Basel Art Fair.

106.   Following that exhibition, on or about June 17, 2004, Freedman called Hilti (on behalf of Plaintiff) and tried to persuade Plaintiff to purchase the Lagrange Pollock for between $8 million - $9 million.

107. Without informing Plaintiff about the IFAR Report (or any other information kept in the Rosales File), Freedman told Hilti that the Lagrange Pollock had come from "the same source as your Rothko": *i.e.*, the purported Mr. X (as opposed to the actual source, Rosales).

108. To try to persuade Plaintiff to purchase the Lagrange Pollock, Freedman also repeated that she had previously sold Plaintiff a "fantastic Rothko."

109. Freedman and Knoedler were insistent and, as they had done with the Work, they transported the Lagrange Pollock to Plaintiff in Liechtenstein to "live with it" for a short time as well.

110. Plaintiff declined to purchase the Lagrange Pollock because Plaintiff believed it did not fit within the criteria of Plaintiff's art collection.

ii. **Defendants' Sale Of The "De Sole Rothko" In 2004**

111. In or about late November 2004, Knoedler sold another purported Mark Rothko work called "*Untitled* (1956)" (*i.e.*, upon information and belief, the same work that was the subject of Wick's article, described above), which Knoedler had acquired from Rosales as part of the Enterprise Works, to Domenico and Eleanore De Sole (the "De Sole Rothko").

112. The De Sole Rothko is the subject of an ongoing lawsuit alleging similar claims as alleged herein, styled: *De Sole v. Knoedler Gallery, LLC d/b/a/ Knoedler & Company*, No. 12 Civ. 2313 (PGG) (the "De Sole Action").

113. According to papers filed in the De Sole Action, Knoedler and Freedman also engaged in deceptive sales practices in the sale of a purported Rothko to the De Soles.

114. In particular, Knoedler and Freedman are alleged to have misled the De Soles into thinking that the De Sole Rothko had been examined and considered to be authentic by a number

of experts when, in fact, none of the identified experts actually opined as to that work's authenticity.

115. As with Plaintiff, Knoedler and Freedman concealed Knoedler's ownership of the De Sole Rothko, and concealed the fact that Knoedler had purchased the De Sole Rothko from Rosales at a fraction of the amount charged to the De Soles and according to the same payment structure as used in connection with Knoedler's acquisition of the Work.

116. Freedman also misrepresented to the De Soles that she supposedly knew Mr. X and Mr. X, Jr. personally, when, in fact, she did not.

117. After learning in the press in or about December 2011 that Knoedler had been sued for selling fake art, the De Soles engaged a forensic analyst, Orion Analytical, LLC ("Orion"), to ascertain the De Sole Rothko's authenticity.

118. Orion determined in or about February 2012, that the "materials and techniques used to create the [De Sole Rothko] are inconsistent and irreconcilable with the claim that [the De Sole Rothko] was painted by Mark Rothko."

119. Upon information and belief, the De Sole Rothko, like the Work, is a fake and was sold as part of Defendants' Scheme.

120. Plaintiffs in the De Sole Action allege that Defendants used interstate wires on numerous occasions to further their fraudulent Scheme.

### iii. Rosales's Refusal In 2005 To Request Mr. X, Jr. To Guarantee Authenticity Of The Enterprise Works

121. In or about May 2005, after the sales to Hilti and De Sole and after the negative IFAR Report, Knoedler and Freedman purportedly asked Rosales to execute a new form of the Sham Statement (which Rosales had been signing in connection with all of the works she consigned or sold to Knoedler) to place in the Rosales File, attesting not only that Rosales was

"the authorized agent," and that "the owner has had absolute clear legal title to" works that Rosales was trying to sell to Knoedler, but also that the anonymous owner "has guaranteed their authenticity."

122.     Rosales purportedly refused to present the new form of the Sham Statement to Mr. X, Jr., claiming that he would be offended.

123.     Similarly, Freedman has averred in the De Sole action that she had another purported conversation with Rosales where Rosales purportedly warned Freedman that if she insisted on learning Mr. X's identity (for purposes of 'buttressing' the seemingly protective internal memos in the Rosales File), then Freedman and Knoedler would "kill the goose that's laying the Golden Egg."

124.     Freedman continued to pad the Rosales File with self-serving internal memos purporting to make Rosales's story sound plausible, and Defendants' efforts to sell Enterprise Works increased.

iv.     **The Sale Of The "Killala Motherwell"**
        **In 2007 By A Former Knoedler Employee**

125.     In or about February 2007, an individual named Julian Weissman ("Weissman"), who is a former employee of Knoedler, sold a purported work by Robert Motherwell called "*Spanish Elegy*," which, upon information and belief, Weissman had acquired from Rosales as part of the Enterprise Works, to an art dealer known as Killala Fine Art Limited (the "Killala Motherwell").

126.     Weissman had elicited from Dedalus a "Contingent and Conditional Opinion Letter" stating that the Killala Motherwell appeared to be a work of Motherwell's. This letter was later retracted by Dedalus.

18

127.     Indeed, in or about December 2007, members of Dedalus's Catalogue Raisonné Project examined photographs of the Killala Motherwell together with photographs of a number of other purported "*Spanish Elegy*" works by Motherwell that Knoedler and Weisman had acquired from Rosales.

128.     Dedalus informed Freedman and Knoedler that Dedalus believed all of the "*Elegy*" works were likely forgeries and that Dedalus would likely not include them in its forthcoming Catalogue Raisonné of Motherwell's works.

129.     Freedman protested Dedalus's opinion and claimed that the works had been kept by the collector (Mr. X) in "hermetically sealed" storage.

130.     Nevertheless, on or about January 14, 2008, Freedman created a letter for the Rosales File purportedly asking Mr. X, Jr. for an "emergency meeting" in Mexico to discuss the "doubt and suspicion" that had been cast on "the works by Robert Motherwell" that Knoedler, Freedman and Weisman possessed, owned or sold (including the Killala Motherwell).  No such meeting took place.

131.     Knoedler also decided to chance the possibility that the purported "*Elegies*" might escape detection as fraud by having Orion test two of the purported Motherwell "*Elegies*" that Knoedler and Freedman possessed or owned (both purportedly created in the 1950s). (Knoedler's use of Orion occurred about four years before the De Soles retained Orion in connection with the De Sole Rothko.)

132.     While awaiting the results from Orion, Knoedler continued aggressively to try to sell works it had acquired from Rosales without informing prospective purchasers that the source of the works was highly questionable and that Knoedler had retained Orion to address claims of forgery.

133.　During the June 2008 Basel Art Fair in Switzerland, which Hilti also attended, Knoedler exhibited at the Beyeler Foundation a purported work by Barnett Newman called "*Untitled* (1949)" (the "Purported Newman").

134.　Upon information and belief, Knoedler had acquired the Purported Newman from Rosales.

135.　During that exhibition, on or about June 17, 2008, Freedman provided Hilti with a "Condition Report" of the Purported Newman prepared by Cranmer.

136.　Cranmer had reported as of October 4, 2005 that the Purported Newman was "in **remarkably good condition**, especially given its age and pristine format." (Emphasis in original.)

137.　Knoedler offered Plaintiff the Purported Newman for between $19 million and $20 million, which, upon information and belief, was several times the auction record to that point for a Newman painting.

138.　Freedman told Plaintiff that the Purported Newman would be "a great fit to your outstanding Rothko" that she had sold Plaintiff previously (*i.e.*, the Work).

139.　Knoedler and Freedman made no effort to provide Plaintiff with information from the Rosales File.

140.　Plaintiff decided not to buy the Purported Newman because of the price demanded and because it did not fit the criteria of Plaintiff's collection.

141.　Four months later, on or about October 20, 2008, Orion issued its preliminary report concerning the two purported Motherwell "*Elegy*" paintings that Knoedler and Freedman possessed or owned (the "Orion Motherwell Report").

142. Orion found, *inter alia*, that the "materials used to make the paintings is inconsistent with the understanding that the paintings were made in the 1950s," which is when they purportedly were made and dated by Motherwell and when Rosales reported that Mr. X had supposedly directly acquired them from Motherwell's "own hand."

143. Orion found that certain pigments in the analyzed works were not used by Motherwell until about the early to mid-1960s.

144. Based on the Orion Motherwell Report, Freedman undertook to create a series of additional 'window-dressing' memos to the Rosales File in view of the Orion Motherwell Report's conclusions. The memos proceeded as follows:

145. According to one memo in the Rosales File, on or about October 24, 2008, Freedman spoke with Rosales about the Orion Motherwell Report "and the problems it raises regarding the dating of the works."

146. Freedman purportedly asked Rosales to gather additional information from Mr. X, Jr. that might be used to reconcile the dating problems raised by the Orion Motherwell Report, and "to approach Mr. X and ask again if there exists *any* tangible evidence related to these transactions." As Freedman knew, no such evidence existed or was produced.

147. According to another memo in the Rosales File, on or about November 7, 2008, Freedman purportedly had a lunch meeting with Rosales.

148. During this meeting Rosales purportedly claimed "that the transactions between Mr. X and the artists continued from the late 1940s through 1964. Mr. X's son sometimes traveled to New York with his father, and remembers going to artists' studios (although he does not remember which ones). He remembers this ending in 1964. They stopped traveling to New

York as the family ceased doing business in New York around that time. They continued after 1964 to travel to California and conduct business there, but did not buy art in that later period."

149. Upon information and belief, the "1964" date offered by Rosales's new account of Mr. X's dealings was selected to give plausibility to the authenticity of the purported Motherwell *Elegies* in light of the Orion Motherwell Report's finding that certain pigments were not used by Motherwell until the early to mid-1960s, without being too obvious that Rosales had changed the story to conform with the timing identified by Orion.

150. Freedman knew Rosales's story to be an evolving fabrication designed to address the Orion Motherwell Report. To give the appearance of plausibility, however, Freedman recorded in her memo that she "agreed to think of and discuss new questions, not previously thought about, which are raised by the expansion of the period of active buying from the previous assumption of 1959 until the later date of 1964."

151. One day after this lunch meeting, Rosales signed another statement claiming that "[t]he artworks were acquired by the current owner's father directly from the various artists, and were passed by inheritance to his immediate heirs (son and daughter)."

152. Rosales also claimed that "[i]t has recently been explained and clarified, in discussion with the owner, that his father, the original owner, was active in acquiring works between the late 1940s and 1964. The works were acquired 'off the record,' directly from the artist's [sic.] studios during trips made to New York related to the family business."

153. Rosales also claimed that "[t]he owner stopped traveling to New York due to a change in the family's business activities, and at the same time ceased purchasing works of art."

154. Again, Freedman knew that Rosales was shifting her story disingenuously to try to 'troubleshoot' the Orion Motherwell Report. In an effort to help and buttress this effort,

Freedman prepared another memo for the Rosales File two days later, on or about November 10, 2008, and offered "Another thought" that the title, "*Spanish Elegy*," instead of Motherwell's "more often used *Elegy to the Spanish Republic*," may have been "added by another hand."

155.     Freedman built upon her surmise with additional surmise that if another person had added the inapt "*Elegy*" titles to those works, that could also explain why the dates on those works were mistakenly "too early" (given the Orion Motherwell Report's finding that Motherwell did not use certain pigments until the 1960s).

156.     Thus, together Freedman and Rosales conceived and memorialized a fictitious tale that might give the appearance of plausibility were they ever investigated for their fraud.

157.     The Killala Motherwell became the object of another lawsuit, styled: *Killala Fine Art Limited v. Weissman*, No. 11 Civ. 0702 (RJS), in which Rosales was a named party (but Knoedler and Freedman were not parties).

158.     In or about October 2011, the Killala action settled. Among other things, Rosales reimbursed Killala about $650,000 for the price of the painting. The settlement agreement is public and does not include a typical "No Admission Of Wrongdoing" provision.

159.     The Killala Motherwell has since been affixed with a stamp stating that Dedalus "has determined that this painting is not an authentic work by Robert Motherwell but a forgery."

**v.     Defendants' Sale Of The "Howard de Kooning" In 2007**

160.     In or about June 2007, about four months after Knoedler sold the Killala Motherwell, Knoedler sold a purported work by Willem de Kooning, which Knoedler had acquired from Rosales as part of the Enterprise Works, to John Howard for $3.5 million (the "Howard de Kooning"). This work is the subject of an ongoing lawsuit alleging similar claims as alleged herein, styled: *Howard v. Freedman*, No. 12 Civ. 5263 (PGG) (the "Howard Action").

161. According to the complaint in the Howard action, only *two days* before selling the Howard de Kooning to Howard for $3.5 million, Knoedler had purchased the work from Rosales for only $750,000.

162. As with the Work that Knoedler sold to Plaintiff, Knoedler paid $9,000 in cash for the Howard de Kooning, gave a check for $31,000, and wire transferred $711,000 to Diaz's brother in Spain.

163. Also as with the Work, Knoedler concealed from Mr. Howard that Knoedler was the owner of the Howard de Kooning.

164. Upon information and belief, the Howard de Kooning, like the Work, is a fake and was sold as part of Defendants' Scheme.

165. Plaintiff in the Howard Action alleges that Defendants used interstate wires on numerous occasions to further their fraudulent Scheme.

**vi.** **Defendants' Sale Of The "Lagrange Pollock" In 2007**

166. In or about November 2007, Knoedler sold the Lagrange Pollock (which Knoedler and Freedman had tried to sell to Plaintiff) to G&S Trustees Limited (for the principal benefit of an individual named Pierre Lagrange) for about $17 million (about double the price that Knoedler had tried to charge Plaintiff for the same work in or about June 2004).

167. Upon information and belief, Lagrange later determined by forensic analysis, in or about 2011, that the Lagrange Pollock was a fake, and he sent a demand letter to Knoedler on or about November 29, 2011, demanding the return of the purchase price.

168. *The next day*, on or about November 30, 2011, Hammer abruptly closed Knoedler, notwithstanding an ongoing exhibition at the gallery and notwithstanding recent renovations to the gallery's space.

169.     Upon information and belief, about two years earlier, on or about October 16, 2009, Freedman abruptly "resigned" from Knoedler.

170.     Upon information and belief, Hammer forced Freedman to resign in order to make her the scapegoat to protect the gallery and Hammer himself in the event that the Scheme were to be discovered.

171.     Knoedler's sales of works acquired from Rosales yielded extraordinary profits to Knoedler, about which, upon information and belief, Hammer was aware.

172.     Each of the fraudulent works obtained from Rosales was a material transaction with respect to the business of Knoedler and was significant to the continuing operation of Knoedler, which Hammer directed.

173.     Knoedler's sales of works from Rosales resulted in extraordinary bonuses to Freedman and net revenues to Hammer.

174.     Lagrange sued Knoedler and Freedman over the Lagrage Pollock alleging similar claims as alleged herein, in an action styled: *Lagrange v. Knoedler Gallery, LLC d/b/a Knoedler & Company*, No. 11 CIV. 8757 (PGG).

175.     In or about October 2012, Knoedler and Freedman settled that lawsuit on undisclosed payment terms.

**E.     Plaintiff's Investigation Into The Work's Authenticity**

176.     In or about May 2012, Hilti called Freedman in New York at her new gallery to ask about newly surfacing information in press reports that Knoedler had been involved in a scam.

177.     Freedman asked Hilti to call her back on her private phone line.

178. Freedman misrepresented to Hilti over the telephone that Plaintiff's Rothko was genuine and that "Knoedler has nothing to do with this."

179. Freedman also misrepresented to Hilti over the telephone that Knoedler had suddenly closed "because of a divorce issue."

180. Plaintiff has engaged a forensic art analyst to examine the Work.

181. Plaintiff's analyst has found, among other things, that a particular red paint pigment known as "PR 170" appears in the Work even though that pigment was only developed in the 1960s and would not have been available to Rothko in 1956 (*i.e.*, the purported date of the Work).

182. Upon information and belief, the Work is a fake and was sold to Plaintiff as part of Defendants' Scheme.

## **FIRST CLAIM FOR RELIEF**

### **(RICO As Against All Defendants)**

183. Plaintiff repeats and realleges paragraphs 1-182 above, as if fully set forth herein.

184. Each Defendant is a "person" as defined by 18 U.S.C. § 1961(3).

185. Defendants formed an association-in-fact enterprise engaged in or affecting interstate or foreign commerce to carry out the fraudulent Scheme as described above.

186. The association-in-fact between Defendants existed for the common purpose of selling forged art. Its organization was such that Rosales and Diaz decided which art to fabricate; Freedman, and DOES 1 through 10 organized, facilitated and executed the sales of the forged art; and Knoedler, 8-31 and Hammer supervised and approved the sales of the forged art. In return, each Defendant obtained substantial monies under the false pretense of selling genuine master artworks.

187. Each Defendant was essential to, and directed the operation and management of, their association-in-fact enterprise, and the enterprise functioned as a continuous unit over the course of about a decade.

188. Knoedler used its name and reputation to attract buyers of the forged art.

189. Freedman, the President of Knoedler, used her name, reputation and skills to induce collectors to buy the forged art, and maintained the Rosales File as window-dressing for her fraudulent activities.

190. Hammer, the beneficial owner of Knoedler through 8-31, oversaw and enabled Knoedler to sell forged art, and encouraged Freedman to sell forged art by awarding her large bonuses based upon such sales.

191. Rosales and Diaz procured and delivered the forged art and introduced the forged art into the market.

192. The precise identities and roles of DOES 1-10 will be ascertained in discovery.

193. Defendants committed federal wire fraud in violation of 18 U.S.C. § 1343. Specifically, Defendants, through their association-in-fact enterprise, used wire communications in foreign commerce to defraud and to substantially advance their scheme of defrauding Plaintiff of money through the employment of the material misrepresentation that Knoedler was selling an authentic painting by Mark Rothko, while intentionally omitting the disclosure of material facts concerning Knoedler's actual acquisition and ownership of the Work, the purported provenance of the Work, and other material information from the Rosales File.

194. On or about January 9, 2002, Knoedler, Rosales and Diaz used wire communications in foreign commerce to transfer $711,000 to an account in Spain to enable Knoedler to purchase the Work.

195.     In or about late October 2002, Freedman used telephone wire communications in foreign commerce to induce Plaintiff to allow the Work to be brought to Liechtenstein so Plaintiff could "live with it" for a few days. Freedman misrepresented the Work's authenticity and provenance at this time and also omitted sharing with Plaintiff material facts from the Rosales File, including but not limited to the fact that Knoedler itself was the owner and seller of the Work.

196.     In or about early November 2002, Freedman used telephone wire communications in foreign commerce to mislead Plaintiff into believing it had decided to purchase a "fantastic" and authentic painting by Rothko with a misrepresented provenance.

197.     On or about November 6, 2002, November 7, 2002, November 8, 2002, November 12, 2002, and November 13, 2002, Knoedler used wire communications in foreign commerce to encourage and enable Plaintiff to pay, and to receive from Plaintiff, the sum of $5.5 million in exchange for the Work.

198.     Defendants each knew, expected or reasonably foresaw that these wire activities would be essential to the Scheme and would further the Scheme.

199.     Defendants' wire fraud activities constituted "racketeering activity" as defined by 18 U.S.C. § 1961(1).

200.     Upon information and belief, Defendants through their association-in-fact enterprise committed similar racketeering activities and predicate acts against a number of other victims with the same intent to defraud.

201.     Defendants engaged in a continuous pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), in that Defendants engaged in at least two acts of racketeering activity within a period of ten years of one another.

202. Defendants engaged in a closed-ended pattern of racketeering activity in that Defendants engaged in a series of related predicate acts extending over and throughout a substantial period of time (*i.e.*, at least a decade).

203. Defendants engaged in an open-ended pattern of racketeering activity in that Defendants operated as part of a long-term association-in-fact for the criminal purpose of defrauding art purchasers, and in that Defendants' predicate acts were a regular way of conducting an ongoing RICO enterprise such that there was, during the period the acts were conducted, a continued threat of criminal activity. The activity consisted of a series of acts with a common purpose (the marketing and sale of the Enterprise Works) that lasted over a period of at least a decade and that posed and may still pose a continued threat of criminal activity.

204. Defendants' racketeering activities against Plaintiff and other victims were related to one another in methodologies, were in furtherance of a common goal of making millions of dollars in profits upon the fraudulent sales of forged art, and targeted similar victims (*i.e.*, wealthy collectors of art).

205. But for the pattern of racketeering activities conducted by Defendants, Plaintiff would not have suffered injury.

206. The pattern of racketeering activities proximately caused Plaintiff's injury in that Plaintiff's injury was reasonably foreseeable.

207. Plaintiff suffered a loss to its business or property by reason of Defendants' racketeering activities in an amount to be determined at trial, but not less than $5.5 million, plus prejudgment statutory interest.

208. As a consequence of the aforesaid, Plaintiff is entitled to trebled damages and to reimbursement of its costs and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

### (RICO Conspiracy As Against All Defendants)

209.  Plaintiff repeats and realleges paragraphs 1-208 above, as if fully set forth herein.

210.  In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) by knowingly agreeing and conspiring to directly or indirectly conduct or participate in the affairs of an enterprise through the pattern of racketeering described in paragraphs 183 through 208 above.

211.  The conspiracy commenced between Defendants by no later than about 2001, and each Defendant committed essential and overt acts in furtherance of the pattern of racketeering activities described above.

212.  Each Defendant was aware of the nature of their conspiracy and that the conspiracy extended beyond each Defendant and involved the other Defendants.

213.  As a direct and proximate consequence of Defendants' conspiracy, and by reason thereof, Plaintiff was injured in its business or property in an amount not less than $5.5 million, plus prejudgment statutory interest, in violation of 18 U.S.C. § 1962(d).

214.  As a consequence of the aforesaid, Plaintiff is entitled to trebled damages and to reimbursement of its costs and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF

### (RICO As Against All Defendants Except Knoedler)

215.  Plaintiff repeats and realleges paragraphs 1-182 above, as if fully set forth herein.

216.  Freedman, Hammer, 8-31, Rosales, Diaz, and DOES 1-10 (collectively, the "Enterprise Defendants") are each "persons" as defined by 18 U.S.C. § 1961(3).

217. The Enterprise Defendants exploited and used Knoedler as their enterprise, engaging in or affecting interstate or foreign commerce to carry out the fraudulent Scheme as described above.

218. The Enterprise Defendants operated with the common purpose of selling forged art. Its organization was such that Rosales and Diaz decided which art to fabricate and to introduce into the market through Knoedler; Freedman, and DOES 1 through 10 organized, facilitated and executed the sales of the forged art through Knoedler; and 8-31 and Hammer supervised and approved the sales of the forged art and directed the business activities of Knoedler. In return, each of the Enterprise Defendants obtained substantial monies under the false pretense of selling genuine master artworks.

219. Each of the Enterprise Defendants was essential to, and directed the operation and management of, their enterprise, and their enterprise functioned as a continuous unit over the course of about a decade.

220. Freedman, the President of Knoedler, used her name, reputation and skills to induce collectors to buy the forged art, and maintained the Rosales File as window-dressing for her fraudulent activities.

221. Hammer, the beneficial owner of Knoedler through 8-31, oversaw and enabled Knoedler to sell forged art, and encouraged Freedman to sell forged art by awarding her large bonuses based upon such sales.

222. Rosales and Diaz procured and delivered the forged art and introduced the forged art into the market.

223. The precise identities and roles of DOES 1-10 will be ascertained in discovery.

224. The Enterprise Defendants committed federal wire fraud in violation of 18 U.S.C. § 1343. Specifically, the Enterprise Defendants, through their enterprise, used wire communications in foreign commerce to defraud and to substantially advance their scheme of defrauding Plaintiff of money through the employment of the material misrepresentation that Knoedler was selling an authentic painting by Mark Rothko, while intentionally omitting the disclosure of material facts concerning Knoedler's actual acquisition and ownership of the Work, the purported provenance of the Work, and other material information from the Rosales File.

225. On or about January 9, 2002, Freedman, Rosales and Diaz used wire communications in foreign commerce to transfer $711,000 to an account in Spain to enable Knoedler to purchase the Work.

226. In or about late October 2002, Freedman used telephone wire communications in foreign commerce to induce Plaintiff to allow the Work to be brought to Liechtenstein so Plaintiff could "live with it" for a few days. Freedman misrepresented the Work's authenticity and provenance at this time and also omitted sharing with Plaintiff material facts from the Rosales File, including but not limited to the fact that Knoedler itself was the owner and seller of the Work.

227. In or about early November 2002, Freedman used telephone wire communications in foreign commerce to mislead Plaintiff into believing it had decided to purchase a "fantastic" and authentic painting by Rothko with a misrepresented provenance.

228. On or about November 6, 2002, November 7, 2002, November 8, 2002, November 12, 2002, and November 13, 2002, Freedman used wire communications in foreign commerce to encourage and enable Plaintiff to pay, and to receive from Plaintiff, the sum of $5.5 million in exchange for the Work.

229. The Enterprise Defendants each knew, expected or reasonably foresaw that these wire activities would be essential to the Scheme and would further the Scheme.

230. The Enterprise Defendants' wire fraud activities constituted "racketeering activity" as defined by 18 U.S.C. § 1961(1).

231. Upon information and belief, the Enterprise Defendants committed similar racketeering activities and predicate acts against a number of other victims with the same intent to defraud.

232. The Enterprise Defendants engaged in a continuous pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), in that the Enterprise Defendants engaged in at least two acts of racketeering activity within a period of ten years of one another.

233. The Enterprise Defendants engaged in a closed-ended pattern of racketeering activity in that the Enterprise Defendants engaged in a series of related predicate acts extending over and throughout a substantial period of time (*i.e.*, at least a decade).

234. The Enterprise Defendants engaged in an open-ended pattern of racketeering activity in that the Enterprise Defendants operated Knoedler for the criminal purpose of defrauding art purchasers, and in that the Enterprise Defendants' predicate acts were a regular way of conducting Knoedler's business such that there was, during the period the acts were conducted, a continued threat of criminal activity. The activity consisted of a series of acts with a common purpose (the marketing and sale of the Enterprise Works) that lasted over a period of at least a decade and that posed and may still pose a continued threat of criminal activity.

235. The Enterprise Defendants' racketeering activities against Plaintiff and other victims were related to one another in methodologies, were in furtherance of a common goal of

making millions of dollars in profits upon the fraudulent sales of forged art, and targeted similar victims (*i.e.*, wealthy collectors of art).

236. But for the pattern of racketeering activities conducted by the Enterprise Defendants, Plaintiff would not have suffered injury.

237. The pattern of racketeering activities proximately caused Plaintiff's injury in that Plaintiff's injury was reasonably foreseeable.

238. Plaintiff suffered a loss to its business or property by reason of the Enterprise Defendants' racketeering activities in an amount to be determined at trial, but not less than $5.5 million, plus prejudgment statutory interest.

239. As a consequence of the aforesaid, Plaintiff is entitled to trebled damages and to reimbursement of its costs and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### (RICO Conspiracy As Against All Defendants Except Knoedler)

240. Plaintiff repeats and realleges paragraphs 1-182 and 215-239 above, as if fully set forth herein.

241. In violation of 18 U.S.C. § 1962(d), the Enterprise Defendants conspired to violate the provisions of 18 U.S.C. § 1962I by knowingly agreeing and conspiring to directly or indirectly conduct or participate in the affairs of an enterprise through the pattern of racketeering described in paragraphs 215 through 239 above.

242. The conspiracy commenced between each of the Enterprise Defendants by no later than about 2001, and each committed essential and overt acts in furtherance of the pattern of racketeering activities described above.

243. Each of the Enterprise Defendants was aware of the nature of their conspiracy and that the conspiracy extended beyond each of the Enterprise Defendants and involved the other Enterprise Defendants.

244. As a direct and proximate consequence of the Enterprise Defendants' conspiracy, and by reason thereof, Plaintiff was injured in its business or property in an amount not less than $5.5 million, plus prejudgment statutory interest, in violation of 18 U.S.C. § 1962(d).

245. As a consequence of the aforesaid, Plaintiff is entitled to trebled damages and to reimbursement of its costs and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

### (N.Y. Gen. Bus. Law §§ 349-350 As Against Knoedler, 8-31 and Hammer)

246. Plaintiff repeats and realleges paragraphs 1-182 above, as if fully set forth herein.

247. Knoedler made material misrepresentations and omissions of fact to Plaintiff in New York in attempting to sell the Work to Plaintiff.

248. Knoedler falsely advertised and misrepresented the Work to Plaintiff as an authentic Rothko in New York, omitted sharing material information from the Rosales File with Plaintiff in New York, and provided a photo of the Work to Plaintiff in New York.

249. Plaintiff was deceived by Knoedler's acts, omissions and practices in New York, which Knoedler committed in the conduct of its business, trade or commerce in the state.

250. Plaintiff was injured as a result of Knoedler's misconduct.

251. Knoedler's misconduct concerning the Enterprise Works, including the Work, was consumer-oriented in that it was directed at consumers who were similarly situated to Plaintiff.

252.   A reasonable consumer in Plaintiff's circumstances would likely have been misled by Knoedler's misconduct.

253.   Knoedler engaged in deceptive trade practices and false advertising, pursuant to N.Y. Gen. Bus. Law §§ 349 and 350, respectively.

254.   Due to the concealment of material facts until only recently, including but not limited to the information in the Rosales File, Plaintiff was unaware and could not have become aware of Knoedler's misconduct until 2012.

255.   Indeed, until May 2012, Freedman continued to try to conceal material facts and mislead Plaintiff into thinking that Knoedler abruptly closed due to a supposed "divorce issue," in order to deceive Plaintiff into not investigating the matter or bringing any cause of action.

256.   Accordingly, the statute of limitations for this claim is tolled by the doctrine of equitable estoppel.

257.   Plaintiff is entitled to an award of not less than $5.5 million in actual damages, plus prejudgment statutory interest, together with reimbursement of Plaintiff costs and reasonable attorneys' fees.

258.   Hammer is ultimately responsible for Knoedler's liability as Knoedler's alter ego because Hammer, through his alter ego 8-31 which is the sole owner of Knoedler, exercised complete domination and management of Knoedler and used that domination and control to falsely advertise and misrepresent the Enterprise Works, including the Work.

## SIXTH CLAIM FOR RELIEF

### (Fraud As Against Knoedler, 8-31, Hammer and Freedman)

259.   Plaintiff repeats and realleges paragraphs 1-182 above, as if fully set forth herein.

260.     Knoedler and Freedman intentionally made material misrepresentations of fact to Plaintiff to induce Plaintiff to purchase the Work.

261.     Knoedler and Freedman also intentionally omitted material facts from Plaintiff to induce Plaintiff to purchase the Work.

262.     Knoedler and Freedman acted with the intent to deceive Plaintiff into purchasing the Work.

263.     Plaintiff actually and justifiably relied on Knoedler's and Freedman's material misrepresentations and omissions of fact in purchasing the Work for $5.5 million, and those material misrepresentations and omissions of fact proximately caused Plaintiff injury in an amount not less than $5.5 million, plus prejudgment statutory interest and plus punitive damages in an amount to be determined at trial but not less than $5.5 million.

264.     Due to the concealment of material facts until only recently, including but not limited to the information in the Rosales File, Plaintiff was unaware and could not have become aware of Knoedler's and Freedman's fraud until 2012.

265.     Indeed, until May 2012, Freedman continued to try to conceal material facts and mislead Plaintiff into thinking that Knoedler abruptly closed due to a supposed "divorce issue," in order to deceive Plaintiff into not investigating the matter or bringing any cause of action.

266.     Hammer is ultimately responsible for Knoedler's liability as Knoedler's alter ego because Hammer, through his alter ego 8-31 which is the sole owner of Knoedler, exercised complete domination and management of Knoedler and used that domination and control to convey the forged Work to Plaintiff thereby injuring Plaintiff.

## SEVENTH CLAIM FOR RELIEF

### (Fraud As Against Knoedler and Freedman)

267.    Plaintiff repeats and realleges paragraphs 1-182 above, as if fully set forth herein.

268.    Knoedler and Freedman intentionally made material misrepresentations of fact to Plaintiff to induce Plaintiff to purchase the Work.

269.    Knoedler and Freedman also intentionally omitted material facts from Plaintiff to induce Plaintiff to purchase the Work.

270.    Knoedler and Freedman acted with the intent to deceive Plaintiff into purchasing the Work.

271.    Plaintiff actually and justifiably relied on Knoedler's and Freedman's material misrepresentations and omissions of fact in purchasing the Work for $5.5 million, and those material misrepresentations and omissions of fact proximately caused Plaintiff injury in an amount not less than $5.5 million, plus prejudgment statutory interest and plus punitive damages in an amount to be determined at trial but not less than $5.5 million.

272.    Due to the concealment of material facts until only recently, including but not limited to the information in the Rosales File, Plaintiff was unaware and could not have become aware of Knoedler's and Freedman's fraud until 2012.

273.    Indeed, until May 2012, Freedman continued to try to conceal material facts and mislead Plaintiff into thinking that Knoedler abruptly closed due to a supposed "divorce issue," in order to deceive Plaintiff into not investigating the matter or bringing any cause of action.

## EIGHTH CLAIM FOR RELIEF

### (Aiding and Abetting Fraud As Against Hammer, 8-31, Rosales and Diaz)

274.    Plaintiff repeats and realleges paragraphs 1-182 and 267-273 above, as if fully set forth herein.

275.    Knoedler and Freedman perpetrated a fraud upon Plaintiff as set forth above.

276.    Hammer and 8-31 knew of the fraud by their domination and management of Knoedler, and by their awareness that Knoedler was selling the Work to Plaintiff in or about November 2002 in a grossly disproportionate amount (*i.e.*, $5.5 million) to what Knoedler had paid to acquire the Work from Rosales in or about January 2002 (*i.e.*, $750,000).

277.    Hammer and 8-31 provided substantial assistance by encouraging the fraud that was perpetrated upon Plaintiff, and by encouraging the misrepresentation of material facts and the omission of material facts concerning the Scheme from Plaintiff.

278.    Rosales and Diaz knew of and provided substantial assistance to the fraud by enabling Knoedler and Freedman to sell the forged Work to Plaintiff for a multi-million dollar profit.

279.    The actions of Hammer, 8-31, Rosales and Diaz in enabling, encouraging, and failing to disclose the fraud proximately caused Plaintiff's damages.

280.    Plaintiff is entitled to damages in an amount not less than $5.5 million, plus prejudgment statutory interest, together with punitive damages in an amount to be determined at trial but not less than $5.5 million.

## NINTH CLAIM FOR RELIEF

### (Conspiracy to Commit Fraud As Against Hammer, 8-31, Rosales and Diaz)

281. Plaintiff repeats and realleges paragraphs 1-182 and 267-273 above, as if fully set forth herein.

282. Knoedler and Freedman perpetrated a fraud upon Plaintiff as set forth above.

283. Along with Knoedler and Freedman, defendants Hammer, 8-31, Rosales and Diaz maintained a corrupt agreement and enterprise in which each committed an overt act in furtherance of a conspiracy to knowingly misrepresent the authenticity and provenance of the Work to defraud Plaintiff of $5.5 million.

284. Plaintiff was proximately injured as a result and has suffered damages in an amount not less than $5.5 million, plus prejudgment statutory interest, together with an award of punitive damages in an amount to be determined at trial but not less than $5.5 million.

## TENTH CLAIM FOR RELIEF

### (Breach of Warranty As Against Knoedler, 8-31 and Hammer)

285. Plaintiff repeats and realleges paragraphs 1-182 above, as if fully set forth herein.

286. At all relevant times, Knoedler was an art merchant.

287. Plaintiff is not an art merchant.

288. Pursuant to both N.Y.U.C.C. § 2-313(1) and § 13.01 of the N.Y. Arts and Cultural Affairs Law, Knoedler expressly warranted to Plaintiff that the Work was authentic and that the Work had a particular provenance.

289. Both of these warranties by Knoedler were false.

290. Plaintiff actually and justifiably relied on both warranties in purchasing the Work.

291. Plaintiff is entitled to rescind its $5.5 million contract to purchase the Work under the doctrine of equitable tolling, due the Knoedler's intentional concealment of material facts that were uniquely in its possession, and due to its repeated efforts over to time to mislead Plaintiff into believing that the Work was a "fantastic Rothko" and was exactly as it had falsely warranted. Those efforts by Knoedler induced Plaintiff not to suspect any wrongdoing by Knoedler, not to conduct an investigation into the Work's authenticity sooner, and not to commence this action sooner.

292. Plaintiff is entitled to damages in an amount not less than $5.5 million, plus prejudgment statutory interest.

293. Hammer is ultimately responsible for Knoedler's liability as Knoedler's alter ego because Hammer, through his alter ego 8-31 which is the sole owner of Knoedler, exercised complete domination and management of Knoedler and used that domination and control to convey the forged Work to Plaintiff thereby injuring Plaintiff.

## ELEVENTH CLAIM FOR RELIEF

### (Unilateral Mistake of Fact As Against Knoedler, 8-31 and Hammer)

294. Plaintiff repeats and realleges paragraphs 1-182 above, as if fully set forth herein.

295. When Plaintiff agreed to purchase the Work, he mistakenly understood the Work to be an authentic painting by Mark Rothko with a particularly described provenance.

296. Knoedler knew that it had misrepresented the Work's provenance and authenticity.

297. Plaintiff's unilateral mistakes of fact were fundamental to its agreement to purchase the Work, and were induced by Knoedler's fraud and intentional concealment of material facts indicating that the Work was not authentic and was not being sold according to the purported provenance stated by Knoedler.

298.     Plaintiff is entitled to rescind its $5.5 million contract to purchase the Work under the doctrine of equitable tolling.

299.     Plaintiff is entitled to damages in an amount not less than $5.5 million, plus prejudgment statutory interest.

300.     Hammer is ultimately responsible for Knoedler's liability as Knoedler's alter ego because Hammer, through his alter ego 8-31 which is the sole owner of Knoedler, exercised complete domination and management of Knoedler and used that domination and control to convey the forged Work to Plaintiff thereby injuring Plaintiff.

## TWELFTH CLAIM FOR RELIEF

### (Mutual Mistake of Fact As Against Knoedler, 8-31 and Hammer)

301.     Plaintiff repeats and realleges paragraphs 1-182 above, as if fully set forth herein.

302.     When Plaintiff agreed to purchase the Work, he mistakenly understood the Work to be an authentic painting by Mark Rothko.

303.     To the extent that Knoedler may be found also to have mistakenly understood the Work to be authentic, the purchase and sale agreement between Plaintiff and Knoedler is the product of a mutual mistake of fact that is fundamental to the parties' contract.

304.     Plaintiff is entitled to rescind its $5.5 million contract to purchase the Work under the doctrine of equitable tolling.

305.     Plaintiff is entitled to damages in an amount not less than $5.5 million, plus prejudgment statutory interest.

306.     Hammer is ultimately responsible for Knoedler's liability as Knoedler's alter ego because Hammer, through his alter ego 8-31 which is the sole owner of Knoedler, exercised

complete domination and management of Knoedler and used that domination and control to convey the forged Work to Plaintiff thereby injuring Plaintiff.

WHEREFORE, Plaintiff demands judgment in its favor as follows:

A.      On its First Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, trebled, plus reimbursement of Plaintiff's reasonable attorneys' fees and costs;

B.      On its Second Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, trebled, plus reimbursement of Plaintiff's reasonable attorneys' fees and costs;

C.      On its Third Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, trebled, plus reimbursement of Plaintiff's reasonable attorneys' fees and costs;

D.      On its Fourth Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, trebled, plus reimbursement of Plaintiff's reasonable attorneys' fees and costs;

E.      On its Fifth Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, plus reimbursement of Plaintiff's reasonable attorneys' fees and costs;

F.      On its Sixth Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, plus punitive damages in an amount to be determined at trial but not less than $5.5 million;

G.      On its Seventh Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, plus punitive damages in an amount to be determined at trial but not less than $5.5 million;

H.      On its Eighth Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, plus punitive damages in an amount to be determined at trial but not less than $5.5 million;

I.      On its Ninth Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest, plus punitive damages in an amount to be determined at trial but not less than $5.5 million;

J.      On its Tenth Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest;

K.      On its Eleventh Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest;

L.      On its Twelfth Claim for Relief, damages in an amount not less than $5.5 million, plus prejudgment statutory interest; and

M.      Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: New York, New York
      January 29, 2013

PRYOR CASHMAN LLP

By: _____
      James A. Janowitz
      William L. Charron
      Stephanie R. Kline
7 Times Square
New York, New York 10036
(212) 421-4100

*Attorneys for Plaintiff*
*The Martin Hilti Family Trust*