USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 30, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE MARTIN HILTI FAMILY TRUST,

                    Plaintiff,

        - against -

KNOEDLER GALLERY, LLC d/b/a
KNOEDLER & COMPANY, ANN
FREEDMAN, MICHAEL HAMMER, 8-31
HOLDINGS, INC., GLAFIRA ROSALES,
JOSE CARLOS BERGANTINOS DIAZ,
JESUS ANGEL BERGANTINOS DIAZ,
PEI-SHEN QIAN, PER HAUBRO
JENSEN, JAIME ANDRADE, and
HAMMER GALLERIES, LLC,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

13 Civ. 0657 (PGG)

FRANCES HAMILTON WHITE,

                    Plaintiff,

        - against -

ANN FREEDMAN, GLAFIRA ROSALES,
KNOEDLER GALLERY, LLC, d/b/a
KNOEDLER & COMPANY, MICHAEL
HAMMER, 8-31 HOLDINGS, INC., JOSÉ
CARLOS BERGANTINOS DIAZ, JAIME
R. ANDRADE, JESUS ANGEL
BERGANTINOS DIAZ, and PEI SHEN
QIAN,

                    Defendants.

13 Civ. 1193 (PGG)

THE ARTHUR TAUBMAN TRUST,
EUGENIA TAUBMAN, and NICHOLAS
TAUBMAN,

                    Plaintiffs,

13 Civ. 3011 (PGG)

- against -

KNOEDLER GALLERY, LLC, d/b/a
KNOEDLER & COMPANY, 8-31
HOLDINGS, INC., ANN FREEDMAN,
MICHAEL HAMMER, GLAFIRA
ROSALES, and JOSÉ CARLOS
BERGANTINOS DIAZ,

                        Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

              In these actions, Plaintiffs claim that certain paintings they purchased from

Defendant Knoedler Gallery, LLC ("Knoedler") are forgeries.  In addition to Knoedler, all

Plaintiffs name the following as defendants:  8-31 Holdings Inc. ("8-31"), Knoedler's sole

member; Michael Hammer, Knoedler's managing member and the owner of 8-31 Holdings, Inc.;

Ann Freedman, Knoedler's former president; Glafira Rosales, a Long Island art dealer who

brought the forged paintings to Knoedler; and Jose Carlos Bergantinos Diaz, Rosales's "longtime

companion."  The Martin Hilti Family Trust ("Hilti") and Frances White also name as

defendants Jaime Andrade, a former Knoedler employee; Jesus Angel Bergantinos Diaz,

Carlos's brother; and Pei-Shen Qian, a Chinese artist based in Queens who allegedly created the

forged paintings.[1]  Hilti also asserts claims against Hammer Galleries, LLC.[2]

              Plaintiffs claim that Knoedler sold nearly forty paintings it acquired from Rosales,

and that all of these paintings – allegedly created by well-known American Abstract

Expressionist artists – are forgeries.  Plaintiffs contend that Defendants knew as early as October

---

[1]  Rosales, the Diaz brothers, and Qian have not appeared in these cases.

[2]  Per Haubro Jensen is named as a defendant in the <u>Hilti</u> action but has not appeared.

2003 that these paintings were not authentic, but nonetheless continued to sell them to unsuspecting buyers.

Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and state law causes of action for fraud, fraudulent concealment, aiding and abetting fraud, fraud conspiracy, deceptive trade practices and false advertising, breach of warranty, and unilateral and mutual mistake.

Defendants Knoedler, Freedman, Hammer, 8-31, and Hammer Galleries LLC have moved to dismiss all claims against them under Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND[3]

### I.   FACTS

#### A.   Rosales' Initial Contact with the Knoedler Gallery

Prior to its closing, the Knoedler Gallery was one of the oldest and most reputable art galleries in the world.  (Amended Complaint ("Am. Cmplt.") (Hilti Dkt. No. 46) ¶ 48; Am. Cmplt. (White Dkt. No. 37) ¶ 33)  In April 2000, Frances Hamilton White and her then husband purchased a purported Jackson Pollock painting from Knoedler and its president, Ann Freedman, for $3.1 million.  (Am. Cmplt. (White Dkt. No. 37) ¶ 1)  On November 6, 2002, the Martin Hilti Family Trust purchased a purported Mark Rothko painting from Knoedler for $5.5 million. (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 1, 7)  In November 2005, the Taubmans purchased a

---

[3] The Court's statement of facts is drawn from allegations set forth in Plaintiffs' amended complaints.  These factual allegations are presumed true for purposes of resolving Defendants' motions to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  In deciding a motion to dismiss, a Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

purported Clyfford Still painting from Knoedler for $4.3 million.  (Am. Cmplt. (<u>Taubman</u> Dkt.

No. 39) ¶ 1)  All of these paintings are forgeries.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 1; Am.

Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 1, 5, 43, 94; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 4, 140, 145,

148)  The paintings Plaintiffs purchased from Knoedler were supplied by Glafira Rosales, a

Long Island art dealer.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 63; Am. Cmplt. (<u>White</u> Dkt. No. 37)

¶¶ 6, 37; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 75)

   In the early-to-mid-1990's, Defendant Jaime Andrade, a Knoedler employee,

introduced Defendant Glafira Rosales and Jose Carlos Bergantinos Diaz to Freedman and others

at Knoedler.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 72; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 24;

<u>Taubman</u> Am. Cmplt. ¶ 23)  Knoedler and Freedman did not investigate Rosales and Diaz's

background, although Diaz had previously been associated with the sale of forged art work.

(<u>Taubman</u> Am. Cmplt. ¶ 31)

   The first series of art works Rosales brought to Knoedler included a number of

purported Richard Diebenkorn paintings.  The paintings had allegedly been acquired from the

Vijande Gallery in Madrid, Spain.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 74-75; Am. Cmplt.

(<u>White</u> Dkt. No. 37) ¶ 25; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 24)  In reality, the

"Diebenkorns" had been created by Qian, with the knowledge and assistance of Rosales and the

Diaz brothers.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 76; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 25)

Shortly after Rosales brought these paintings to Knoedler, representatives of Diebenkorn's

family and estate – the leading experts on Diebenkorn's work – viewed two of the works and

told Freedman that these paintings did not appear to be authentic.  (Am. Cmplt. (<u>Hilti</u> Dkt. No.

46) ¶ 77; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 25; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 25)

Between 1994 and 1998, however, Knoedler and Freedman – whom Hammer had made

president of Knoedler in 1994 – sold all of the purported Deibenkorns to various buyers without corroborating Rosales's provenance story or disclosing the doubts expressed by the Diebenkorn family and estate.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 78; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 25; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 23, 26-27)

       In 1996, Rosales told Freedman that she had gained access to a collection of paintings by leading American Abstract Expressionist artists, including Mark Rothko, Robert Motherwell, Jackson Pollock, Willem de Kooning, Barnett Newman, Clyfford Still, Franz Kline, Sam Francis, and Lee Krasner.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 28; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 12; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 6)  According to Rosales, this collection of Abstract Expressionist masterworks was owned by a Mexican friend – the son of a deceased art collector – whose identity she had sworn to keep secret.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 28)  Rosales told Freedman that, as a child in Mexico, she had met a European couple who – decades ago – purchased numerous works directly from now-famous Abstract Expressionist painters.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 27)  Rosales referred to the deceased collector and his son as "Mr. X" and "Mr. X, Jr."  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 27; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 28)

       Rosales stated that Mr. X – who was either of Swiss or Mexican descent – had acquired these paintings "directly from the artists" and "off the record" in New York City, either between the 1950s and early 1960s, or between the late 1940s and 1964, during business trips Mr. X made to the United States in connection with his sugar business.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 13, 64-65, 82)  After Mr. X and his wife died in the early 1990s, their two children inherited the paintings.  The children were not interested in art, however, and wanted to sell the

paintings, and to do so anonymously.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 82; Am. Cmplt. (<u>White</u>

Dkt. No. 37) ¶ 27; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 28)

        Rosales had no documentation concerning Mr. X's acquisition of the paintings or

any other materials corroborating her story or the purported provenance[4] of the works.

(<u>Taubman</u> Am. Cmplt. ¶ 28)  Rosales claimed that Mr. X's daughter (also unidentified) had

destroyed all of the paperwork concerning the paintings after Mr. X and his wife died.  (Am.

Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 68)  In any event, Mr. X purchased the paintings with cash.  (Am.

Cmplt. (<u>White</u> Dkt. No. 37) ¶ 28)  Mr. X's collection had never been displayed, and the paintings

had been stored and wrapped in a "sealed" container in Mexico.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46)

¶ 14, 69)

        In reality, Rosales and Jose Carlos Bergantinos Diaz had purchased the paintings

at issue from Pei-Shen Qian, a Chinese painter then living in Queens.  (Am. Cmplt. (<u>Hilti</u> Dkt.

No. 46) ¶ 17-18, 55; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 6; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39)

¶¶ 19-20)  Jose Carlos Bergantinos Diaz met Qian in the late 1980s in New York City, where

Qian was selling his own art.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 19; Am. Cmplt. (<u>White</u> Dkt. No.

37) ¶ 22; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 19)  From the early 1990s through the 2000s,

Diaz and his brother, Jesus Bergantinos Diaz, paid Qian to paint or draw dozens of art works in

the styles of famous artists.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 20; Am. Cmplt. (<u>White</u> Dkt. No.

37) ¶ 22; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 19)  Jose Carlos Bergantinos Diaz provided Qian

with certain paints, canvasses, and other materials for Qian to use in creating the works, in order

to make them appear authentic.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 24; Am. Cmplt. (<u>White</u> Dkt.

---

[4] "Provenance" is defined as "the history of ownership of a valued object or work of art or
literature."  Merriam Webster, http://www.merriam-webster.com/dictionary/provenance (last
visited September 29, 2015).

No. 37) ¶ 23; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 21)  The two men forged artists' signatures

on these works, and Jose Carlos Bergantinos Diaz treated the works through various methods in

order to make them appear aged.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 22-23; Am. Cmplt. (<u>White</u>

Dkt. No. 37) ¶ 23; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 22)

> **B.      The Knoedler Gallery Begins Trading in, and**
> **Developing a Provenance for, the Rosales Paintings**

          In December 1996, Knoedler began trading in Abstract Expressionist paintings

that Rosales claimed were part of Mr. X's collection (the "Rosales Paintings").  Knoedler's first

acquisition was a purported work by Mark Rothko, purchased for $225,000.  (Am. Cmplt.

(<u>Taubman</u> Dkt. No. 39) ¶ 35)  Four months later, Freedman acquired this Rothko from Knoedler

in an "even trade" for a Diebenkorn that she had purchased in 1991 for $100,000.  (<u>Id.</u>)  In 1997,

Knoedler purchased a second "Rothko" from Rosales for $150,000, and re-sold the work within

a month for $360,000.  (<u>Taubman</u> Am. Cmplt. ¶ 35 n.5)

          In February 1998, a prospective buyer cancelled his purchase of two Rosales

Paintings – a "Rothko" and a "Kline" – after learning from Freedman that Knoedler would not

provide the name of "the original collector who acquired the works in 1960."  (<u>Taubman</u> Am.

Cmplt. ¶ 36)  The Knoedler invoice for the cancelled sale lists the provenance of these works as

follows:

          **PROVENANCE** (for both):  Private Collection, Mexico

(Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 37)

          During a June 18, 1998 meeting at Knoedler, Rosales told Freedman that she had

five Abstract Expressionist works available for sale, including paintings by Still, de Kooning,

Motherwell, and Newman.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 80; Am. Cmplt. (<u>White</u> Dkt. No.

37) ¶ 26; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 40)  Knoedler ultimately acquired more than five

Abstract Expressionist works from Rosales, including works by additional artists such as Rothko, Pollock, Kline, Francis, and Krasner.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 81; Am. Cmplt. (Taubman Dkt. No. 39) ¶ 44)

At the June 18, 1998 meeting, Rosales also recounted details about Mr. X's background, family, acquaintances, and businesses.  Rosales told Freedman that Mr. X's "American paintings were acquired directly from the artists"; that his son, the current owner of the collection, "maintain[ed] residences in Mexico City . . . and Zurich"; and that although there had once existed letters written between the artists and Mr. X, these had all been "disposed of" after Mr. X's death.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 38)  Rosales did not mention anyone who served as an intermediary between Mr. X and the artists from whom Mr. X acquired the works in his collection.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 38-39)

On July 1, 1998, Knoedler sold the "Rothko" that had been the subject of the cancelled sale to a different client.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 41)  The invoice for this sale lists the work's provenance as follows:

> **PROVENANCE []**
>
> Acquired directly from the Artist in the early 1960's.
> Private Collection, Mexico and Switzerland

(Id.)

On August 5, 1998, Rosales told Freedman that Mr. X's collection included a Motherwell, two paintings by Newman, two paintings by Still, and a Jackson Pollock.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 42)  Rosales did not state or suggest that any person acted as an intermediary between Mr. X and these artists.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 43)

After the August 5, 1998 meeting, Knoedler purchased or accepted on consignment at least twenty-three Rosales Paintings.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 44)

Rosales sold these works to Knoedler at a fraction of the price that Freedman and Knoedler later obtained for these paintings on the open market.  (Am. Cmplt. (White Dkt. No. 37) ¶ 29; Am. Cmplt. (Taubman Dkt. No. 39) ¶ 32)  In selling these works, Knoedler and Freedman used portions of Rosales' original provenance story, buttressed with additional fabricated information. (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 33)  Freedman began referring to Mr. X as the "Secret Santa."  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 30)

Rosales brought the Rosales Paintings only to Knoedler and one other gallery owned by a former Knoedler employee, Julian Weissman.[5]  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 15)

In 1999 or early 2000, Freedman asked Rosales whether it was possible that Mr. X had purchased the Rosales Paintings through Alfonso Ossorio, a well-known Abstract Expressionist artist and collector who lived near Pollock on Long Island.  Ossorio – who was deceased – had been a friend and colleague of many of the leading Abstract Expressionist artists. (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 46-47; Am. Cmplt. (White Dkt. No. 37) ¶ 57; Am. Cmplt. (Hilti Dkt. No. 46) ¶ 84)  In January 2000, Rosales told Freedman that Mr. X, Jr. had "confirmed" that his father – in purchasing the Rosales Paintings – had relied on Ossorio's advice.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 84-85; Am. Cmplt. (White Dkt. No. 37) ¶ 57; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 45-48)  Knoedler employees and consultants then attempted to find corroboration for the theory that Mr. X had acquired his collection with Ossorio's help. (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 50)  Although this research yielded no corroboration (see id.), beginning in December 2001, Knoedler began using Ossorio's name in connection with

---

[5] Rosales sold or consigned 23 works to Weissman's gallery.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 110)

presentations about the provenance of Rosales Paintings.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 51)  The <u>Taubman</u> Plaintiffs allege that it is highly unusual for an art dealer to (1) change a provenance; or (2) include an agent or adviser in a work's provenance, because a provenance addresses prior owners of a work of art.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 52)

**C.  Levy's 2001 Purchase of the "Green Pollock" and Changes in the Alleged Provenance of the Rosales Paintings**

In March 2001, Knoedler purchased a purported Jackson Pollock – <u>Untitled 1949</u> (the "Green Pollock") – from Rosales for $750,000.  In late 2001, Freedman and Knoedler sold this painting to Jack Levy for $2 million.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 87; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 56; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 56-57)  The invoice documenting the sale to Levy describes the work's provenance as follows:

> **PROVENANCE []**
> The Artist
> Alfonso Ossorio
> Private Collection, Switzerland (by descent to present owner)
> Knoedler & Company, New York

(Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 57)  Freedman told Levy that the owner's father, a Swiss collector, had acquired the work through Ossorio, who was a known collector of Pollock's work. (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 89; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 57; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 59)  The sale to Levy was conditioned, however, on a favorable review of the work's provenance and authenticity by the International Foundation for Art Research ("IFAR").  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 88; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 57; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 58)

On October 9, 2003, IFAR issued its report on the Green Pollock.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 90; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 59; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 61)  IFAR refused to certify the painting's authenticity and cast serious doubt on the

purported provenance of the painting.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 55)  The report states that the "negatives" concerning the authenticity of the Green Pollock were "very convincing;" that the artist's signature was "suspect;" and that "too many reservations exist to make a positive attribution to Jackson Pollock."  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 59; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 61)  IFAR also found that the technique and style of the Green Pollock was not consistent with Pollock's technique and style.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 91)  The report also states that it is "inconceivable" that the work had passed through Ossario's hands yet had never been added to the catalogue raisonné[6] for Pollock.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 90; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 59; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 61)  As a result of the IFAR report, the sale of the Green Pollock was cancelled, and Knoedler refunded the purchase price to Levy.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 93; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 55, 62)

Freedman informed Hammer of the IFAR report's conclusions and the cancelled sale to Levy.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 95)  Hammer read the IFAR report "very carefully."  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 95, 97; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 61; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 63)  Hammer also reviewed an internal Knoedler memo stating that the IFAR report raised questions about the Green Pollock's "authenticity" and "authorship," and noting that "IFAR is held in high esteem by galleries, museums and the art world in general."  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 64)  Hammer told Freedman that the

---

[6]  "'A catalogue raisonné is a "definitive catalogue of the works of a particular artist; inclusion of a painting in a catalogue raisonné serves to authenticate the work, while non-inclusion suggests that the work is not genuine."  <u>Thome v. Alexander & Louisa Calder Found.</u>, 70 A.D.3d 88, 94 (1st Dep't 2009) (quoting <u>Kirby v. Wildenstein</u>, 784 F. Supp. 1112, 1113 (S.D.N.Y. 1992)).

Green Pollock should not be sold until "we get answers." (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 97;
Am. Cmplt. (<u>White</u> Dkt. No. 37) Cmplt. ¶ 61)

Despite the negative IFAR report, David Mirvish became a co-investor with
Knoedler in the Green Pollock. (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 100; Am. Cmplt. (<u>Taubman</u>
Dkt. No. 39) ¶ 66) Hammer allegedly "insisted" that a copy of the IFAR report be provided to
Mirvish before he invested in the painting. (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 67) Hammer,
8-31, Knoedler, and Freedman did not provide the IFAR report to potential purchasers of Rosales
Paintings, however, nor did they disclose that the IFAR report had challenged the authenticity of,
and rejected the purported provenance of, a painting that Rosales had brought to the gallery.
(Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 103; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 60-61; Am. Cmplt.
(<u>Taubman</u> Dkt. No. 39) ¶¶ 67, 74)

In a fax to Hammer dated December 15, 2003, Freedman discussed Mirvish's
willingness to invest in the Green Pollock. (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 66) A
handwritten note on the reverse side of the fax cover sheet contains the following phrases in
quotation marks: "discreet sources are my stock in trade," "don't kill the goose that's laying the
Golden egg," and "I'm not going to change my way of doing business. If you are not
[comfortable] – step away." (<u>Id.</u> ¶ 66)

After the IFAR report was issued, Hammer, 8-31, Knoedler, and Freedman
changed their story about the provenance of the Rosales Paintings. (Am. Cmplt. (<u>Hilti</u> Dkt. No.
46) ¶¶ 104-06; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 62; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 69)
David Herbert – a deceased art world figure and Andrade's long-time companion – became the
"adviser" or "agent" who had assisted Mr. X in buying these works, and Ossorio was no longer
mentioned. (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 104-06; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 62;

Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 69)  Rosales told Freedman that Mr. X, Jr. had

"confirmed" that Herbert was his father's adviser.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 106)

Freedman told Rosales to tell Julian Weissman – the only other dealer selling Rosales Paintings

– to update his provenance story by substituting Herbert's name for that of Ossorio.  (Am.

Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 110)  Purchasers of Rosales Paintings were never told that Knoedler

had repeatedly changed its account of the provenance of the Rosales Paintings.  (Am. Cmplt.

(<u>Taubman</u> Dkt. No. 39) ¶ 74)

             Freedman maintained a file concerning the Rosales Paintings (the "Rosales File").

That file included internal memos in which Freedman documented changes in the provenance

story, posited explanations for suspicious facts, and attempted to refute arguments that threatened

to expose the truth.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 33, 64-66, 204; Am. Cmplt. (<u>White</u> Dkt.

No. 37) ¶ 32; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 34)  After Knoedler adopted the David

Herbert provenance story, Freedman created an internal document entitled "Notes on David

Herbert."  In this document, Freedman attempted to explain how Herbert was connected to each

of the artists represented in Rosales Paintings.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 70)

Andrade provided Freedman with documentation regarding Herbert's art gallery, but nothing in

these materials ties Herbert to any of the Rosales Paintings.  (Am. Cmplt. (<u>White</u> Dkt. No.

37) ¶ 63; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 71-72)  Knoedler researchers likewise could not

find evidence suggesting that Herbert was involved in Mr. X's acquisition of the Rosales

Paintings.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 107)  Freedman also asked the de Kooning

Foundation for information that might confirm a connection to Herbert; no such information was

uncovered.  (<u>Id.</u> ¶ 108)

### D.   White's April 2000 Purchase of a "Pollock"

In March 2000, Plaintiff White went to the Knoedler Gallery and noticed what appeared to be a Jackson Pollock on display.  (Am. Cmplt. (White Dkt. No. 37) ¶ 35)  Freedman told White that the painting, Untitled 1949, was an authentic Jackson Pollock owned by a private collector in Switzerland.  (Id. ¶¶ 2, 35)

Knoedler purchased this work from Rosales – who had brought it to Knoedler "only months earlier" – for $670,000, and sold it to White on April 8, 2000, for $3.1 million.  (Id. ¶¶ 36, 39, 95)  Accordingly, Knoedler reaped a profit of nearly 400% on the transaction.[7]  (Id. ¶ 95)

The invoice for the painting reads as follows:

> **Jackson Pollock (1912-1956)**
> Untitled
> 1949
> Oil and enamel on canvas mounted on Masonite
> 28 ½ x 15 inches
> CA 23579
> Signature location: Signed and dated lower right: "Jackson Pollock 49"
>
> **Provenance & Bibliography**
> Private Collection, Switzerland

---

[7]  White alleges that such a profit is highly unusual for consigned works, and that commissions on consigned works typically range between 10 and 20 percent of the net payable to the owner.  (Id. ¶ 96)  White further alleges that it is highly unusual for a gallery owner to be able to purchase a work at a price point sufficiently below the then current market value, such that the gallery can – as here – sell the work for a large profit in a short period of time.  (Id.)  From 1996 to 2000, Knoedler's average profit on sales of Rosales Collection paintings was over 150%, and in some cases much higher.  (Id. ¶ 97)

An executive at Hammer Galleries – another subsidiary of 8-31 and thus owned by Hammer (see Am. Cmplt. (White Dkt. No. 37) ¶ 98; Am. Cmplt. (Hilti Dkt. No. 46) ¶ 51) – found the profit margin on Rosales Paintings "troubling" and inquired about it with another executive at Hammer Galleries.  That executive assured him that Hammer "was aware" of the situation.  (Id. ¶ 98)  Hammer was directly responsible for the operations of Knoedler, reviewed sales figures and financials, and attended 8-31 board meetings where Knoedler's financials were reviewed.  (Id. ¶ 100)

> To be included in publication on Jackson Pollock, "A Design for Change" (working title), by Dr. Stephen Polcari, to be published by Cambridge University Press.

(Id. ¶ 35)[8]

On April 9, 2000, Knoedler and Freedman mailed White an appraisal that valued the painting at $3.5 million.[9]  (Id. ¶ 42)

In late February 2011, White decided to sell the Pollock and contacted Christie's. (Id. ¶¶ 4, 89)  Christie's refused to accept the work for auction, noting that it does not appear in the Pollock catalogue raisonné – a fact Knoedler and Freedman allegedly concealed from White.[10]  (Id.)  White contacted Knoedler, but was told that no one was available to discuss the work with her.  (Id. ¶ 90)  After several months of calls, Knoedler's Director spoke with White in mid-May 2011.  (Id.)  The Director told White that Knoedler was not interested in acquiring the work because it was now focusing on contemporary art.  (Id. ¶¶ 4, 90)  When White asked for additional information regarding the work's provenance, the Director refused to provide any information, stating that it was confidential.  (Id. ¶ 90)

White received no further information concerning the work prior to the closing of Knoedler Gallery.  (Id. ¶ 91)  Thereafter, White retained a forensic examiner, who examined the work.  The examiner concluded, inter alia, that the painting contained paint that was not

---

[8]  White alleges that Freedman knew at the time that the painting was not from a "private collection in Switzerland."  White also notes that Polcari never published a book on Jackson Pollock.  (Id. ¶¶ 36, 38, 44)

[9] The appraisal was signed by Freedman in her capacity as President of Knoedler.  (Id. ¶ 42)

[10] A Christie's representative informed White that the fact that the painting does not appear in the catalogue raisoneé means that the market will reject it, and recommended that White ask Freedman and Knoedler for a refund.  (Id. ¶ 89)

available commercially until 1973, more than 20 years after the work was allegedly created.
(Id. ¶ 92)

### D.    The Martin Hilti Family Trust's November 2002 Purchase of a "Rothko"

On May 26, 2001, Rosales consigned a "Rothko" with Knoedler.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 3, 6, 111)  On January 8, 2002, Knoedler terminated the consignment arrangement and purchased the work from Rosales for $750,000.  (Id. ¶ 119; Am. Cmplt. (White Dkt. No. 37) ¶ 65)  Between June 15 and August 18, 2002, Knoedler exhibited the "Rothko" at the Beyeler Foundation's "Rothko Rooms" in Basel, Switzerland.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 135)

On October 24, 2002, Michael Hilti, one of the trustees of the Martin Hilti Family Trust, visited the Knoedler Gallery and met with Freedman.  (Id. ¶ 137)  Freedman showed Hilti an alleged Rothko, known as "Untitled (1965)."  Freedman described the painting as a "fantastic Rothko."  (Id. ¶¶ 1, 138)  Hilti had seen the work at the Beyeler Foundation's exhibition a few months earlier.  (Id. ¶ 139)

In written materials Freedman provided to Hilti, the provenance of the painting was described as follows:  "The Artist; Private Collection, Switzerland (acquired directly from the artist); By descent to current owner."  (Id. ¶ 141)  In the Rosales File, Freedman maintained a different version of the painting's provenance: "The Artist; Private Collection, Switzerland (acquired directly from the artist through Alfonso Ossorio); By descent to current owner."  (Id. ¶¶ 147-48, 151)

On November 13, 2002, the Hilti Family Trust purchased the purported Rothko for $5.5 million.  (Id. ¶ 172)  The $ 5.5 million sale price was a markup of more than seven times Knoedler's purchase price.  (Id. ¶ 7)  The invoice for the purchase stated the provenance as: "The

Artist; Private Collection, Switzerland (acquired directly from artist); By descent to current owner." (Id. ¶ 159)

In May 2012, Michael Hilti called Freedman in New York at her new art gallery to ask about press reports that Knoedler had been involved in a scam. (Id. ¶ 294) Freedman asked Hilti to call her back on her private phone line, and then told him that Hilti's Rothko was genuine and that "Knoedler has nothing to do with this." (Id. ¶¶ 295-96) Freedman told Hilti that Knoedler had suddenly closed "because of a divorce issue." (Id. ¶ 297)

Hilti later engaged a forensic art analyst to examine the Rothko the Trust had purchased from Knoedler. (Id. ¶ 298) The analysis revealed, inter alia, that the "Rothko" contained paint that was not developed until the 1960s, and thus would not have been available to Rothko in 1956 when the work was purportedly created. (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 4, 299)

### E.    The Taubmans' November 2005 Purchase of a "Still"

On December 22, 2004, Knoedler purchased a purported Clyfford Still painting from Rosales for $600,000.[11] (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 75) In February 2005, Knoedler exhibited the work and offered it for sale at the Art Dealers Association of America's Art Show in New York City. (Id. ¶ 81) Eugenia Taubman, then a trustee of the Arthur Taubman Trust, attended the art show and discussed the painting with Freedman. (Id. at 82-83) Freedman stated that the work was created by Clyfford Still in 1949; that a Swiss collector had purchased the painting from Still's studio with the help of David Herbert; that the collector had amassed a

---

[11] The Taubmans note that the invoice for this purchase reflects no provenance whatsoever. The lack of provenance and "extremely low price" raise substantial questions about the painting's provenance and authenticity. (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 78, 80)

collection of Abstract Expressionist paintings directly from artists with Herbert's assistance; and that upon the collector's death, the collection had passed by inheritance to the collector's children, who were the current owners and now sought to sell the works.  (Id. ¶ 83)  Freedman further represented that the collector was of a well-known aristocratic family, but that she could not reveal his identity.  The collector's children wished for their father to remain anonymous on account of his clandestine romantic involvement with Herbert.  (Id.)

In April 2005, Eugenia Taubman began negotiating a purchase price for the Still painting with Freedman.  (Id. ¶ 86)  In October 2005, they agreed on a purchase price of $4.3 million.  (Id.)  On November 7, 2005, Freedman, on behalf of Knoedler, signed a letter of agreement concerning the sale and sent Taubman an invoice for $4.3 million.  (Id. ¶¶ 87-88 and Exs. C-D)  In signing the letter of agreement, Knoedler and Freedman represented, inter alia, that the work was created by Clyfford Still in 1949, and that "[f]ull provenance, bibliography, and exhibition history [of] the [work], where available, shall be provided by [Knoedler]."  (Id. ¶ 87)  The invoice contained the following description and provenance:

> **Clyfford Still (American; 1904-1980)**
> Untitled
> 1949
> Oil on canvas
> 52 x 36 inches
> Signed and dated on verso: "Clyfford 1949"
> A 12373
>
> **Provenance**
> The Artist (David Herbert as agent)
> Private Collection
> By descent to present owner

(Id. ¶ 89)

Taubman alleges that Knoedler and Freedman did not disclose a number of relevant facts about the painting and the transaction, including that: (1) Knoedler itself owned the painting; (2) the painting had been delivered to Knoedler by Rosales; (3) no one at Knoedler had ever seen any evidence substantiating the provenance story provided for the painting; (4) no one at Knoedler knew the name of Mr. X or his children; (5) Ossorio (and not Herbert) had initially been identified as having facilitated Mr. X's purchases of Rosales Paintings; (6) the Diebenkorn Foundation and IFAR had expressed doubts about the authenticity of other Rosales Paintings, and the sale of one work had been cancelled due to IFAR's evaluation; and (7) the vast majority of sale proceeds paid by Knoedler to Rosales for the painting had been sent to Diaz's brother in Spain.  (Id. ¶ 103)

On November 15, 2005, Taubman wired $4.3 million from the Trust's account at Wachovia Bank to Knoedler's account at HSBC Bank.  (Id. ¶ 90)  In December 2005, Knoedler delivered the painting to Taubman in Bucharest, Romania, where the Taubmans were living on diplomatic assignment.  (Id. ¶ 91)  Knoedler made a gross profit of $3.7 million on its sale of the "Still" to Taubman – an 86% gross profit margin.  (Id. ¶ 101)

In the summer of 2011, Nicholas Taubman read press reports about a lawsuit alleging that Freedman had been dealing in forged art, and he began making inquiries concerning the Still the Taubmans had purchased from Knoedler.  (Id. ¶¶ 133-36)  In December 2012, Taubman retained forensic conservator James Martin, of Orion Analytical, LLC, to conduct scientific testing of the painting.  (Id. ¶ 138)  Orion's analysis revealed that the edges of the canvas had been artificially discolored with brown paint, which is uncharacteristic of Still's work.  Moreover, the painting contained paint not commercially produced or marketed until several years after 1949, the purported date of the painting.  (Id. ¶ 140)

F.     **The Dedalus Foundation's December 2007**
       **Claim that Rosales's "Motherwells" are Forgeries**

The Dedalus Foundation is responsible for the Robert Motherwell catalogue

raisonné.  (Am. Cmplt. (White Dkt. No. 37) ¶ 82; Am. Cmplt. (Taubman Dkt. No. 39) ¶ 117)  In

December 2007, as part of the effort to create a Motherwell catalogue raisonné, Dedalus

examined seven purported Motherwell paintings that Rosales had sold to Knoedler and Julian

Weissman.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 82-83; Am. Cmplt. (Taubman Dkt. No.

39) ¶ 117)  The Foundation initially examined photographs of (1) a Motherwell that an art dealer

– Killala Fine Art Limited – had purchased from Julian Weissman earlier that year[12]; and

(2) several purported "Spanish Elegy" Motherwells that Knoedler and Weissman had acquired

from Rosales.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 205, 208; Am. Cmplt. (White Dkt. No.

37) ¶ 83)  The Foundation observed several anomalies in the works' style and provenance, and

concluded that they were "highly suspect."  (Am. Cmplt. (White Dkt. No. 37) ¶ 82; Am. Cmplt.

(Taubman Dkt. No. 39) ¶ 117)  After more than a year of extensive analysis, the Foundation

concluded that "it was significantly unlikely that any of [Rosales's Motherwells] were the work

of Motherwell," and decided that these works would not be included in the Motherwell catalogue

raisonné.  (Am. Cmplt. (White Dkt. No. 37) ¶ 82; Am. Cmplt. (Taubman Dkt. No. 39) ¶ 117)

The Foundation informed Freedman and Knoedler in December 2007 that it believed that all of

---

[12]  At the time of the sale, the Foundation had provided a "Contingent and Conditional Opinion
Letter" stating that the "Motherwell" purchased by Killala appeared to be a work of Robert
Motherwell.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 206; Am. Cmplt. (White Dkt. No. 37) ¶ 84)  The
letter was retracted by the Foundation in February 2009, after forensic analysis indicated that
Rosales' Motherwells were forgeries.  (Hilti Am. Cmplt. ¶ 207; White Am. Cmplt. ¶ 84)

the "Elegy" works were likely forgeries and that these paintings would not be included in the forthcoming Motherwell catalogue raisonné.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 209)

On January 14, 2008, Freedman wrote a letter asking Mr. X, Jr. for an "emergency meeting" in Mexico to discuss the "doubt and suspicion" that had been cast on the Motherwells supplied by Rosales.  (Id. ¶ 211)  No such meeting took place.  (Am. Cmplt. (Id. ¶ 212)  Knoedler and Freedman did not notify any buyer of Rosales Paintings that the Dedalus Foundation had concluded that "Motherwells" brought to market by Rosales were forgeries.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 118)

After the Foundation issued its determinations concerning the Rosales Motherwells, Knoedler retained Orion Analytical, LLC to conduct forensic tests on two of these paintings.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 213)  On October 20, 2008, Orion issued a preliminary report.  (Id. ¶ 224)  Although Rosales had stated that the paintings were made and dated by Motherwell in the 1950s, and that Mr. X had acquired them from Motherwell at that time, Orion found that the "materials used to make the paintings is inconsistent with the understanding that the paintings were made in the 1950s."  (Id. ¶ 225)  Orion found that certain pigments in the works were not used by Motherwell until about the early to mid-1960s.  (Id. ¶ 226)

On October 24, 2008, Freedman told Rosales about the Orion report "and the problems it raises regarding the dating of the works."  (Id. ¶ 228)  Freedman asked Rosales to gather additional information from Mr. X, Jr. that might resolve the discrepancy, and to "approach Mr. X, [Jr.,] and ask again if there exists any tangible evidence related to these transactions."  (Id. ¶ 229 (emphasis in original))

On November 7, 2008, Rosales told Freedman that "[i]t ha[d] recently been explained and clarified, in discussion with the owner, that his father, the original owner, was active in acquiring works between the late 1940s and 1964.  The works were acquired 'off the record,' directly from the artist's [sic] studios during trips made to New York related to the family business."  (Id. ¶ 237; see also id. ¶¶ 231-32)

### G. The September 2009 Grand Jury Subpoenas, the Termination of Freedman's Employment, and Hammer's Direction that No Additional Rosales Paintings be Sold

In 2009, the United States Attorney's Office for the Southern District of New York began to investigate defendants' activities.  (Am. Cmplt. (White Dkt. No. 37) ¶ 86; Taubman Am. Cmplt. ¶ 119)  In September 2009, a grand jury issued subpoenas to Freedman and Knoedler seeking information about the sale of Rosales Paintings.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 43; Am. Cmplt. (White Dkt. No. 37) ¶ 86; Am. Cmplt. (Taubman Dkt. No. 39) ¶ 3)

On October 16, 2009, Hammer fired Freedman.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 43, 259-60; Am. Cmplt. (White Dkt. No. 37) ¶ 86; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 3, 120)  In public statements, however, Hammer and Knoedler described Freedman's departure as a "resignation."  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 121)  On October 27, 2009, Hammer sent a letter to Knoedler customers, including Taubman's art adviser, stating that Freedman had "resigned."  (Id. ¶ 122)  Attached to that letter was a letter from Frank Del Deo, Freedman's replacement, stating that the gallery was "respectful of Ann's decision."  (Id.)  Neither letter disclosed that Freedman's departure was related to questions about the authenticity of Rosales Paintings.  (Id.)  Hammer ordered that all remaining Rosales Paintings were to be marked "not for sale," and directed Knoedler employees not to speak to any third party about the Rosales Paintings.  (Id. ¶ 123)

21

Knoedler's records reveal that the gallery's profits from the Rosales Paintings kept Knoedler in business.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 40)  Between 1994 and 2011, Knoedler earned a profit of approximately $30 million.  Without the sale of Rosales Paintings, however, the gallery would have suffered a loss of more than $3 million.  (<u>Id.</u> ¶¶ 264, 266-67; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 99; <u>Taubman</u> Am. Cmplt. ¶ 160)  After the gallery stopped selling Rosales Paintings, it ceased to be profitable.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 42)

**H.    <u>The Closing of the Knoedler Gallery and Rosales's Arrest</u>**

In November 2007, Freedman and Knoedler sold Pierre Lagrange a purported Jackson Pollock for $17 million (the "Lagrange Pollock").  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 256; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 78)  Knoedler had obtained the alleged Pollock from Rosales.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 182; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 78)  Freedman had told Lagrange that the painting was part of a private collection from Switzerland, and that it had been acquired directly from the artist.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 79)  Freedman also told Lagrange that David Herbert had acted as an intermediary between the Swiss collector and Pollock; that the Lagrange Pollock would be included in the upcoming updated Pollock catalogue raisonné; and that twelve leading scholars had viewed the work and determined that it was authentic.  (<u>Id.</u> ¶ 80)

In 2011, a forensic analysis commissioned by Lagrange revealed that the Lagrange Pollock was a forgery.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 257; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 81)  The painting contains a red pigment that did not become available until years after the Lagrange Pollock was allegedly created.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 81)  This same pigment is also found in the "Rothko" purchased by Hilti and the "Pollock" purchased by White.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 81, 92)

On November 29, 2011, Lagrange presented its forensics report to Knoedler, and demanded the return of the purchase price.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 257; Am. Cmplt. (White Dkt. No. 37) ¶ 87; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 3, 137)  The next day, November 30, 2011, the Knoedler Gallery announced that it was closing permanently, notwithstanding recent renovations and an ongoing exhibition at the gallery.[13]  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 44, 258; Am. Cmplt. (White Dkt. No. 37) ¶¶ 5, 87; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 3, 137)

On May 20, 2013, Rosales was arrested and charged in a criminal complaint with tax fraud and other crimes.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 3, 141)  The complaint alleged that Rosales had sold more than 60 forged paintings to "two prominent Manhattan art galleries," one of which was clearly identifiable as Knoedler.  (Id. ¶ 141)  On September 16, 2013, Rosales pled guilty to a nine-count indictment charging her with, inter alia, mail and wire fraud, and money laundering.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 7, 93; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 3, 142; see also United States v. Rosales, 13 Cr. 518 (KPF) (S.D.N.Y.) (Dkt. No. 14))  During her plea allocution, Rosales admitted that she had "agreed with others to sell works of art claimed to be created by various [E]xpressionist artists . . . and to make false representations as to the authenticity and provenance of those works."  (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 3, 142)  Rosales also admitted that the Rosales Paintings had been created by Pei-Shen Qian, working in concert with the Diaz brothers.  (Am. Cmplt. (White Dkt. No. 37) ¶

---

[13] Days later, Lagrange filed a lawsuit in the Southern District of New York alleging that Knoedler and Freedman had sold him a forged Jackson Pollock painting. (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 261; Am. Cmplt. (White Dkt. No. 37) ¶¶ 5, 88; Am. Cmplt. (Taubman Dkt. No. 39) ¶ 3)  This action was settled in October 2012.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 263; Am. Cmplt. (Taubman Dkt. No. 39) ¶ 149 & n.12)

93)  On March 31, 2014, Qian and the Diaz brothers were indicted for their role in the forged art

scheme.  (Id. ¶ 7)

## II.   PROCEDURAL HISTORY

### A.   Hilti

On May 1, 2014, the Martin Hilti Family Trust filed an amended complaint

against Defendants Knoedler Gallery, LLC d/b/a Knoedler & Company, Ann Freedman, Michael

Hammer, 8-31 Holdings, Inc., Glafira Rosales, Jose Carlos Bergantinos Diaz, Jesus Angel

Bergantinos Diaz, Pei-Shen Qian, Per Haubro Jensen, Jaime Andrade, and Hammer Galleries,

LLC.  (Am. Cmplt. (Hilti Dkt. No. 46))  The Amended Complaint pleads the following causes of

action:  (1) substantive RICO and RICO conspiracy claims against all Defendants except

Hammer Galleries; (2) deceptive trade practices and false advertising claims, pursuant to N.Y.

Gen. Bus. Law §§ 349, 350, against Knoedler, Hammer, and 8-31; (3) fraud and fraudulent

concealment claims against, among others, Knoedler, Freedman, Hammer, and 8-31; (4) an

aiding and abetting fraud claim against, among others, Hammer and 8-31; (5) conspiracy to

commit fraud and conspiracy to commit fraudulent concealment claims against, among others,

Hammer and 8-31; (6) an aiding and abetting fraudulent concealment claim against, among

others, Hammer and 8-31; (7) breach of warranty, unilateral mistake, and mutual mistake claims

against Knoedler, Hammer, and 8-31; and (8) an unjust enrichment claim against, among others,

Freedman, Hammer, and Hammer Galleries.  (Id.)

Defendants Knoedler, Freedman, Hammer, 8-31 Holdings, and Hammer Galleries

have moved to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6).  (Hilti Dkt.

Nos. 91, 93, 95, 104)

**B.**     **White**

On April 29, 2014, White, filed an amended complaint against Ann Freedman, Glafira Rosales, Knoedler Gallery, LLC, d/b/a Knoedler & Company, Michael Hammer, 8-31 Holdings, Inc., Jose Carlos Bergantinos Diaz, Jaime R. Andrade, Jesus Angel Bergantinos Diaz, and Pei Shen Qian.  (Am. Cmplt. (White Dkt. No. 37))  The White Amended Complaint pleads the following causes of action:  (1) fraud and fraudulent concealment against Knoedler, Freedman, Hammer, and 8-31; (2) aiding and abetting fraud and conspiracy to commit fraud claims against, among others, Hammer and 8-31; (3) substantive RICO and RICO conspiracy claims against all Defendants; (4) breach of express and implied warranty claims and violation of § 13.01 of the N.Y. Arts and Cultural Affairs Law against Knoedler, Freedman, Hammer, and 8-31; (5) unilateral mistake and mutual mistake claims against Knoedler, Hammer, and 8-31; and (6) deceptive trade practices and false advertising claims, pursuant to N.Y. Gen. Bus. Law §§ 349, 350 against Knoedler, Freedman, Hammer, and 8-31.  (Id.)

Defendants Knoedler, Freedman, Hammer, and 8-31 Holdings have moved to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6).  (White Dkt. Nos. 72, 74, 85)

**C.**     **Taubman**

On April 29, 2014, the Arthur Taubman Trust, Eugenia Taubman, and Nicholas Taubman filed an amended complaint against Knoedler Gallery, LLC, d/b/a Knoedler & Company, 8-31 Holdings, Inc., Ann Freedman, Michael Hammer, Glafira Rosales, and José Carlos Bergantiños Diaz.  (Am. Cmplt. (Taubman Dkt. No. 39))  The Taubman Amended Complaint pleads the following causes of action:  (1) fraud and fraudulent concealment against Knoedler, Freedman, and 8-31; (2) aiding and abetting fraud and conspiracy to commit fraud

claims against, among others, Hammer and 8-31; (3) substantive RICO and RICO conspiracy claims against all Defendants; (4) breach of express and implied warranty claims and violation of § 13.01 of the N.Y. Arts and Cultural Affairs Law against Knoedler and 8-31; (5) unilateral mistake and mutual mistake claims against Knoedler and 8-31; and (6) deceptive trade practices and false advertising claims, pursuant to N.Y. Gen. Bus. Law §§ 349, 350 against Knoedler, Freedman, and 8-31.  (Id.)

Defendants Knoedler, Freedman, Hammer, and 8-31 Holdings have moved to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6).  (Taubman Dkt. Nos. 61, 63, 70)

## DISCUSSION

## I.  MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (quoting Chambers, 282 F.3d at 152–53).

A district court may also "rely on matters of public record in deciding a motion to dismiss under [R]ule 12(b)(6)." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998); see also Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004) ("[W]e may also look to public records . . . in deciding a motion to dismiss.") "In the motion to dismiss context, . . . a court should generally take judicial notice 'to determine what statements [the documents] contain[ ][,] . . . [but] not for the truth of the matters asserted.'" Schubert v. City of Rye, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011) (quoting Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

Fed. R. Civ. P. 9(b) sets standards for pleading fraud claims, and requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632-33 (S.D.N.Y. 2008). Rule 9(b) requires a plaintiff to "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation omitted)).

## II.    SUCCESSOR LIABILITY

White purchased the forged Pollock in April 2000.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 1, 39, 115, 175(g))  Knoedler Gallery, LLC and 8-31 Holdings, Inc. were not formed until 2001, however.  (Schmerler Decl. (Dkt. No. 76), Ex. A at 1, Ex. B at 1)  Both entities argue that all claims against them should be dismissed because White's Amended Complaint does not allege sufficient facts to demonstrate successor liability.  (Knoedler/8-31 Br. (White Dkt. No. 75) at 1)

As to 8-31, the Court agrees that White has not pled facts demonstrating that 8-31 is the successor to any entity that existed in 2000.  Accordingly, White cannot proceed against 8-31 on a successor liability theory.  As discussed later in this opinion, however, White has pled facts demonstrating that 8-31 is Knoedler's alter ego.  Moreover, for the reasons discussed below, this Court concludes that White has pled facts sufficient to show that Knoedler is a successor to the entity that sold the forged Pollock to White.

White argues that Knoedler is liable under both the "de facto merger" and "mere continuation" theories of successor liability (Pltf. Br. (White Dkt. No. 82) at 7-9), while Knoedler argues that White has failed to state a claim for successor liability under either theory. (Knoedler/8-31 Reply Br. (White Dkt. No. 81) at 2-5)

White's Amended Complaint alleges that "Knoedler Gallery, LLC is the successor-in-interest of M. Knoedler & Co. and/or of Knoedler-Modarco, Inc., all of which did business as 'Knoedler & Company,' and each of which is a mere continuation of the prior entity operating under that name."  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 11, 103, 1 n.1)  8-31 is the sole member of Knoedler, and "Hammer is, and has been since 1990, directly and/or via 8-31 and/or Knoedler-Modarco, the sole beneficial owner of Knoedler."  (Id. ¶¶ 12-13)  White further alleges that Knoedler operated for 200 years before it closed, and that Freedman was the "Director, President and/or sole manager of Knoedler beginning in 1994[, through 2009]."  (Id. ¶¶ 5, 10, 86)  Finally, White alleges that, "[a]t all relevant times, Hammer managed and oversaw the officer-level personnel and company finances of Knoedler."  (Id. ¶ 12)

Knoedler is a Delaware limited liability company whose sole member is 8-31, which is a Delaware corporation.  (Id. ¶¶ 11, 13)  Both entities have their principal place of business in New York.  (Id.)

"In federal question cases, federal courts generally apply a federal-law – as opposed to a state-law – choice of law analysis to determine which jurisdiction's substantive law is applicable."  Lyons v. Rienzi & Sons, Inc., 863 F. Supp. 2d 213, 221 (E.D.N.Y. 2012) on reconsideration in part, No. 09 Civ. 4253, 2012 WL 1339442 (E.D.N.Y. Apr. 17, 2012); see also Barkanic v. Gen. Admin. of Civ. Aviation of the People's Repub. of China, 923 F.2d 957, 961 (2d Cir. 1991).  "The federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation."  In re Koreag, Controle et Revision S.A., 961 F.2d 341, 350 (2d Cir. 1992).

"In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum

state." Manning Int'l Inc. v. Home Shopping Network, Inc., 152 F. Supp. 2d 432, 436 n.3

(S.D.N.Y. 2001). "Under the law of New York, the forum state, the first step in a choice of law

analysis is to determine whether an actual conflict exists between the laws of the jurisdictions

involved." Forest Park Pictures v. Univeral Tel. Network, Inc., 683 F.3d 424, 433 (2d Cir.

2012). Where an actual conflict exists, "'New York courts seek to apply the law of the

jurisdiction with the most significant interest in, or relationship to, the dispute.'" Lazard Freres

& Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997) (quoting Brink's Ltd. v.

South African Airways, 93 F.3d 1022, 1030 (2d Cir. 1996)); see also Forest Park Pictures, 683

F.3d at 433.

            The parties have briefed both New York and Delaware law. See Knoedler/8-31

Reply Br. (Dkt. No. 81) at 2-5; Pltf. Br. (Dkt. No. 82) at 6-9. It is not necessary to resolve the

issue of which state's law applies to the successor liability issue, however, because New York

and Delaware law are generally in agreement, and to the extent they differ, that difference has no

bearing on resolution of the successor liability issue here.

            "To state a claim based on successor liability, a plaintiff must plead enough facts

for the Court to infer that one of the exceptions to 'the general rule finding that a business entity

acquiring the assets from another business generally results in no successor liability.'" New

York v. Town of Clarkstown, No. 11 Civ. 0293 (KMK), 2015 WL 1433299, at *16 (S.D.N.Y.

Mar. 30, 2015) (quoting City of Syracuse v. Loomis Armored US, LLC, 900 F. Supp. 2d 274,

288 (N.D.N.Y. 2012)); Hayden Capital USA, LLC v. Northstar Agri Indus., LLC, No. 11 Civ.

594 (DAB), 2012 WL 1449257, at *4 (S.D.N.Y. Apr. 23, 2012) ("[B]oth New York and

Delaware recognize that when one company sells or transfers all of its assets to another

company, the acquiring company generally does not become liable for the debts or liabilities of

the seller/transferor.").  "Both Delaware and New York [] recognize that there are [four]

exceptions to this rule: (1) where the buyer expressly assumed the debt at issue; (2) where the

transaction amounted to a fraud; (3) where the transaction constitutes a <u>de</u> <u>facto</u> merger; or

(4) where the successor is a mere continuation of the predecessor."  <u>Hayden Capital USA, LLC</u>,

2012 WL 1449257, at *4 (citations omitted).  Only the latter two exceptions are at issue in this

case.

> Under New York law, the hallmarks of a <u>de</u> <u>facto</u> merger include:
>
> (1) continuity of ownership; (2) a cessation of ordinary business and
> dissolution of the acquired corporation as soon as possible; (3) assumption by
> the successor of the liabilities ordinarily necessary for the uninterrupted
> continuation of the business of the acquired corporation; and (4) a continuity
> of management, personnel, physical location, assets, and general business
> operation.

<u>Societe Anonyme Dauphitex v. Schoenfelder Corp.</u>, No. 07 Civ. 489, 2007 WL 3253592, at *3

(S.D.N.Y. Nov. 2, 2007) (citing <u>Cargo Partner AG v. Albatrans, Inc.</u>, 352 F.3d 41, 46 (2d Cir.

2003).  Moreover, "there is significant support in the case law for the notion that 'not all [of]

these elements are necessary to find a <u>de</u> <u>facto</u> merger.'"  <u>Id.</u> (quoting <u>Fitzgerald v. Fahnestock &</u>

<u>Co., Inc.</u>, 286 A.D.2d 573, 574-75 (1st Dep't 2001)).

> Under Delaware law, a <u>de</u> <u>facto</u> merger requires the following elements:
>
> (1) one corporation transfers all of its assets to another corporation; (2) payment is
> made in stock, issued by the transferee directly to the shareholders of the
> transferring corporation; and (3) in exchange for their stock in that corporation,
> the transferee agreeing to assume all the debts and liabilities of the transferor.

<u>SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.</u>, No. 12 Civ. 7280 (ALC)

(DCF), 2013 WL 5366373, at *14 (S.D.N.Y. Sept. 25, 2013) (quoting <u>Magnolia's at Bethany,</u>

<u>LLC v. Artesian Consulting Eng'rs Inc.</u>, No. S11 C04013, 2011 WL 4826106, at *3 (Del. Super.

Ct. Sept.19, 2011)).

Although under both New York and Delaware law a plaintiff attempting to demonstrate a de facto merger must allege continuity of ownership between the selling and acquiring corporations, the two states interpret this element differently.  Under New York law, it is sufficient to allege that "shareholders of the selling corporation hold even an indirect interest in the assets."  SungChang, 2011 WL 4826106, at *14 (citing In re New York City Asbestos Litig., 15 A.D.3d 254, 256 (1st Dep't 2005) ("The first criterion, continuity of ownership, exists where the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation as the result of the successor's purchase of the predecessor's assets, as occurs in a stock-for-assets transaction.")).  "In contrast, under Delaware law, the 'continuity of ownership' element is only met if shareholders of the predecessor corporation acquire a direct ownership interest in the successor corporation."  SungChang, 2013 WL 5366373, at *15 (emphasis in original) (citations omitted).

Here, given the allegations of the Amended Complaint, it is not clear that White is alleging that the shareholders of the predecessor companies – M. Knoedler and Co. and Knoedler-Modarco, Inc. – acquired a direct ownership interest in the successor entity, Knoedler Gallery, LLC.  White alleges that Hammer ultimately controlled or controls all of these entities, but White pleads that 8-31 is the sole member of Knoedler Gallery, LLC, and it is unclear whether 8-31 existed prior to the creation of Knoedler Gallery, LLC.  Moreover, White does not allege that 8-31 is the successor to any entity that existed prior to Knoedler Gallery, LLC's formation.  Accordingly, it is possible that White is alleging that the shareholders in the predecessor corporation acquired an indirect interest in the successor company.  An indirect interest in a successor corporation does not satisfy Delaware requirements for demonstrating the "continuity of ownership" element of a de facto merger.  SungChang, 2013 WL 5366373, at *15.

The Court need not resolve this issue, however, because White has plausibly alleged Knoedler's successor liability under the "mere continuation" exception.

In both New York and Delaware, "the mere continuation exception . . . is only available where 'it is not simply the business of the original corporation which continues, but the corporate entity itself.'"  SungChang, 2013 WL 5366373, at *16 (quoting Colon v. Multi–Pak Corp., 477 F.Supp.2d 620, 626-27 (S.D.N.Y. Mar 07, 2007) (citations omitted)).  "[Because] there is no actual conflict between Delaware and New York law on the mere continuation exception, [this Court] will apply New York law."  Id.

"The mere continuation exception applies where 'it is not simply the business of the original corporation which continues, but the corporate entity itself' and there is a 'common identity of directors, stockholders, and the existence of only one corporation at the completion of the transfer.'"  Silverman Partners LP v. Verox Grp., No. 08 Civ. 3103 (HB), 2010 WL 2899438, at *5 (S.D.N.Y. July 19, 2010) (quoting Colon v. Multi-Pak Corp., 477 F. Supp. 2d 620, 626-27 (S.D.N.Y. 2007)) (internal quotation marks and citation omitted).  Accordingly, where there is a common identity of directors and stockholders, and where the predecessor entity transfers not only assets, but also business location, employees, management and good will to the successor, this exception is applicable.  McDarren v. Marvel Entm't Group, Inc., No. 94 Civ. 910 (LMM), 1995 WL 214482, at *8 (S.D.N.Y. Apr. 11, 1995).  "'[T]he underlying theory of the exception is that [ ] if [a] corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.'"  Silverman Partners LP, 2010 WL 2899438, at *5 (quoting Societe Anonyme, 2007 WL 3253592, at *6) (second and third alterations in original).

Here, White alleges that Knoedler Gallery, LLC "is a mere continuation of the prior entity operating under that name" (Am Cmplt. (White Dkt. No. 37) ¶ 11), and the facts pleaded in the Amended Complaint bear out this claim.  The corporate change appears to have been a change in form rather than in substance.  Hammer's control over Knoedler's operations was not affected by the corporate change.  "At all relevant times, Hammer managed and oversaw the officer-level personnel and company finances of Knoedler."  (Id. ¶ 12)  Freedman also remained in her roles as "Director, President and/or sole manager of Knoedler." (Id. ¶¶ 10, 86)  Moreover, the predecessor entity transferred not only its assets, but also its business location, employees, management, and good will to the successor.   The allegations in White's Amended Complaint are sufficient to support a claim of successor liability against Knoedler under the "mere continuation" theory of successor liability.  See Societe Anonyme, 2007 WL 3253592, at *5-7 (plaintiff sufficiently alleged "mere continuation" where predecessor and successor company had shared office space, shared an address, shared employees and management, and where it was logical to infer that the successor company was created to avoid contractual liability).

## III.    STATUTE OF LIMITATIONS

In Hilti, Knoedler, 8-31, Hammer, and Hammer Galleries argue that the statute of limitations has expired on all of Plaintiff's claims against them.  (Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 7-15; Hammer Br. (Hilti Dkt. No. 92) at 21 (adopting arguments made by Knoedler and Freedman); Hammer Galleries Br. (Hilti Dkt. No. 96) at 4-6)  Freedman argues that the statute of limitations has expired on Plaintiff's fraud and fraudulent concealment claims, breach

of warranty claims, and New York General Business Law claims against her.  (Freedman Br. (<u>Hilti</u> Dkt. No. 105) at 4, 8-12, 22, 24-25)

In <u>Taubman</u>, Knoedler, 8-31, and Hammer argue that the statute of limitations has expired on all of Plaintiffs' claims against them.  (Knoedler/8-31 Br. (<u>Taubman</u> Dkt. No. 64) at 5-13; Hammer Br. (Dkt. No. 62) at 20 (adopting arguments made by Knoedler and Freedman)) Freedman argues that the statute of limitations has expired on Plaintiffs' fraud and fraudulent concealment claims, and deceptive business practices claims against her.  (Freedman Br. (<u>Taubman</u> Dkt. No. 71) at 7-11, 19-21)

In <u>White</u>, Knoedler, 8-31, and Hammer argue that the statute of limitations has expired on all of Plaintiff's claims against them.  (Knoedler/8-31 Br. (<u>White</u> Dkt. No. 75) at 6-16); Hammer Br. (<u>White</u> Dkt. No. 73) at 24 (adopting arguments made by Knoedler and Freedman))  Freedman argues that the statute of limitations has expired on Plaintiff's fraud and fraudulent concealment claims, breach of warranty claims, and New York General Business Law claims against her.  (Freedman Br. (<u>White</u> Dkt. No. 86) at 6-10, 18-24)

A.   **Application to RICO and Fraud Claims**

1.   **Limitations Periods**

"The statute of limitations for a civil RICO claim is four years."  <u>Cohen v. S.A.C. Trading Corp.</u>, 711 F.3d 353, 361 (2d Cir. 2013) (citing <u>Rotella v. Wood</u>, 528 U.S. 549, 552 (2000); <u>Agency Holding Corp. v. Malley-Duff & Assocs.</u>, 483 U.S. 143, 156 (1987)).  "[T]his Circuit has adopted an 'injury discovery' rule in RICO cases which holds that 'a plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury.'"  <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F.3d 56, 60 (2d Cir. 1998) (quoting <u>Bankers Trust v. Rhoades</u>, 859 F.2d 1096, 1103 (2d Cir. 1988)).  "Thus, . . .

the limitations period does not begin to run until [plaintiffs] have actual or inquiry notice of the injury.  Inquiry notice is notice such that a 'reasonable investor of ordinary intelligence would have discovered the existence of the fraud.'"  Id. (quoting Dodds v. Cigna Secs., Inc., 12 F.3d 346, 350 (2d Cir. 1993)); see also Takeuchi v. Sakhai, No. 05 Civ. 6925 (JSR), 2006 WL 119749, at *2 (S.D.N.Y. Jan. 17, 2006) ("In the case of a RICO claim predicated on fraud, a plaintiff should have discovered his injury when he has received information sufficient to alert a reasonable person to the probability that he has been misled.").

New York law provides that fraud claims, including claims of aiding and abetting fraud and conspiracy to commit fraud, must be commenced within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . . discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8); see also Koch v. Christie's Int'l PLC, 699 F.3d 141, 154 (2d Cir. 2012) (addressing aiding and abetting fraud and fraud conspiracy claims).

### 2.   Inquiry Notice

One is placed on inquiry notice when "'a person of ordinary intelligence would consider it "probable" that fraud had occurred.'"  Koch, 699 F.3d at 151 n.3 (quoting with approval Koch v. Christie's Int'l PLC, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011)); see also Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005) (a party is on "[i]nquiry notice . . . 'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded'") (quoting Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101 (2d Cir. 2003)).

"Inquiry notice imposes an obligation of reasonable diligence."  Cohen, 711 F.3d at 362.  "[T]he date on which knowledge of a fraud will be imputed to a plaintiff can depend on

the plaintiff's investigative efforts." Id. at 361. "If the plaintiff makes no inquiry once the duty

to inquire arises, knowledge will be imputed as of the date the duty arose." Id. at 361-62

(internal quotation marks and citations omitted); see also Koch, 699 F.3d at 155 ("New York law

recognizes . . . that a plaintiff may be put on inquiry notice, which can trigger the running of the

statute of limitations[,] if the plaintiff does not pursue a reasonable investigation.") "[I]f some

inquiry is made, the court will impute knowledge of what a plaintiff in the exercise of reasonable

diligence should have discovered concerning the fraud, and in such cases the limitations period

begins to run from the date such inquiry should have revealed the fraud." Cohen, 711 F.3d at

362 (brackets, quotation marks, and citations omitted).

   "Although determining whether a plaintiff had sufficient facts to place her on

inquiry notice is often inappropriate for resolution on a motion to dismiss, [the Second Circuit]

ha[s] found dismissal appropriate where the facts needed for determination of when a reasonable

plaintiff of ordinary intelligence would have been aware of the existence of fraud can be gleaned

from the complaint and papers integral to the complaint," id. (alterations, quotation marks, and

citations omitted), as well as from matters of which judicial notice may properly be taken.

Staehr v. Hartford Fins. Servs. Grp., 547 F.3d 406, 426-27 (2d Cir. 2008); see id. at 427

("Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly

demonstrates when the plaintiff should have discovered the fraudulent conduct."). "[I]t is proper

under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year

discovery rule when the alleged facts do establish that a duty of inquiry existed and that an

inquiry was not pursued." Koch, 699 F.3d at 155-56. In sum, "where the facts would suggest

the probability of fraud to a reasonably intelligent person, failure to investigate will prove fatal to

the plaintiff's claim if such a claim is not brought within the statutory limitations period

beginning from the time of such inquiry notice." <u>Id.</u> at 156. "Whether a plaintiff was placed on inquiry notice is analyzed under an objective standard." <u>Staehr</u>, 547 F.3d at 427.

      **3.**      **<u>Analysis</u>**

          **a.**      **<u>Defendants' Statute of Limitations Arguments Concerning Hilti's RICO and Fraud Claims</u>**

Defendants argue that the statute of limitations period for Hilti's RICO and fraud claims began to run when Hilti purchased the purported Rothko in 2002. (Freedman Br. (<u>Hilti</u> Dkt. No. 105) at 2, 7; Knoedler/8-31 Br. (<u>Hilti</u> Dkt. No. 94) at 13-15; Hammer Br. (<u>Hilti</u> Dkt. No. 92) at 21 (adopting Knoedler and Freedman's arguments); Hammer/8-31/Hammer Galleries Reply Br. (<u>Hilti</u> Dkt. No. 103) at 19 (same))  In support of this argument, Defendants contend that the purported Rothko had problems "visible to the naked eye" that raised serious doubts as to its authenticity. (Freedman Br. (<u>Hilti</u> Dkt. No. 105) at 3, 11-12; Freedman Reply Br. (<u>Hilti</u> Dkt. No. 107) at 6; Knoedler/8-31 Br. (<u>Hilti</u> Dkt. No. 94) at 14-15; Knoedler Reply Br. (<u>Hilti</u> Dkt. No. 102) at 6-8)  Defendants further contend that a February 22, 2002 New York Times article about the Rothko – which Knoedler allegedly gave to Hilti on November 2, 2002 – put Hilti on notice that the written materials Freedman provided to Hilti about the Rothko were inaccurate. (Freedman Br. (<u>Hilti</u> Dkt. No. 105) at 7-9)  Defendants also claim that a 2005 article by Oliver Wick (curator of the Rothko show at the Beyeler Foundation, and one of the Rothko experts Freedman mentioned to Hilti prior to the sale) put Hilti on inquiry notice, because the article asserted that the original owner of Hilti's Rothko had obtained the work through David Herbert – a point not mentioned in the provenance Knoedler supplied to Hilti. (Freedman Br. (<u>Hilti</u> Dkt. No. 105) at 2, 7, 12; Freedman Reply Br. (<u>Hilti</u> Dkt. No. 107) at 5-6)  Finally, Defendants contend that Hilti should have obtained an independent opinion regarding the work's

authenticity and provenance, or contacted the Rothko experts Freedman claimed had seen the work.  (Freedman Br. (Hilti Dkt. No. 105) at 12)

**i.**     **Hilti Was Not Put on Inquiry Notice**

As noted above, under New York law the statute of limitations for fraud claims is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8).  Here, it is undisputed that – prior to the filing of Hilti's Complaint – more than six years had elapsed since the commission of the alleged fraud.  The timeliness of Hilti's claims thus turns on when Hilti discovered or should have discovered the alleged fraud.

Hilti alleges that it did not learn of Defendants' fraud until May 2012, when Michael Hilti read press reports suggesting that Knoedler had been involved in a scam.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 294)  Michael Hilti contacted Freedman, and then retained a forensic art analyst to examine the alleged Rothko.  (Id. ¶¶ 295-98)  The forensic analysis revealed that the Rothko was a forgery (id. ¶¶ 299), and Hilti filed suit on January 29, 2013.  (Cmplt. (Hilti Dkt. No. 1)).

As noted above, "'where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.'"  Koch, 699 F.3d at 155 (quoting Gutkin v. Siegal, 85 A.D.3d 687, 688 (1st Dep't 2011)).  "Only where it conclusively appears that the plaintiff had knowledge of facts [sufficient to suggest to a person of ordinary intelligence the probability that he had been defrauded] should a complaint be dismissed on motion."  Azoy v. Fowler, 57 A.D.2d 541, 542 (2d Dep't 1977).

39

Defendants argue that Hilti was put on inquiry notice because (1) the forged nature of the alleged Rothko was obvious from the face of the painting; (2) a 2002 <u>New York Times</u> article revealed an error in the written materials Freedman had provided to Hilti; and (3) Oliver Wick's 2005 article stated that the original owner of the Rothko had obtained the work through David Herbert.  (Freedman Br. (<u>Hilti</u> Dkt. No. 105) at 2-3, 7-9, 11-12; Freedman Reply Br. (<u>Hilti</u> Dkt. No. 107) at 5-6; Knoedler/8-31 Br. (<u>Hilti</u> Dkt. No. 93) at 14-15; Knoedler Reply Br. (<u>Hilti</u> Dkt. No. 102) at 6-8)

With respect to Defendants' argument that the forged nature of the painting was obvious, this Court cannot find, as a matter of law, that the appearance of the painting put Hilti on inquiry notice.  Hilti purchased the purported Rothko from Knoedler – at that time, one of the most established and reputable art galleries in the world.  (Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 1, 48)  Freedman, Knoedler's president, "repeatedly proclaimed" to Hilti that the work was an authentic, "fantastic Rothko."  (<u>Id.</u> ¶¶ 1, 138, 163)  Knoedler also provided written materials to Hilti representing that the work had been acquired by a private collector directly from Rothko, and that the work had passed by descent to the current owner.  (<u>Id.</u> ¶¶ 141, 148, 159)  Freedman also provided Hilti with an October 29, 2002 letter from Laili Nasr at the National Gallery of Art, which stated that – if the Mark Rothko Catalogue Raisonné project were to publish a supplement "to introduce new works on canvas that were discovered since the 1998 publication of the first volume of the catalogue devoted to the artist's paintings on canvas" – then it was intended that Hilti's Rothko would be included.  (<u>Id.</u> ¶¶ 154-55, 158)  Freedman also provided Hilti with a February 22, 2002 <u>New York Times</u> article that praised the work.  (<u>Id.</u> ¶¶ 158)  Finally, an inspection of the painting arranged by Hilti indicated that the work was in fine

condition.  (Id. ¶ 118)  In sum, there is nothing pleaded in the Amended Complaint suggesting that it was apparent from the face of the painting that it was a forgery.[14]

Defendants' next argument – that a New York Times article stating that the work was exhibited at the ADAA show somehow put Hilti on inquiry notice – is frivolous.  The New York Times article describes the work as "a 1956 painting by Mark Rothko that is small but surely one of his best. . . ."  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 131)  The article thus supports rather than undermines the authenticity of the painting.

Finally, Defendants' argument that Oliver Wick's 2005 essay contradicts Knoedler's representations to Hilti concerning the work's provenance, is also unavailing.  Hilti's Amended Complaint states that Wick's essay mentioning David Herbert addresses a different forged Rothko than the painting purchased by Hilti.  See Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 179-80.

While it is true that Hilti could have sought an independent opinion or contacted the Rothko experts mentioned by Freedman, it had "'no reason to suspect the authenticity of their painting'" at that time.  See De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 298 (S.D.N.Y. 2013) (quoting Rosen v. Spanierman, 894 F.2d 28, 36 n.2 (2d Cir. 1990)).  The fact that additional experts were available to Hilti at the time of purchase does not demonstrate that they were on inquiry notice.

---

[14]  In arguing that the forged nature of the work is apparent from "the face of the work," Defendants rely on a May 4, 2012 Michael Hilti letter to the De Soles (see Declaration of Charles D. Schmerler ("Schmerler Decl.") (Hilti Dkt. No. 97), Ex. B (May 4, 2012 Ltr.) at 2-3), who are plaintiffs in another action against Defendants.  See De Sole, et al. v. Knoedler Gallery LLC, et al., No. 12 Civ. 2313 (PGG) (S.D.N.Y. Mar. 28, 2012).  This letter is not discussed or incorporated by reference in Hilti's Amended Complaint, nor is it integral to the claims made in the Amended Complaint.  Accordingly, this letter cannot be considered in connection with Defendants' motions to dismiss.

In sum, Defendants have not demonstrated that "a reasonable plaintiff of ordinary intelligence would have been aware of the existence of fraud." [15] Cohen, 711 F.3d at 362. Accordingly, Defendants' motions to dismiss Hilti's RICO and fraud claims on statute of limitations grounds is denied.

### b. Defendants' Statute of Limitations Arguments Concerning the Taubman Plaintiffs' RICO and Fraud Claims

The Taubman Plaintiffs filed suit on May 3, 2013. (Taubman Cmplt. (Dkt. No. 1)) Because the alleged fraud in their case was complete in November 2005, when the Taubmans purchased the purported Clyfford Still, their fraud claims are timely only if they were brought within two years of the date the fraud was discovered, or could have been discovered with reasonable diligence. The Taubmans allege that they did not learn of Defendants' fraud until the summer of 2011, when Nicholas Taubman read an article discussing the Dedalus Foundation's allegations concerning Rosales's Motherwells. (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 135-36)

Defendants argue that the Taubmans received actual notice of the fraud in 2007, in connection with discussions the Taubmans had with Knoedler about purchasing a second painting – the "Green Pollock." That painting – which the Taubmans decided not to purchase – had the same provenance as the Still painting. Defendants contend that the Taubmans learned of "red flags" about the authenticity of that painting at that time, and that their attorney advised

---

[15] Brown v. Kay, 889 F. Supp. 2d 468 (S.D.N.Y. 2012), cited by Knoedler and 8-31 (Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 14), is not to the contrary. In Brown, plaintiff sued his father's estate in 2011 for fraud relating to certain allegedly fake paintings that plaintiff's father had provided to plaintiff's mother under a separation agreement forty years earlier. The court dismissed the fraud claim for several reasons, including the existence of a release and res judicata. Brown, 889 F. Supp. 2d at 481-84. As to statute of limitations, the court found that "by no later than 2002, when [plaintiff] brought suit in state court against his father . . . [he] was well aware of the key pillars of [the] fraud claim." Id. at 483.

them not to purchase the painting unless Knoedler provided contractual assurances as to the work's provenance.  (Freedman Br. (Taubman Dkt. No. 71) at 1-2, 7-9; Knoedler/8-31 Br. (Taubman Dkt. No. 64) at 12-13)  Defendants further argue that the Taubmans also learned in 2007 that Knoedler had lied about its corporate history.  (Freedman Br. (Taubman Dkt. No. 71) at 7, 9)

Defendants' argument that the Taubmans were on actual notice of the fraud relies on documents that are not (1) discussed in the Amended Complaint; (2) attached as an exhibit to the Amended Complaint; (3) incorporated by reference in the Amended Complaint; or (4) "integral" to the Amended Complaint.  See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).  Accordingly, they are not properly before the Court in connection with Defendants' motions to dismiss.

Defendants also argue that the Taubmans were on inquiry notice because they purchased the work "with full knowledge [that] (1) Knoedler Gallery could not disclose the owner of the [w]ork; (2) the provenance of the [w]ork could not be documented; and (3) they had not been provided with a formal certificate of authenticity for the [w]ork."  (Freedman Br. (Taubman Dkt. No. 71) at 10; Freedman Reply Br. (Taubman Dkt. No. 73) at 4)  Defendants contend that the Taubmans were required to conduct an independent inquiry regarding the work's authenticity, and to contact the experts who Freedman said had viewed the work. (Freedman Reply Br. (Taubman Dkt. No. 73) at 4)

Defendants provided the Taubmans with extensive information concerning the provenance of the painting (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 83), however, and represented that experts had acknowledged the work as a Still.  Indeed, Freedman – on behalf of Knoedler – signed a letter agreement representing, inter alia, that the work was created by Clyfford Still in

43

1949.  (Id. ¶ 87)  Knoedler also provided a condition report concerning the work from Cranmer

Art Conservation, which stated that it was in "remarkably good condition."  (Id. ¶ 85)

        Defendants have not demonstrated that the Taubmans were put on inquiry notice.

The fact that they could have done more research at the time of purchase does not demonstrate

that they were on inquiry notice.  The Taubmans "had no reason to suspect the authenticity of

their painting [at the time of purchase]."  Rosen, 894 F.2d at 36 n.2; see id. ("New York courts

have exhibited a reluctance to impute discovery to a plaintiff maintaining a claim of fraud who

has no reason to suspect that he has been defrauded").

### c.    Defendants' Statute of Limitations Arguments Concerning White's RICO and Fraud Claims

        White filed suit on February 21, 2013.  (Cmplt. (White Dkt. No. 1))  Because the

alleged fraud in her case was complete on April 6, 2000, when White purchased the purported

Jackson Pollock, her fraud claims are timely only if they were brought within two years of the

date the fraud was discovered, or could have been discovered with reasonable diligence.  White

alleges that she did not learn of Defendants' fraud until December 1, 2011, when Pierre

Lagrange – who also purchased a Rosales Painting from Knoedler – brought a lawsuit claiming

that the purported Jackson Pollock he had purchased from Knoedler was a forgery.  (Am. Cmplt.

(White Dkt. No. 37) ¶¶ 78-80, 91; see also Pltf. Br. (White Dkt. No. 78) at 5)

        Defendants argue that the statute of limitations period for White's fraud claims

began to run when she purchased the purported Pollock in 2000, because one of the material

omissions alleged – the fact that the work was not listed in the Pollock catalogue raisonné – was

publicly available at the time of purchase.  (Knoedler/8-31 Br. (White Dkt. No. 75) at 14-15;

Knoedler/8-31 Reply Br. (White Dkt. No. 81) at 10-12; Freedman Br. (White Dkt. No. 86) at 2-

3; Freedman Reply Br. (White Dkt. No. 88) at 2, 5)  Defendants further contend that Freedman's

"alleged failure to mention whether the [w]ork was in the [Pollock] catalogue raisonné" put White on inquiry notice.  (Freedman Br. (White Dkt. No. 86) at 10; Freedman Reply Br. (White Dkt. No. 88) at 5)  She contends that White should have "obtained an independent opinion regarding the [w]ork's authenticity or provenance," and also confirmed whether the work was included in the Pollock catalogue raisonné.  (Freedman Br. (White Dkt. No. 86) at 9-10)

The fact that the painting White purchased was not listed in the publicly available Pollock catalogue raisonné at the time of purchase did not put her on inquiry notice of a fraud. Defendants provided White with a great deal of information concerning the provenance of the painting, both verbally and in writing, and represented that it had been acknowledged as a Pollock by experts in the field.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 2, 35, 38, 46)  Moreover, White chose to acquire the alleged Pollock through Knoedler because of its reputation as New York City's oldest art gallery and one of its most respected and trusted galleries.  (Id. ¶ 33) These facts do not establish that "a reasonable plaintiff of ordinary intelligence would have been aware of the existence of fraud."  Cohen, 711 F.3d at 362.

Defendants argue, however, that White had actual knowledge that the work was not in Pollock's catalogue raisonné on February 17, 2011, when Christie's informed White that it would not accept the work for auction because it was not included in Pollock's catalogue raisonné.  White did not file this lawsuit until February 21, 2013, however, two years and four days later.  (Freedman Br. (White Dkt. No. 86) at 1, 6, 8; Freedman Reply Br. (White Dkt. No. 88) at 3-4)

Once again, the documents Defendants cite in support of this argument are not properly before this Court.  To establish the February 17, 2011 date, Defendants rely on an internal email among Christie's employees.  (Declaration of Luke Nikas ("Nikas Decl.") (White

Dkt. No. 87), Ex. 1 ("internal Christie's email"))  The internal Christie's email is not attached as an exhibit to White's Amended Complaint, nor is it incorporated by reference in, or "integral" to, the Amended Complaint.  See Sira, 380 F.3d at 67.  Although Defendants argue that the internal Christie's email "directly relates" to White's allegation that Christie's informed her in "late February" that the work is not listed in the Pollock catalogue raisonné, this contention does not demonstrate that the internal Christie's email is incorporated in, or integral to, White's Amended Complaint.  See Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 156-57 (2d Cir. 2006) ("with respect to whether the materials considered were integral to Global's complaint, a necessary prerequisite for that exception is that the 'plaintiff[ ] rel[y] on the terms and effect of [the] document in drafting the complaint . . . ; mere notice or possession is not enough'") (quoting Chambers, 282 F.3d at 153) (emphasis in Chambers).

Assuming arguendo that notice that the alleged Pollock was not listed in the Pollock catalogue raisonné put White on inquiry notice – an issue that this Court expresses no opinion on at this time – the Amended Complaint does not demonstrate that White learned of this fact more than two years before she filed suit.

White's RICO and fraud claims will not be dismissed on statute of limitations grounds.

**B.      Application to Warranty, Mistake, New York General Business Law, and Unjust Enrichment Claims**

Knoedler and 8-31 argue that the breach of warranty,[16] mistake, and New York General Business Law §§ 349-350 claims alleged in the Hilti, White, and Taubman actions are

---

[16]  Hilti alleges that "Knoedler, through its invoice and [w]riteup [for the Rothko], expressly warranted to Plaintiff that the [w]ork was painted by Rothko and that the [w]ork had a particular provenance."  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 455)  White alleges that "Freedman and Knoedler expressly represented to the Whites that the [w]ork was created by Jackson Pollock in

time-barred.  (Knoedler/8-31 Br. (<u>Hilti</u> Dkt. No. 94) at 7-13; Knoedler/8-31 Br. (<u>White</u> Dkt. No. 75) at 7-12; Knoedler/8-31 Br. (<u>Taubman</u> Dkt. No. 64) at 7-11)  Freedman argues that Hilti's and White's breach of warranty claims – and the New York General Business Law deceptive business practices claims alleged in the <u>Hilti</u>, <u>White</u>, and <u>Taubman</u> actions – are time-barred. (Freedman Br. (<u>Hilti</u> Dkt. No. 105) at 22-25; Freedman Br. (<u>White</u> Dkt. No. 86) at 19-20, 22-25; Freedman Br. (<u>Taubman</u> Dkt. No. 71) at 4, 20-21)  Hammer argues that the breach of warranty, mistake, and New York General Business law claims alleged in the <u>Hilti</u> and <u>White</u> actions are time-barred.  (Hammer Br. (<u>Hilti</u> Dkt. No. 92) at 21 (adopting Knoedler and Freedman's arguments); Hammer Br. (<u>White</u> Dkt. No. 73) at 24 (same))  Hammer Galleries argues that the unjust enrichment claim alleged in the <u>Hilti</u> action is time-barred.  (Hammer Galleries Br. (<u>Hilti</u> Dkt. No. 96) at 1, 4-6)

### 1.      Limitations Periods

#### a.      Limitations Period for Breach of Warranty Claims

Under Section 2-725(1) of New York's Uniform Commercial Code, an action for breach of warranty must be brought within four years of the date the cause of action accrues. N.Y. U.C.C. § 2-725(1).  Section 2-725(2) provides that

> [a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

---

1949 and the [w]ork's provenance was that it was part of a 'Private Collection, Switzerland," and that these representations are express warranties.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 194-95) White also alleges that "Knoedler and Freedman impliedly warranted that the [w]ork would be merchantable."  (<u>Id.</u> ¶ 213)  The Taubmans allege that "Knoedler expressly represented to Taubman . . . that the [p]ainting was created by Still in 1949 and that the [p]ainting was obtained from a private collection in Switzerland," and that these representations constitute express warranties.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 260-61)  The Taubmans also allege that "Knoedler impliedly warranted that the [p]ainting would be merchantable."  (<u>Id.</u> ¶ 285)

N.Y. U.C.C. § 2-725(2).  The statute further provides that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  Id.  In sum, the plain language of the statute makes clear that the statute of limitations generally begins to run "on tender of delivery," and that lack of knowledge of a defect has no effect on the running of the limitations period.  See Brady v. Lynes, No. 05 Civ. 6540 (DAB), 2008 WL 2276518, at *12 (S.D.N.Y. June 2, 2008) (argument that breach occurs upon discovery is "contrary to black letter law"); Morgan v. Abco Dealers, Inc., No. 01 Civ. 9564 (PKL), 2007 WL 4358392, at *6 (S.D.N.Y. Dec. 11, 2007); Orlando v. Novurania of Am., Inc., 162 F. Supp. 2d 220, 224 (S.D.N.Y. 2001).

### b.    Limitations Period for Mistake Claims

Under N.Y. C.P.L.R. § 213(6), a six-year statute of limitations applies to mistake claims.  A cause of action for mistake accrues at the time of the alleged mistake.  Johnson v. Broder, 112 A.D.3d 788 (2d Dep't 2013).

### c.    Limitations Periods for NY General Business Law Claims

Claims brought under New York General Business Law §§ 349 and 350 are subject to a three-year statute of limitations under N.Y. C.P.L.R. § 214(2).  Marshall v. Hyundai Motor Am., 51 F. Supp. 3d 451, 459 (S.D.N.Y. 2014); Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 441 (S.D.N.Y. 2014), aff'd, 579 F. App'x 7 (2d Cir. 2014).  A cause of action accrues "when plaintiff has been injured by a deceptive act or practice violating [these sections]."  Gaidon v. Guardian Life Ins. Co. of Am., 96 N.Y.2d 201, 210 (2001).

### d.    Limitations Period for Unjust Enrichment Claims

Unjust enrichment claims seeking monetary damages – as here (see Am. Cmplt. (Hilti Dkt. No. 46) at 76 ¶ Q) – are subject to a three-year statute of limitations under N.Y.

C.P.L.R. § 214(3).  Ingrami v. Rovner, 45 A.D.3d 806, 808 (2d Dep't 2007); see also Matana v. Merkin, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013) ("Under New York law, the statute of limitations applicable to an unjust enrichment claim depends on the nature of the substantive remedy plaintiff seeks. . . .  The limitations period is six years where plaintiff seeks an equitable remedy, but three years where plaintiff seeks monetary damages."); Grynberg v. Eni S.p.A., No. 06 Civ. 6495 (RLC), 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007) ("New York courts have held that [unjust enrichment] claims are governed by either a three-year statute of limitations when monetary relief is sought or a six-year statute of limitations when equitable relief is sought.").  "The statute of limitations on an unjust enrichment claim begins to run upon the occurrence of the wrongful act giving rise to the duty of restitution."  Ingrami, 45 A.D.3d at 808.

## 2.    Equitable Tolling

The doctrine of equitable tolling applies where defendant's fraudulent conduct results in plaintiff's lack of knowledge of a cause of action.[17]  Marshall, 51 F. Supp. 3d at 462; see also Pearl v. City of Long Beach, 296 F.3d 76, 82 (2d Cir. 2002).

---

[17] "'Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.'"  Marshall, 51 F. Supp. 3d at 462 (quoting Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007) (internal citations and quotations marks omitted).  "[T]he reported decisions of the federal and state courts do not always mean the same thing by their use of these phrases, and phrases to which some judges ascribe different meanings are used interchangeably by other judges."  Pearl v. City of Long Beach, 296 F.3d 76, 81 (2d Cir. 2002).  It has been said that "New York appears to use the label 'equitable estoppel' to cover both the circumstances 'where the defendant conceals from the plaintiff the fact that he has a cause of action [and] where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired.'"  Id. at 82 (quoting Joseph M. McLaughlin, Practice Commentaries, N.Y. C.P.L.R. C201:6, at 63 (McKinney 1990)).  However, some New York courts distinguish between the two circumstances, and refer only to the latter circumstance as equitable estoppel:

> Although both the doctrines of equitable estoppel and equitable tolling have a common origin, they are applied in different circumstances. Equitable estoppel is applicable where the plaintiff knew of the existence of the cause of action, but the

"For equitable tolling to apply, plaintiff must show that the defendant wrongfully concealed its actions, such that plaintiff was unable, despite due diligence, to discover facts that would allow him to bring his claim in a timely manner, or that defendant's actions induced plaintiff to refrain from commencing a timely action."  De Sole, 974 F. Supp. 2d at 318; see also Marshall, 51 F. Supp. 3d at 462 (plaintiff must show that "'the defendant wrongfully concealed material facts,' which 'prevented plaintiff's discovery of the nature of the claim,' and that 'plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled.'") (quoting Koch v. Christie's Int'l PLC, 699 F.3d 141, 157 (2d Cir. 2012)); Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007) ("'Due diligence on the part of the plaintiff in bringing [an] action,' . . . is an essential element of equitable relief.") (quoting Doe v. Holy See (State of Vatican City), 17 A.D.3d 793, 794 (3d Dep't 2005)).  Stated differently, "equitable estoppel will apply 'where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action' . . . [and when] the plaintiff [has] demonstrate[d] reasonable reliance on the defendant's misrepresentations." Zumpano v. Quinn, 6 N.Y.3d 666, 674 (2006) (quoting Simcuski v Saeli, 44 N.Y.2d 442, 449 (1978)).

---

defendant's misconduct caused the plaintiff to delay in bringing suit.  Equitable tolling, on the other hand, is applicable where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action.

Kotlyarsky v. New York Post, 195 Misc. 2d 150, 153 (Sup. Ct. Kings Cnty. 2003); see also Marshall, 51 F. Supp. 3d at 462-63; Statler, D.C. v. Pell, Inc., 775 F. Supp. 2d 474, 482 (E.D.N.Y. 2011).  For the sake of clarity, and because Plaintiffs do not assert that they knew of the existence of the cause of action long before filing suit, this Court will continue to refer to the doctrine as equitable tolling.  See Shared Commc'ns Servs. of ESR, Inc. v. Goldman, Sachs & Co., 38 A.D.3d 325, 326 (1st Dep't 2007).

"When deciding whether to toll the running of the statute of limitations, the issue is not whether Plaintiff was in possession of all of the information necessary to prevail on his claims, but whether plaintiff had enough information to commence a lawsuit." Statler, 775 F. Supp. 2d at 483.  "Ultimately, tolling can apply only when a plaintiff has acted with reasonable diligence and can show extraordinary circumstances that justify the requested toll." Id.

      **3.**    **Analysis**

          **a.**    **Hilti's Equitable Tolling Claim**

Hilti purchased the purported Rothko from Knoedler and Freedman on November 6, 2002.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 1)  Accordingly, the statute of limitations for Hilti's (1) breach of warranty claim expired in 2006; (2) mistake claim expired in 2008; and (3) General Business Law and unjust enrichment claims expired in 2005.  Because Hilti filed this action on January 29, 2013 (Hilti Dkt. No. 1), all of these claims are untimely unless the statute was extended for some reason.

Hilti argues that the doctrine of equitable tolling applies to preserve all of these claims.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 390-92, 458, 466, 473, 482; Pltf. Br. (Hilti Dkt. No. 100) at 24-27)  Knoedler, 8-31, and Hammer Galleries contend that the Amended Complaint provides no basis for applying equitable tolling.  (Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 9; Hammer Galleries Br. (Hilti Dkt. No. 96) at 5-6)

Hilti alleges that Freedman tried to "lull" Hilti into "believing it had made a great decision" by purchasing the Rothko, noting that "[o]n several occasions, Freedman described the [w]ork to Plaintiff as a 'fantastic Rothko' or a 'great Rothko,'" while trying to sell more Rosales Paintings to Hilti.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 36-38)  As to the General Business Law §§ 349-350 claims, Hilti argues that Freedman tried to conceal material facts until May 2012 –

51

such as the reason for Knoedler's closing – and to mislead Hilti into thinking that it had bought a "fantastic Rothko."  (Id. ¶ 391)  With respect to the breach of warranty claim, Hilti alleges that Knoedler intentionally concealed material facts that were uniquely in its possession and made "repeated efforts over . . . time to mislead Plaintiff into believing that the [w]ork was a 'fantastic Rothko' and was exactly as it had falsely warranted."  (Id. ¶ 458)  Such generalized and conclusory allegations of fraudulent concealment are not sufficient to toll a statute of limitations. See Armstrong v. McAlpin, 699 F.2d 79, 90 (2d Cir. 1983).[18]

Hilti also claims that Defendants wrongfully concealed the IFAR report.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 101, 103; Pltf. Br. (Hilti Dkt. No. 100) at 25)  As this Court has previously noted, however, "mere silence or failure to disclose the wrongdoing is insufficient." De Sole, 974 F. Supp. 2d at 319 (citations and internal quotation marks omitted).  Accordingly, these allegations are insufficient to foreclose the statute of limitations defense.

Hilti further alleges that on June 17, 2004, Freedman called Michael Hilti and "tried to persuade him, on behalf of Plaintiff, to purchase the Lagrange Pollock," explaining that

---

[18] Hilti also contends that "the self-concealing nature of the Scheme did not begin to collapse until widespread press reporting in 2012 about Knoedler's abrupt closure at the end of 2011." (Pltf. Br. (Hilti Dkt. No. 100) at 26-27 (citing Am. Cmplt. (Hilti Dkt. No. 46) ¶ 294))  To the extent Hilti is arguing that the self-concealing nature of the forgery prevented it from discovering the fraud, the Second Circuit rejected a similar argument in a case involving a forged John Singer Sargent painting.  See Rosen v. Spanierman, 894 F.2d 28, 32 (2d Cir. 1990) (discovery exception to statute of limitations set forth in N.Y. U.C.C. § 2-725(2) did not apply where plaintiffs contended that they had been duped into purchasing a forged painting).  The Rosen court found that the forged nature of the purported Sargent painting was discoverable at the time of delivery through measures that were not "extraordinary."  Rosen, 894 F.2d at 32 ("While we would hesitate to deem the alleged defect here readily discoverable if extraordinary measures were required to detect the flaw, a painting's lack of authenticity is readily apparent to the trained eye of an art expert.")  Even assuming arguendo that the task of determining the inauthenticity of Hilti's alleged Rothko was more challenging than determining the legitimacy of the Sargent painting in Rosen, Hilti has not pled facts sufficient to demonstrate that it could not have ascertained the accuracy of Knoedler's warranties.

the Pollock had come from "'the same source as [Hilti's] Rothko.'"  (Am. Cmplt. (Hilti Dkt. No.

46) ¶¶ 184-85)  "To try to lull and persuade Plaintiff to purchase the Lagrange Pollock,

Freedman also repeated that she had previously sold Plaintiff a 'fantastic Rothko.'"  (Id. ¶ 186)

Hilti argues that these were "fresh acts of affirmative misrepresentation and concealment with

respect to the Scheme in their effort to sell the 'Lagrange Pollock' to Hilti . . . ."  (Pltf. Br. (Hilti

Dkt. No. 100) at 25 (citing Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 181-87))  Similarly, Hilti alleges

that Freedman tried to sell Hilti a Newman on June 17, 2008, telling Hilti that the Newman

would be "'a great fit to your outstanding Rothko.'"  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 218-21)

These statements do not meet the standard for equitable tolling, however, because – according to

Hilti – they were made in an effort to sell more forged paintings, rather than to conceal

Defendants' prior fraud.  See Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 186, 218, 221; see also De Sole,

974 F. Supp. 2d at 319 ("For equitable tolling to apply, . . . the later fraudulent misrepresentation

must be for the purpose of concealing the former tort."); Ross v. Louise Wise Services, Inc., 8

N.Y.3d 478, 491 (2007) (with respect to negligence and emotional distress claims, stating that

"[f]or the [equitable estoppel] doctrine to apply, a plaintiff may not rely on the same act that

forms the basis for the claim – the later fraudulent misrepresentation must be for the purpose of

concealing the former tort"); Keitt v. New York City, 882 F. Supp. 2d 412, 439 (S.D.N.Y. 2011)

("New York law provides for equitable tolling where a defendant 'wrongfully deceived or misled

the plaintiff in order to conceal the existence of a cause of action.'") (citation omitted).

　　　　Hilti also argues that Defendants made "additional efforts at lulling and deceiving

in or about 2005 . . . by laundering the 'David Herbert' story through Oliver Wick . . . .  (Pltf. Br.

(Hilti Dkt. No. 100) at 26 (citing Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 175-80))  Hilti does not

allege that any Hilti representative read or learned of Wick's article.  Accordingly, the required

element of reliance has not been adequately alleged.  See Zumpano, 6 N.Y.3d at 674 ("[T]he

plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations.");

Simcuski v. Saeli, 44 N.Y.2d 442, 449 (1978) (reliance is a necessary element for invoking

doctrine of equitable estoppel); Dombroski v. Samaritan Hosp., 47 A.D.3d 80, 82-83 (3d Dep't

2007) ("Even where an intentional misrepresentation is thus established, to invoke the [equitable

estoppel] doctrine a plaintiff must demonstrate reasonable reliance on the defendant's

misrepresentations and due diligence on the part of the plaintiff in bringing the action.") (internal

citations and quotation marks omitted); Shared Commc'ns Servs. of ESR, Inc. v. Goldman,

Sachs & Co., 38 A.D.3d 325, 326 (1st Dep't 2007) ("there is no basis for tolling the statute of

limitations under New York's doctrine of equitable estoppel, since plaintiff failed to show that it

was prevented from timely filing an action due to reasonable reliance by it on 'deception, fraud

or misrepresentations' by defendant") (citation omitted); Pahlad v. Brustman, 33 A.D.3d 518,

519-520 (1st Dep't 2006) ("plaintiff must demonstrate reasonable reliance on the defendant's

misrepresentations, . . . and due diligence on the part of the plaintiff in ascertaining the facts, and

in commencing the action, is an essential element when plaintiff seeks the shelter of [the

equitable estoppel] doctrine"), aff'd, 8 N.Y.3d 901 (2007); Twersky v. Yeshiva Univ., 993 F.

Supp. 2d 429, 442-43 (S.D.N.Y. 2014) ("In order to invoke equitable estoppel, a plaintiff must

also demonstrate reasonable reliance on the defendant's misrepresentations, and due diligence in

bringing a claim when the conduct relied upon as a basis for equitable estoppel ceases to be

operational."), aff'd 579 F. App'x 7 (2d Cir. 2014); Corp. Trade, Inc. v. Golf Channel, No. 12

Civ. 8811 (PKC), 2013 WL 5375623, at *6 (S.D.N.Y. Sept. 24, 2013) ("'Equitable estoppel is

appropriate where the plaintiff is prevented from filing an action within the applicable statute of

limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant.'") (quoting Putter v. N. Shore. Univ. Hosp., 7 N.Y.3d 548, 552 (2006)).

Accordingly, 8-31, Hammer Galleries, Hammer, and Knoedler's motion to dismiss Hilti's breach of warranty, mistake, General Business Law, and unjust enrichment claims is granted.

### b.   White's Equitable Tolling Claim

White purchased the purported Pollock from Freedman and Knoedler in April 2000.  (Am. Cmplt. (White Dkt. No. 37) ¶ 1)  Accordingly, the statute of limitations for White's (1) breach of warranty claim expired in 2004; (2) mistake claim expired in 2006;[19] and (3) General Business Law expired in 2003.  Because White filed this action on February 21, 2013 (Cmplt. (White Dkt. No. 1)), her breach of warranty, mistake, and General Business Law claims are untimely unless the statute was extended for some reason.[20]

White argues that the doctrine of equitable tolling applies to preserve all of these claims.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 198, 207, 216, 223, 230, 241; Pltf. Br. (White Dkt. No. 82) at 10-15)

---

[19] White also argues that her mistake claims did not accrue until she discovered the fraud.  (Pltf. Br. (White Dkt. No. 82) at 10-11)  This is incorrect.  A cause of action for mistake accrues at the time of the alleged mistake.  Johnson v. Broder, 112 A.D.3d 788, 788 (2d Dep't 2013).

[20] White also asserts claims for breach of express and implied warranty under Hawaiian law.  See Haw. Rev. Stat. §§ 490:2-313, 2-314; Am. Cmplt. (White Dkt. No. 37) ¶¶ 195, 212.  White contends that, under Hawaiian law, a warranty of authenticity given by a merchant for artwork constitutes an express warranty of future performance, and the statute of limitations for a claim based on such a warranty begins to run "'when the breach is discovered or reasonably should have been discovered.'"  (Pltf. Br. (White Dkt. No. 78) at 18-19 (quoting Balog v. Center Art Gallery – Hawaii, Inc., 745 F.Supp. 1556, 1572 (D. Hawaii 1990)).

Defendants argue that the application of Hawaiian law is improper here, because – under the "center of gravity" test – New York was the place of negotiation, contracting, and performance.  (Freedman Br. (White Dkt. No. 86) at 20 n.6)  White argues, however, that it is premature to make the choice-of-law determination, because the record lacks facts necessary to conduct the

White argues that equitable tolling applies because Defendants took "affirmative steps" to conceal their wrongdoing by (1) not disclosing the IFAR report and the concerns it raised about the Rosales Paintings, and (2) "continuing operation of the gallery and sales of forged paintings subsequent to the sale of the [w]ork [purchased by White]." (Pltf. Br. (<u>White</u>

---

"center of gravity" analysis. (Pltf. Br. (<u>White</u> Dkt. No. 78) at 19; Pltf. Br. (<u>White</u> Dkt. No. 82) at 10)

White's Amended Complaint alleges that she first saw the Pollock while visiting the Knoedler Gallery in New York. At that time, Freedman told her that the painting was "an authentic Jackson Pollock and . . . that it was owned by a private collector in Switzerland." (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 34-35) These representations were memorialized in an invoice which was sent to White's residence in Hawaii. (<u>Id.</u> ¶ 35) On April 6, 2000, White mailed a check to Knoedler in New York in payment for the Pollock. (<u>Id.</u> ¶ 39) A few days later, Knoedler and Freedman shipped the work to White's residence in Hawaii. (<u>Id.</u> ¶ 40)

"In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." <u>Manning Int'l Inc. v. Home Shopping Network, Inc.</u>, 152 F. Supp. 2d 432, 436 n.3 (S.D.N.Y. 2001). No party disputes that New York's choice-of-law rules apply. "Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." <u>Forest Park Pictures v. Universal Television Network, Inc.</u>, 683 F.3d 424, 433 (2d Cir. 2012). Such is the case here.

Where an actual conflict exists, "'New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.'" <u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108 F.3d 1531, 1539 (2d Cir. 1997) (quoting <u>Brink's Ltd. v. South African Airways</u>, 93 F.3d 1022, 1030 (2d Cir. 1996)). In contract cases, New York courts apply the "center of gravity" or "grouping of contacts" analysis in determining the choice of law. <u>GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.</u>, 449 F.3d 377, 383 (2d Cir. 2006). "Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." <u>Lazard Freres & Co.</u>, 108 F.3d at 1539 (quoting <u>Brink's Ltd.</u>, 93 F.3d at 1030-31). All of these facts are addressed in the Amended Complaint.

The Court concludes that New York law applies, because the "overall balance of negotiation and performance tips in favor" of New York. <u>See</u> <u>Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.</u>, 155 F. Supp. 2d 1, 13 (S.D.N.Y. 2001), <u>aff'd in part and remanded,</u> 277 F.3d 253 (2d Cir. 2002). The sole face-to-face meeting between White and Freedman was at the Knoedler Gallery in New York; Freedman's alleged false representations were made at this meeting; the painting was sold from the Gallery located in New York; and payment was received by the Gallery in New York. (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 34-35, 39).

Dkt. No. 82) at 14 (citing Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 59-62))[21]  These allegations are

not sufficient to invoke the doctrine of equitable tolling.

> "Equitable tolling '"is triggered by some conduct on the part of the defendant

after the initial wrongdoing; mere silence or failure to disclose the wrongdoing is insufficient."'"

<u>De Sole</u>, 974 F. Supp. 2d at 319 (quoting <u>Ross v. Louise Wise Servs., Inc.</u>, 8 N.Y.3d 478, 491-92

(2007) (quoting <u>Zoe G. v. Frederick F.G.</u>, 208 A.D.2d 675, 675-76 (2d Dep't 1994))); <u>see</u> <u>also</u>

<u>Corsello v. Verizon New York, Inc.</u>, 18 N.Y.3d 777, 789 (2012) ("[I]n cases where the alleged

concealment consisted of nothing but defendants' failure to disclose the wrongs they had

committed, [New York courts] have held that the defendants were not estopped from pleading a

statute of limitations defense.").  Defendants' continued efforts to sell more forged paintings do

not constitute affirmative acts aimed at concealing Knoedler's past frauds.  <u>See</u> <u>De Sole</u>, 974 F.

Supp. 2d at 319; <u>Marshall</u>, 51 F. Supp. 3d at 464 (equitable tolling not applicable where

"Defendant continued the same deceptive practices that persuaded Plaintiffs to purchase their

vehicles and remained silent about any defect").

> Accordingly, Knoedler, 8-31, Hammer, and Freedman's motions to dismiss

White's breach of warranty and General Business Law claims, and Knoedler, 8-31, and

Hammer's motion to dismiss the mistake claims, will be granted.

### c.  <u>The Taubmans' Equitable Tolling Claim</u>

> The Taubmans purchased the purported Still from Freedman and Knoedler in

November 2005.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 1)  Accordingly, the statute of

limitations for the Taubman's (1) breach of warranty claim expired in 2009; (2) mistake claim

---

[21] White argues that the wrong perpetrated on her was self-concealing, and thus equitable tolling
applies.  (Pltf. Br. (Dkt. No. 82) at 11-13)  This argument is rejected for the reasons explained
above in connection with Hilti's equitable tolling claim.

expired in 2011; and General Business Law claims in 2008.  Because the Taubmans filed this

action on May 3, 2013 (Cmplt. (Taubman Dkt. No. 1)), these claims are untimely unless the

statute was extended for some reason.

The Taubmans argue that the doctrine of equitable tolling applies to preserve

these claims.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 266-71, 281, 289, 296, 303, 313; see also

Pltf. Br. (Taubman Dkt. No. 68) at 37-44)

The Taubmans complain that Knoedler and Freedman did not disclose (1)

evidence that the Diebenkorns Rosales had brought to Knoedler were not authentic, and (2) the

Dedalus Foundation's conclusion that Rosales's "Motherwells" were "highly suspect" and not fit

for inclusion in the Motherwell catalogue raisonné.  (Id. ¶¶ 111-18)  Equitable tolling "'is

triggered by some conduct on the part of the defendant after the initial wrongdoing[, however];

mere silence or failure to disclose the wrongdoing is insufficient.'"  Ross, 8 N.Y.3d at 491-92

(quoting Zoe G., 208 AD.2d at 675-676).  Therefore these allegations are not sufficient.

The Taubmans also allege that "Knoedler further sought to cover up its fraudulent

sale to Taubman by continuing to correspond and do business with Taubman as if" Knoedler still

believed the work was authentic.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 125)  For example,

between March through June 2007, Knoedler, Freedman, and Taubman negotiated Taubman's

potential purchase of the Green Pollock.  (Id. ¶ 126)  Knoedler and Freedman did not tell

Taubman about the IFAR report, however, or the change in provenance of the Green Pollock.

(Id.)  To the contrary, on June 2, 2007, Freedman told the Taubmans that "[Knoedler's] invoice

is always [Knoedler's] legal guarantee."  (Id. ¶¶ 127, 267)  These statements do not meet the

standard for equitable tolling, however, because they were allegedly made for the purpose of

selling more paintings, not for the purpose of concealing Knoedler's prior fraud.[22]  See De Sole, 974 F. Supp. 2d at 319; Marshall, 51 F. Supp. 3d at 464.

The Taubmans also allege that Hammer – in his role as Chairman of Knoedler – sent a letter dated October 27, 2009 to Knoedler customers – including the Taubman's art adviser at the time – informing them that Freedman had "resigned."  (Am. Cmplt. (Taubman Dkt. No. 37) ¶¶ 122, 268)  The Taubmans further allege that Hammer's October 27, 2009 letter announcing Freedman's "resignation" was sent in order "to ensure that no connection would be drawn between Freedman's abrupt departure from Knoedler and problems with the Rosales Collection."  (Id. ¶ 268)

Assuming arguendo that the Taubmans have plausibly alleged that Hammer's letter was sent in an effort to conceal Knoedler's prior deceptive conduct concerning the Rosales Paintings, including the work sold to the Taubmans, Plaintiffs have not alleged that they saw the letter, much less that they relied on it.  Reasonable reliance on a defendant's misrepresentations is a required element for invoking equitable tolling.  See Zumpano, 6 N.Y.3d at 674 ("the plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations"); Simcuski, 44 N.Y.2d at 449 (reliance is a necessary element for invoking doctrine of equitable estoppel); Dombroski, 47 A.D.3d at 82-83 ("Even where an intentional misrepresentation is thus established, to invoke the [equitable estoppel] doctrine a plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations and due diligence on the part of the plaintiff in bringing the action") (internal citations and quotation marks omitted); Shared Commc'ns Servs. of ESR, Inc., 38 A.D.3d at 326 ("there is no basis for tolling the statute of limitations under New

---

[22]  The Taubmans' "self-concealing scheme" argument (see Am. Cmplt. (Taubman Dkt. 37) ¶ 270) is rejected for the same reasons discussed above.

York's doctrine of equitable estoppel, since plaintiff failed to show that it was prevented from timely filing an action due to reasonable reliance by it on 'deception, fraud or misrepresentations' by defendant"); Pahlad, 33 A.D.3d at 520 ("plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations, . . . and "due diligence on the part of the plaintiff in ascertaining the facts, and in commencing the action, is an essential element when plaintiff seeks the shelter of [the equitable estoppel] doctrine.").

Because the Taubmans have not alleged that they saw Hammer's October 27, 2009 letter, much less that they relied on it, there is no basis to apply equitable tolling.

Knoedler, 8-31, and Freedman's motions to dismiss the Taubmans' General Business Law claims, and Knoedler and 8-31's motions to dismiss the Taubmans' mistake and breach of warranty claims, are granted.

## IV.    SUBSTANTIVE RICO CLAIM

### A.    Applicable Law

To sustain a private cause of action under RICO, a plaintiff must allege:  "(1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and alteration omitted); see also 18 U.S.C. § 1964(c) (providing a cause of action for "[a]ny person injured in his business or property by reason of a violation" of Section 1962).  An underlying violation of RICO occurs when "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, . . . conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."  18 U.S.C. 1962(c).  Thus, in addition to injury and causation, a plaintiff must

allege:  "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."  Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983).

The "pattern of racketeering activity" elements are adequately pled where plaintiff makes factual allegations sufficient to demonstrate that defendants committed two or more predicate acts as part of a pattern of racketeering activity.  Here, Plaintiffs allege that Defendants committed two or more acts of mail and/or wire fraud.  Mail and wire fraud are included in the statutory definition of "racketeering activity."  18 U.S.C. § 1961(1)(B).

To establish RICO claims based on mail and wire fraud, a complaint must, as a threshold matter, allege "the existence of a fraudulent scheme."  McLaughlin v. Anderson, 962 F.2d 187, 190-91 (2d Cir. 1992).  The complaint must also allege that "the defendant 'caused' the mailing or use of the wires," and that "the mailing or use of the wires 'was for the purpose of executing the scheme or, in other words, incident to an essential part of the scheme.'"  Maersk, Inc. v. Neewra, Inc., 687 F. Supp. 2d 300, 332 (S.D.N.Y. 2009) (quoting United States v. Bortnovsky, 879 F.2d 30, 36 (2d Cir. 1989)).  In short, a RICO complaint must provide "a detailed description of the underlying [fraudulent] scheme and the connection . . . of the mail and/or wire communications [to the scheme]."  In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

A RICO plaintiff must also plead facts sufficient to demonstrate that the plaintiff's injury was caused by the defendant's racketeering activities.  See Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 323 (2d Cir. 2011).  Where, as here, a RICO violation is predicated on acts of fraud, a plaintiff must allege that the defendant's acts were not only the "but for" cause

of plaintiff's injury, but the proximate cause as well, necessitating "some direct relation between the injury asserted and the injurious conduct alleged"; "[a] link that is too remote, purely contingent, or indirect is insufficient." Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9 (2010) (internal quotation marks and alteration omitted). This causation requirement is necessary because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." Ideal Steel, 652 F.3d at 316 (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 458  (2006) (alteration omitted)).

Hammer contends that the RICO claims against him should be dismissed because the Amended Complaints do not adequately allege that he (1) committed a predicate act, (2) participated in the operation or management of the RICO enterprise, or (3) caused Plaintiffs' injuries.  (Hammer Br. (Hilti Dkt. No. 91) at 11-15; Hammer Br. (White Dkt. No. 73) at 14-20; Hammer Br. (Taubman Dkt. No. 62) at 14-20)

8-31 contends – as to the Hilti action – that the RICO claims against it should be dismissed, because Hilti has not adequately alleged that 8-31 (1) committed a predicate act, (2) participated in the operation or management of the RICO enterprise, or (3) caused Hilti's injury. (Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 20-23)

Hammer and 8-31 do not challenge the existence of a RICO enterprise.

**B.**   **Analysis**

**1.**   **The Alleged Enterprise**

"'Any principled analysis of a RICO claim . . . must begin from an understanding of what enterprise is alleged.'"  Freund v. Lerner, 09 Civ. 7117 (HB), 2010 WL 3156037, at *6 (S.D.N.Y. Aug. 10, 2010) (quoting Spira v. Nick, 876 F. Supp. 553, 561 (S.D.N.Y. 1995))  An

enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004) (citation and quotation marks omitted). This definition "is obviously broad. . . . The term 'any' ensures that the definition has wide reach . . . and the very concept of an association in fact is expansive." Boyle v United States, 556 U.S. 938, 944 (2009); see also Automated Teller Mach. Advantage LLC v. Moore, No. 08 Civ. 3340 (RMB) (FM), 2009 WL 2431513, at *6 (S.D.N.Y. Aug. 6, 2009) (Boyle "establishes a low threshold for pleading [an association-in-fact] enterprise"). Thus, RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981).

Where, as here, the alleged enterprise is a "group of individuals associated in fact although not a legal entity," see 18 U.S.C. § 1961(4), "the persons to be held liable are the individual defendants who participated in the association by committing predicate acts which related to and furthered the association's purported common purpose." In re Gas Reclamation, Inc. Sec. Litig., 659 F. Supp. 493, 518 (S.D.N.Y. 1987) The "'person'" and the "'enterprise'" are thus "'distinct.'" Id. at 517 (quoting Rush v. Oppenheimer & Co., Inc., 628 F. Supp. 1188, 1194 (S.D.N.Y. 1985)); see also In re Energy Sys. Equip. Leasing Sec. Litig., 642 F. Supp. 718, 740-41 (E.D.N.Y.1986) ("enterprise composed of an association-in-fact, even if made up entirely of individual defendants deemed to be § 1961(3) 'persons,' is to be viewed for purposes of RICO claims as possessing a separate existence from its individual members. . . . [T]he various defendants constitute persons under RICO, while the interaction and relationship between these defendants with regard to the alleged scheme . . . comprises an association-in-fact enterprise separate and distinct from those individual persons."); Fustok v. Conticommodity Servs., Inc.,

618 F. Supp. 1074, 1076 (S.D.N.Y. 1985) ("an association in fact which constitutes a RICO enterprise is not merely a synonym for the collective of 'individuals' which form the association, but instead it is a distinct entity").

Plaintiffs in the instant actions allege that Knoedler, Freedman, Rosales, Hammer, 8-31, Jose Carlos Bergantinos Diaz, and others joined forces for the purpose of selling forged artworks. Plaintiffs further allege that each Defendant had a relationship with the others and with the enterprise: Rosales and the Diazes arranged for the production of the forged artworks and brought them to Knoedler for sale; Knoedler and Freedman marketed and sold the forged artworks to Knoedler's customers; Hammer, through 8-31, managed and operated Knoedler – permitting it to be used as a platform to sell forged artwork, and – through his compensation practices – incentivized Freedman to escalate her sales of forged artwork through Knoedler. (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 304; Am. Cmplt. (White Dkt. No. 37) ¶¶ 164-74; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 235-39)  In return for engaging in their illegal acts, all of these defendants reaped the benefits of the fraudulent sales. Plaintiffs also allege that the enterprise was of sufficient duration to pursue its purpose: over more than a decade, the enterprise sold nearly forty forged artworks to dozens of unsuspecting collectors for some $60 million. (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 264; Am. Cmplt. (White Dkt. No. 37) ¶¶ 164, 175; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 166, 233, 241)

Here, the complaints aver "a[n] [illegal] purpose, [a] relationship[] among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946. These allegations are sufficient to make out a RICO enterprise. See Galerie Furstenberg v. Coffaro, 697 F. Supp. 1282, 1287 (S.D.N.Y. 1988) (RICO enterprise established where defendants had been "continuously distributing, advertising,

offering for sale and/or selling . . . forged or counterfeited [works of art]"); <u>Boyle</u>, 556 U.S. at

941 (RICO enterprise existed where "loosely and informally organized" group (1) participated in

more than thirty bank robberies during a ten-year period, (2) "met beforehand to plan the

crime[s] . . . and [to] assign roles that each participant would play," and (3) split the proceeds of

the robberies, even though the enterprise had no "leader or hierarchy" and no "long-term master

plan or agreement").

## 2.      <u>Hammer and 8-31's Participation in the RICO Enterprise</u>

A RICO plaintiff must allege that the defendant "conduct[ed] or participate[d],

directly or indirectly, in the conduct of [a RICO] enterprise's affairs through a pattern of

racketeering activity . . . ."  18 U.S.C. § 1962(c); <u>see</u> <u>Reves v. Ernst & Young</u>, 507 U.S. 170,

177-79 (1993).  In other words, the defendant must have had "some part in directing [the

enterprise's] affairs."  <u>Reves</u>, 507 U.S. at 179.  Hammer argues that Plaintiffs have not

adequately alleged that he participated in the RICO enterprise.  (Hammer Br. (<u>Hilti</u> Dkt. No. 91)

at 12-15; Hammer Br. (<u>Taubman</u> Dkt. No. 62) at 16-18; Hammer Br. (<u>White</u> Dkt. No. 73) at 16-

19)

In <u>Reves</u>, the Supreme Court stated that the phrase "to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs" means that "one must

participate in the operation or management of the enterprise itself."  <u>Reves</u>, 507 U.S. at 185

(internal quotation marks omitted).  Simply put, "one is liable under RICO only if he

'participated in the operation or management of the enterprise itself.'"  <u>Azrielli v. Cohen Law</u>

<u>Offices</u>, 21 F.3d 512, 521 (2d Cir. 1994) (quoting <u>Reves</u>, 507 U.S. at 185).  "In the Second

Circuit, 'the "operation or management" test typically has proven to be a relatively low hurdle

for plaintiffs to clear, especially at the pleading stage.'"  <u>City of New York v. LaserShip, Inc.</u>, 33

F. Supp. 3d 303, 310 (S.D.N.Y. 2014) (quoting First Capital Asset Mgmt. v. Satinwood, Inc.,

385 F.3d 159, 175-76 (2d Cir.2004)).

Here, all three Amended Complaints contain similar allegations demonstrating

Hammer's participation in the operation or management of the alleged RICO enterprise:

1. Hammer is the president and sole beneficial owner of 8-31 Holdings, Inc., which is
the sole member and sole owner of Knoedler.  (Am. Cmplt. (White Dkt. No. 37)
¶¶ 12, 141, 171; Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 39, 283, 290, 293; Am. Cmplt.
(Taubman Dkt. No. 39) ¶¶ 13-14, 162, 163, 168)

2. Hammer was directly responsible for Knoedler's operations at all relevant times.
(Am. Cmplt (White Dkt. No. 37) ¶¶ 12, 39, 141, 171; Am. Cmplt. (Hilti Dkt. No. 46)
¶¶ 39, 283, 290, 293; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 13-14, 162, 163, 168)

3. In his role at Knoedler, Hammer personally reviewed detailed information about
Knoedler's financial condition, sales, and profits and was responsible for determining
the compensation of officer-level personnel, including Freedman.  (Am. Cmplt.
(White Dkt. No. 37) ¶¶ 12, 100-01, 140, 150, 173; Am. Cmplt. (Hilti Dkt. No. 46)
¶¶ 270, 291-92; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 157, 160, 163, 165)

4. Hammer knew that Glafira Rosales – an art dealer – was delivering the Rosales
Paintings to Knoedler, which were allegedly created by the most important abstract
expressionist painters, such as Pollock, Rothko, Motherwell, and de Kooning; that
Rosales would not reveal the collector's identity; that there was no paperwork
documenting the provenance of these works; that all of these paintings were
purportedly "newly discovered" works with no established provenance; that efforts
had been made to confirm the provenance of at least one of these paintings, and that
that effort had not been successful.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 30, 37, 59-
62, 96-98, 131, 150; Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 123-25, 291; Am. Cmplt.
(Taubman Dkt. No. 39) ¶¶ 163-64, 222)

5. In his capacity as President of 8-31, Hammer appointed Freedman to serve as
president of Knoedler in or about 2001.  Freedman informed Hammer of every sale of
a Rosales Painting at the time the sale was made.  (Am. Cmplt. (White Dkt. No. 37)
¶¶ 10, 12, 30; Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 50, 270, 291, 288, 304; Am. Cmplt.
(Taubman Dkt. No. 39) ¶¶ 23, 163(a), 222)

6. Hammer knew that Knoedler's mark-ups for Rosales Paintings were extraordinarily
high.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 30, 96-98, 100, 140, 150; Am. Cmplt.
(Hilti Dkt. No. 46) ¶¶ 7, 8, 11, 121, 264, 291, 412, 441; Am. Cmplt. (Taubman Dkt.
No. 39) ¶ 163)  For example, Knoedler paid Rosales $750,000 for a purported Rothko
and sold it ten months later to Hilti for $5.5 million, "a markup of more than seven
times Knoedler's purchase price."  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 7, 8, 291, 412,

441).  Similarly, Knoedler paid Rosales $670,000 for a purported Pollock and sold it eleven months later to White for $ 3.1 million.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) at ¶¶ 1, 39, 47, 95).  Likewise, Knoedler paid Rosales $600,000 for a purported Still and sold it thirteen months later to the Taubmans for $ 4.3 million.  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 1, 79, 86, Ex. E at 2)  Knoedler's mark-ups on Rosales Paintings averaged 275%.  Mark-ups of this magnitude are highly unusual in the art industry, where gallery commissions on consigned works typically range from 10% to 20% above the sum payable to the original owner.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) at ¶¶ 96-98; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 7, 8, 291; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 101, 152-56)  That Knoedler was able to repeatedly purchase from Rosales – an art dealer – numerous previously unknown works from acknowledged masters such as Pollock, Rothko, and Still for a fraction of the value such works commanded in the marketplace strongly suggested that the paintings sold to Plaintiffs, and the other Rosales Paintings in which Knoedler was then trafficking, were not authentic.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) at ¶¶ 26, 28-29, 47-48, 97; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 264; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 4, 28, 32-33, 44, 49, 53-54, 79-80, 154, 163(a), 166, 238, Ex. E)  As noted above, Hammer was contemporaneously aware of all of these sales and the profits Knoedler had realized on these sales.

7.  Hammer "very carefully" read an October 9, 2003 report from the International Foundation for Art Research (the "IFAR report") concerning the authenticity and provenance of a purported Jackson Pollock painting that Rosales had sold to Knoedler for $750,000 in March 2001, and which the gallery had sold several months later to a buyer named Jack Levy for $2 million.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 59-61; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 90-104; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 55, 63-69, 164, 225)  The IFAR report rejects Rosales's claim that her clients had acquired the Pollock through Alfonso Ossorio and concludes that the painting could not be attributed to Pollock.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 59; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 90-91, 103; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 61)  The conclusion of the IFAR report determined that, <u>inter alia</u>, that the signature on the painting was considered "suspect" and raised "serious" concerns about its authenticity, and that the "negatives" concerning the authenticity of the Pollock were "very convincing."  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 59-60; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 90-91, 97, 103; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 61)  Based on the IFAR report, Knoedler agreed to take back the purported Pollock from Levy and to refund the $2 million purchase price.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 59; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶ 93; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 62)  Although Hammer insisted that a potential co-investor in the Pollock painting be provided with a copy of the IFAR Report, he took no steps to ensure that potential purchasers of other Rosales Paintings would receive a copy of that report.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 59-61; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 90-104; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 63-69, 164, 225)  Hammer also reviewed an internal Knoedler memo stating that the IFAR report raised questions about the Green Pollock's "authenticity" and "authorship," and noting that "IFAR is held in high esteem by galleries, museums and the art world in general."  (Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶ 64)

8. Given that Hammer was responsible for the gallery's operations and routinely reviewed detailed information concerning Knoedler's sales, expenses, and profits, he was aware that between 1994 and Knoedler's closing in 2011 profits from sales of Rosales Paintings accounted for nearly all of Knoedler's profits.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 99, 100; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 39-40, 266-68, 283-84, 288, 290-91; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 159-61, 163)  Hammer also personally received millions in profits obtained by Knoedler from the sale of Rosales Paintings, and millions more in Knoedler profits were transferred to Hammer's holding company, 8-31.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 95, 101, 112); Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 40, 45, 265, 269, 271, 287, 292-93; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 166, 179)

9. Hammer directly supervised Freedman and determined her compensation.  Freedman's compensation doubled during the period from 2002 to 2008, largely as a result of profits Knoedler realized from the sale of Rosales Paintings.  Hammer steadily increased Freedman's share of Knoedler's profits from 10% in 1998 to 30% by 2008.  Plaintiffs contend that Hammer's repeatedly increased Freedman's profit share to incentivize her to continue to bring into the gallery, and sell, more of the Rosales Paintings.  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 58, 101, 141, 173; Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 39, 270, 284, 288, 290, 293; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 13-14, 162, 163, 165, 169)

10. After Knoedler received a grand jury subpoena, Hammer fired Freedman and then sent a letter to all Knoedler customers announcing that Freedman had "resigned."  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 86; Hilti Dkt. No. 46) ¶¶ 43, 259-60, 339; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 3, 13, 120-22, 268)

These pleaded facts are sufficient to create a plausible inference that Hammer and 8-31 – the entity through which Hammer controlled Knoedler – participated in the operation and management of the alleged RICO enterprise, that they exercised some degree of control over the RICO enterprise, and that they knew of its fraudulent objective.

## 2. <u>Predicate Acts</u>

A RICO plaintiff must also show a "pattern of racketeering activity" based upon the occurrence of at least two predicate acts within a ten-year period.  18 U.S.C. § 1961(5).  The predicate acts must be "related" and "amount to or pose a threat of continued criminal activity." <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989).  The continuity requirement can be

satisfied by either "closed-ended" or "open-ended" continuity.  Grimes v. Fremont Gen. Corp.,

785 F. Supp. 2d 269, 300 (S.D.N.Y. 2011) (citations and quotation marks omitted).

    Here, Plaintiffs have alleged predicate acts consisting of mail and/or wire fraud, in

violation of 18 U.S.C. §§ 1341 and 1343.  These offenses are acts of racketeering for purposes of

RICO.  See 18 U.S.C. § 1961(1); Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 454 (2006).

To prove mail or wire fraud, "it is not necessary to show that [defendants] actually mailed [or

wired] . . . anything themselves." Pereira v. United States, 347 U.S. 1, 8 (1954).  Instead, "it is

sufficient if [defendants] caused it to be done." Id.  Moreover, where the mails or wires are used

in furtherance of fraud, the communications need not contain false or misleading information

themselves.  See Schmuck v. United States, 489 U.S. 705, 715 (1989).  "It is sufficient for the

mailing [or transmission] to be incident to an essential part of the scheme or a step in the plot."

Id. at 710-11 (citations, quotation marks, and alterations omitted).

    Hammer contends that "no allegation exists that Mr. Hammer was involved in the

alleged mail or wire fraud[;] [therefore] the RICO claims should be dismissed."  (Hammer Br.

(Hilti Dkt. No. 91) at 12; see also Hammer Br. (White Dkt. No. 73) at 15-16 ("No factual

allegation exists that could lead to the conclusion that Mr. Hammer sent or caused anything to be

sent through the mail or a wire that was a part of the RICO scheme."); Hammer Br. (Taubman

Dkt. No. 62) at 15-16 ("[N]othing is sufficiently alleged that Mr. Hammer sent or caused

anything to be sent through the mail or a wire for purposes of executing a RICO scheme."))  This

argument is without merit.

    The Second Circuit has made clear, however, that "[t]o prove a violation of 18

U.S.C. § 1341, [one] need only show that a defendant was one of the participants in a scheme to

defraud, and that the mails were used in furtherance of that scheme." United States v. Corey,

566 F.2d 429, 431 (2d Cir. 1977); see also Chanayil v. Gulati, 169 F.3d 168, 170-71 (2d Cir.

1999) ("The elements of mail . . . fraud include (1) the existence of a scheme to defraud, (2) the

defendant's knowing participation in the scheme, and (3) the use of . . . mail . . . communications

in interstate commerce in furtherance of the scheme."); Blue Cross and Blue Shield of New

Jersey, Inc. v. Philip Morris, Inc., 113 F. Supp. 2d 345, 367 (E.D.N.Y. 2000) ("RICO liability for

any particular defendant is not . . . premised on establishing that each defendant actually

committed two predicate acts, but only that each defendant was 'involved' in the commission of

two predicate acts that are sufficiently related and continuous to establish a pattern.") (emphasis

and citations omitted).  Likewise, "to prove a violation of 18 U.S.C. § 1343, it need only be

shown that a defendant was one of the participants in a fraudulent scheme which was furthered

by the use of interstate transmission facilities."  Corey, 566 F.2d at 431; see also City of New

York v. Smokes-Spirits.com., Inc., 541 F.3d 425, 446 (2d Cir. 2008), rev'd and remanded on

other grounds sub. nom. Hemi Grp., LLC v. City of New York, 559 U.S. 1 (2010); United States

v. Fasciana, 226 F. Supp. 2d 445, 452 (S.D.N.Y. 2002) ("In order to prove wire fraud under 18

U.S.C. § 1343, [one] must prove a defendant was one of the participants in a fraudulent scheme

which was furthered by the use of interstate transmission facilities.").  Here, Plaintiffs have pled

facts demonstrating that Hammer knowingly participated in a fraudulent scheme to sell forged

artwork at an art gallery he controlled.  It was foreseeable to him that the mails and wires would

be used in connection with the alleged fraudulent scheme.  Accordingly, the predicate act

requirement is satisfied.

### 3.    Injury and Causation

To state a civil RICO claim, a plaintiff is required to show that a RICO predicate

offense "not only was a 'but for' cause of his injury, but was the proximate cause as well."

Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992).  Proximate cause for RICO

purposes requires "some direct relation between the injury asserted and the injurious conduct

alleged."  Id.  A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient.  Id.

at 271, 274.

In Hilti and White, Hammer argues that Plaintiffs have not pled sufficient facts to

demonstrate that he caused them an injury.  (Hammer Br. (Hilti Dkt. No. 92) at 15; Hammer Br.

(White Dkt. No. 73) at 20)

According to Hammer, Hilti and White's allegations involving Hammer concern

events that took place after the sale of the purported Rothko to Hilti in November 2002, and after

the sale of the purported Pollock to White in April 2000.  (Hammer Br. (Hilti Dkt. No. 91) at 15;

Hammer Br. (White Dkt. No. 73) at 20)  This is not accurate.

The amended complaints in Hilti and White both allege that Hammer was aware

of the fraud scheme, and was a participant in that fraud scheme, from its inception.  (Am. Cmplt.

(Hilti Dkt. No. 46) ¶¶ 9, 13, 16, 29, 32, 39, 293; Am. Cmplt. (White Dkt. No. 37) ¶¶ 12, 30, 96-

97, 100-01, 140-41, 171)  Moreover, both Hilti and White allege that because Hammer and 8-31

permitted Knoedler – a venerable and highly reputable art gallery – to be used as a platform for

the sale of forged art – and indeed, incentivized Freedman to continue and expand the trafficking

in forged paintings – Knoedler and Freedman were able to convince Plaintiffs to purchase forged

paintings, each for millions of dollars.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 8, 9, 126, 270, 292;

Am. Cmplt. (White Dkt. No. 37) ¶¶ 30, 58, 101, 141, 171, 173)

The Hilti Amended Complaint also alleges that Hammer helped build an "aura of

authenticity" around the Rothko by exhibiting the work at reputable venues, preparing a viewing

sheet listing Rothko experts who had seen the work, and concealing the ownership history of the work from Hilti.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 7, 11, 121, 126-27, 129, 135)

*       *       *       *

The Amended Complaints plead sufficient facts to make out a substantive RICO claim as against Hammer and 8-31.  Accordingly, their motions to dismiss Plaintiffs' substantive RICO claim is denied.

## V.    RICO CONSPIRACY CLAIM

### A.    Applicable Law

18 U.S.C. § 1962(d) prohibits any person from conspiring to violate any of the substantive provisions set forth in 18 U.S.C. § 1962(a)-(c).  A RICO conspiracy claim requires factual allegations demonstrating that a defendant agreed to participate "'in a charged enterprise's affairs' through a pattern of racketeering, 'not a conspiracy to commit predicate acts.'"  United States v. Pizzonia, 577 F.3d 455, 463 (2d Cir. 2009) (quoting United States v. Persico, 832 F.2d 705, 713 (2d Cir. 1987)).  The Reves "operation or management" test does not apply to RICO conspiracy, however.  Pizzonia, 577 F.3d at 462 n.4.  "Assuming that a RICO enterprise exists, [one] must prove only that the defendants know the general nature of the conspiracy and that the conspiracy extends beyond their individual roles."  United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000) (citations, quotation marks, and alterations omitted); see also Salinas v. United States, 522 U.S. 52, 64 (1997) ("A person . . . may be liable for [RICO] conspiracy even though he was incapable of committing the substantive offense."); United States v. Yannotti, 541 F.3d 112, 122 (2d Cir. 2008) ("[D]efendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme.").

72

**B.** __Analysis__

Hammer and 8-31 argue that Plaintiffs' RICO conspiracy claims in Hilti, White, and Taubman must be dismissed, because Plaintiffs have not pled a legally sufficient substantive RICO violation.  (Hammer Br. (Hilti Dkt. No. 92) at 15-16; Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 24; Hammer Br. (White Dkt. No. 73) at 20-21; Hammer Br. (Taubman Dkt. No. 62) at 19-20)  As noted above, however, the elements of a substantive RICO claim and a RICO conspiracy claim are different.  Accordingly, the sufficiency of a RICO conspiracy claim does not depend on the sufficiency of a substantive RICO claim.  In any event, this Court has found that Plaintiffs have adequately pled a substantive RICO claim as to Hammer and 8-31.

Hammer also argues that Plaintiffs' RICO conspiracy claims must be dismissed because they have failed to plead that Hammer agreed to commit a predicate act.  (Hammer Br. (Hilti Dkt. No. 91) at 16; Hammer Br. (White Dkt. No. 73) at 21; Hammer Br. (Taubman Dkt. No. 62) at 20)  Plaintiffs are not obligated to plead that Hammer agreed to commit any particular predicate act, however.  Instead, they are required to plead facts demonstrating that Hammer agreed to join the alleged RICO enterprise with knowledge that predicate acts would be committed by members of that enterprise.  See Pizzonia, 577 F.3d at 463; see also Salinas, 522 U.S. at 63-64; Fertitta, 2015 WL 374968, at *6.

Hammer and 8-31 further argue that Plaintiffs have not demonstrated that they agreed to join a RICO conspiracy that had as its objective the sale of forged artworks.  (Hammer Br. (Hilti Dkt. No. 91) at 16; Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 24; Hammer Br. (Taubman Dkt. No. 62) at 20)  This argument is rejected for the reasons discussed above in connection with Plaintiffs' substantive RICO claims.  Plaintiffs have pled facts demonstrating – as to Hammer and 8-31 – that they knowingly agreed to participate in a scheme to sell forged artworks.

Hammer and 8-31's motions to dismiss the RICO conspiracy claims in <u>Hilti</u>, <u>White</u>, and <u>Taubman</u> are denied.

## VI.   <u>FRAUD</u>

Freedman, Knoedler, and 8-31 have moved to dismiss Plaintiffs' fraud claims on the grounds that Plaintiffs have not pled facts demonstrating justifiable reliance.

### A.   <u>Applicable Law</u>

Under New York law, a fraud requires "(1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance." <u>Kottler v. Deutsche Bank AG</u>, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting <u>Granite Partners, L.P. v. Bear, Stearns & Co.</u>, 17 F. Supp. 2d 275, 286 (S.D.N.Y. 1998)).

As noted above, Fed. R. Civ. P. 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); <u>In re Pfizer Inc. Sec. Litig.</u>, 584 F. Supp. 2d 621, 632-33 (S.D.N.Y. 2008). Particularity requires the plaintiff to "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" <u>Kottler</u>, 607 F. Supp. 2d at 462 (quoting <u>Stevelman v. Alias Research, Inc.</u>, 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation omitted)).

### B.   <u>Analysis</u>

Hilti, White, and the Taubmans have asserted fraud claims against Knoedler, Freedman, Hammer, and 8-31 among others. <u>See</u> Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 396-409, Sixth and Seventh Claims for Relief; Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 114-28, First Claim for

Relief; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 180-93, First Claim for Relief.

Plaintiffs have specified the statements that they contend are fraudulent, focusing in particular on assertions made by Freedman – on behalf of Knoedler – concerning the origin and provenance of the paintings.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 37, 136, 141-42, 158-59, 162; Am. Cmplt. (White Dkt. No. 37) ¶¶ 2, 35, 38, 41-42, 114-28; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 83, 87, 89)  Plaintiffs have also identified the material information Freedman failed to disclose regarding the origin and provenance of the paintings.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 137, 141-45, 150, 152, 160-61, 164; Am. Cmplt. (White Dkt. No. 37) ¶¶ 35-37, 42-44, 117; Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 83, 87, 103)  Plaintiffs have also specified where and when the alleged fraudulent statements were made.  Hilti alleges that Michael Hilti discussed the alleged Rothko with Freedman at the Knoedler Gallery on October 24, 2002, and again over the telephone on November 6, 2002.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 137, 162)  White alleges that she discussed the alleged Pollock with Freedman at the Knoedler Gallery in March 2000.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 34-35)  The Taubmans allege that Eugenia Taubman and Freedman discussed the Still at the ADAA art show at the New York Armory in February 2005.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 81-83)  Plaintiffs also explain in detail why the statements Freedman made to them were fraudulent.  This proof has been discussed in connection with Plaintiffs' RICO claims, and the Court will not repeat that analysis here.  In sum, Plaintiffs have satisfied Rule 9(b)'s heightened pleading requirement.

Plaintiffs have also pleaded sufficient facts to make out the five substantive elements of a fraud claim.  Defendants do not dispute that Plaintiffs have (1) identified Freedman's misrepresentations and false statements about the origin and provenance of the works they purchased; and (2) alleged "'facts that give rise to a strong inference of fraudulent

intent.'"  B & M Linen, Corp. v. Kannegiesser, USA, Corp., 679 F. Supp. 2d 474, 481 (S.D.N.Y.

2010) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

    Defendants argue, however, that Plaintiffs have not pleaded facts demonstrating

reliance.  They contend that Plaintiffs are sophisticated art collectors or, alternatively, are treated

as sophisticated as a matter of law, because they had art consultants advising them about their

purchases.  (Freedman Br. (Hilti Dkt. No. 105) at 13; Knoedler/8-31 Br. (Hilti Dkt. No 94) at 24;

Freedman Br. (White Dkt. No. 86) at 11; Knoedler/8-31 Br. (White Dkt. No. 75) at 16; Freedman

Br. (Taubman Dkt. No. 71) at 11); Knoedler/8-31 Rep. Br. (Taubman Dkt. No. 69) at 11)

Defendants further argue that Plaintiffs' failure to conduct an investigation before their purchases

defeats reasonable reliance.  (Freedman Br. (Hilti Dkt. No. 105) at 13-20; Knoedler/8-31 Br.

(Hilti Dkt. No 94) at 24; Freedman Br. (White Dkt. No. 86) at 10-17; Knoedler/8-31 Br. (White

Dkt. No. 75) at 16; Freedman Br. (Taubman Dkt. No. 71) at 11-19); Knoedler/8-31 Reply Br.

(Taubman Dkt. No. 69) at 11)

    "The question of what constitutes reasonable reliance is always nettlesome

because it is so fact-intensive."  Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d. 91, 98 (2d

Cir. 1997).  Generally, courts "consider the entire context of the transaction, including factors

such as its complexity and magnitude, the sophistication of the parties, and the content of any

agreements between them."  Emergent Capital Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d

189, 195 (2d Cir. 2003).  However, "if plaintiff has the means of knowing, by the exercise of

ordinary intelligence, the truth, or the real quality of the subject of the representation, he must

make use of those means, or he will not be heard to complain that he was induced to enter into

the transaction by misrepresentations."  Schlaifer Nance & Co., 119 F.3d. at 98 (citation and

quotation marks omitted); see also Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir.

2003) ("A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment."

The issue of whether Plaintiffs' reliance was reasonable cannot be resolved as a matter of law at this stage of the proceedings.  Knoedler was a highly esteemed art gallery that had been in business for more than one hundred years.  Nothing in the Amended Complaints demonstrates as a matter of law that Plaintiffs were put on notice that the paintings they purchased might be forgeries.  Whether Plaintiffs are sophisticated art collectors, or whether they are treated under the law as sophisticated parties because they used art advisers, can likewise not be resolved as a matter of law at the pleading stage.[23]

The fifth element of fraud requires that damage to the plaintiff be caused by reliance on the defendant's misrepresentations and omissions.  Plaintiffs have pled sufficient facts to demonstrate that their damages were caused by such reliance.

Freedman, Knoedler, and 8-31's motions to dismiss Plaintiffs' fraud claims are denied.

## VII.   FRAUDULENT CONCEALMENT

Freedman, Knoedler, and 8-31 have moved to dismiss Plaintiffs' fraudulent concealment claims.  Hammer has moved to dismiss White's fraudulent concealment claim.

### A.   Applicable Law

"The elements of a fraudulent concealment claim under New York law are:  (1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such

---

[23] Levin v. Gallery 63 Antiques Corp., No. 04 Civ. 1504 (KMK), 2006 WL 2802008 (S.D.N.Y. Sept. 28, 2006), cited by Freedman and Knoedler, was decided at summary judgment.

disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and

(6) damages." Woods v Maytag Co., 807 F. Supp. 2d 112, 124 (E.D.N.Y. 2011) (citing Aetna

Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 582 (2d Cir. 2005); see also Brass v.

Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (New York recognizes a duty to

disclose by a party to a business transaction in three situations:  "first, where the party has made

a partial or ambiguous statement . . . second, when the parties stand in a fiduciary or confidential

relationship with each other . . . and third, where one party possesses superior knowledge, not

readily available to the other, and knows that the other is acting on the basis of mistaken

knowledge.") (citations omitted).

    With respect to the duty to disclose, "New York recognizes a cause of action to

recover damages for fraud based on concealment, where the party to be charged has superior

knowledge or means of knowledge, such that the transaction without disclosure is rendered

inherently unfair." Miele v. Am. Tobacco Co., 2 A.D.3d 799, 803 (2d Dep't 2003) (citations

omitted); see also Abrams v. Gen. Motors Corp., 120 Misc. 2d 371, 374 (N.Y. Cty. 1983) ("If

one party has superior knowledge or has means of knowledge not available to both parties, then

he is under a legal obligation to speak and silence would constitute fraud.") (citations omitted);

Nasaba Corp. v. Harfred Realty Corp., 287 N.Y. 290, 295 (1942) ("Concealment with intent to

defraud of facts which one is duty-bound in honesty to disclose is of the same legal effect and

significance as affirmative misrepresentations of fact.").

  **B.**  <u>**Analysis**</u>

    Freedman, Knoedler, and 8-31 argue that Plaintiffs' fraudulent concealment

claims should be dismissed, because they did not have a confidential or fiduciary relationship

with Plaintiffs, and therefore did not have a duty to disclose.  (Freedman Br. (Hilti Dkt. No. 105)

at 4, 21; (Freedman Br. (<u>Taubman</u> Dkt. No. 71) at 4, 19-20; (Freedman Br. (<u>White</u> Dkt. No. 86)

at 3, 18-19; Knoedler/8-31 Br. (<u>Hilti</u> Dkt. No. 94) at 24)  In <u>White</u>, Hammer has moved to

dismiss the fraudulent concealment claim against him.  (Hammer Br. (<u>White</u> Dkt. No. 73) at 5-6)

       Freedman, Knoedler, and 8-31 ignore the case law holding that a fraudulent

concealment claim may be brought where a defendant has made "a partial or ambiguous

statement," or "where one party possesses superior knowledge, not readily available to the other,

and knows that the other is acting on the basis of mistaken knowledge."  <u>Brass</u>, 987 F.2d at 150

(citation and quotation marks omitted).  Here, Plaintiffs have pled facts adequate for either

theory.  <u>See</u>, <u>e.g.</u>, Am. Cmplt. (<u>Hilti</u> Dkt. No. 46) ¶¶ 1, 138, 142-44, 162-64; Am. Cmplt. (<u>White</u>

Dkt. No. 37) ¶¶ 2, 35-38, 43; Am. Cmplt. (<u>Taubman</u> Dkt. No. 39) ¶¶ 78-80, 83, 87-89, 102-03,

105-09.

       As to <u>White</u>'s fraudulent concealment claim, Defendants also argue that a plaintiff

cannot establish a duty to disclose when "'the information at issue was a matter of public record

that could have been discovered through the exercise of ordinary diligence.'"  (Freedman Br.

(<u>White</u> Dkt. No. 86) at 19 (quoting <u>246 Sears Rd. Realty Corp. v. Exxon Mobil Corp.</u>, No. 09

Civ. 889 (NGG) (JMA), 2012 WL 4174862 (Sept. 18, 2012)))  Defendants have not

demonstrated that the allegations in White's Amended Complaint establish as a matter of law

that the true facts concerning her "Pollock" were a matter of public record.

       As to White's fraudulent concealment claim, Hammer argues that he had no duty

to disclose, because he did not have a confidential or fiduciary relationship with White, did not

make a "partial or ambiguous statement" – or indeed any statement – to her, and did not know of

any statement made by Knoedler or Freedman to White, whether any such statement was false,

or that White was acting on the basis of mistaken knowledge.  (Hammer Br. (<u>White</u> Dkt. No. 73)

at 6)  While it is true that White does not allege that Hammer communicated directly with her, or had any relationship with her, White does plead facts demonstrating that Hammer knew that Freedman was marketing the painting she purchased for $3.1 million as an authentic Pollock. White has also alleged that Hammer knew, inter alia, that the work was entirely undocumented, that it was not included in the Pollock catalogue raisonné, and that it had been consigned by Rosales for $670,000, a small fraction of the value of the painting on the open market, if it were legitimate.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 30, 37, 131-32, 140)  Given the fact that Freedman contemporaneously informed Hammer of each sale of a Rosales Painting (id. ¶ 30), it is plausibly alleged that Hammer knew that White was acting on the basis of mistaken knowledge when she bought the alleged Pollock.

Hammer's motion to dismiss White's fraudulent concealment claim is denied.

## VIII.   AIDING AND ABETTING FRAUD

Hammer has moved to dismiss Plaintiffs' aiding and abetting fraud claims on the grounds that Plaintiffs have not demonstrated that he had knowledge of the fraud scheme or that he provided substantial assistance to it.  (Hammer Br. (Hilti Dkt. No. 92) at 5-9; Hammer Br. (White Dkt. No. 73) at 6-11; Hammer Br. (Taubman Dkt. No. 62) at 4-12)

8-31 argues that Hilti's aiding and abetting fraud claim must be dismissed because Hilti has not alleged facts demonstrating that 8-31 provided substantial assistance to the fraud scheme or proximately caused Hilti's injury.  (Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 20-17-18)

### A.   Applicable Law

Aiding and abetting fraud has three elements:   "'(1) that an independent wrong exist[s]; (2) that the aider or abettor know[s] of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong.'"  Adelphia Recovery Trust v. Bank of Am., N.A.,

624 F. Supp. 2d 292, 312 (S.D.N.Y. 2009) (quoting Landy v. Fed. Deposit Ins. Corp., 486 F.2d

139, 162-163 (3d Cir. 1973)).  To meet Rule 9(b) pleading requirements, "'a claim for aiding and

abetting fraud requires plaintiff to plead facts showing[] the existence of a fraud, defendant's

knowledge of the fraud, and that the defendant provided substantial assistance to advance the

fraud's commission.'"  Adelphia Recovery Trust, 624 F. Supp. 2d at 312 (quoting Wight v.

BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000)).  To survive a motion to dismiss, a

complaint must allege "actual knowledge of fraud with the particularity necessary to survive the

heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."  Lerner v. Fleet

Bank, N.A., 459 F.3d 273, 292-93 (2d Cir. 2006); see also Krys v. Pigott, 749 F.3d 117, 127 (2d

Cir. 2014) ("[U]nder New York law, a complaint adequately alleges the knowledge element of

an aiding and abetting claim when it pleads 'not . . . constructive knowledge, but actual

knowledge of the fraud as discerned from the surrounding circumstances.'") (quoting Oster v.

Kirschner, 77 A.D.3d 51, 56 (1st Dep't 2010)).

        As to the "substantial assistance" element, "'[a] defendant provides substantial

assistance only if [she] affirmatively assists, helps conceal, or by virtue of failing to act when

required to do so enables [the fraud] to proceed.'"[24]  JP Morgan Chase Bank v. Winnick, 406 F.

Supp. 2d 247, 256 (S.D.N.Y. 2005) (quoting Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,

No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)).  "Whether the

---

[24] "'Absent a confidential or fiduciary relationship between the plaintiff and the aider and abettor, the inaction of the latter does not constitute substantial assistance warranting aider and abettor liability.'"  Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 203 (S.D.N.Y. 2006) (quoting Ryan v. Hunton & Williams, No. 99 Civ. 5938 (JG), 2000 WL 1375265, at *10 (E.D.N.Y. Sept. 20, 2000)).  "In the absence of a fiduciary duty, which, again, has not been sufficiently pleaded, inaction on the part of an affiliated entity is not sufficient to sustain a claim of aiding and abetting fraud."  Beach v. Citigroup Alternative Investments LLC, No. 12 Civ. 7717 (PKC), 2014 WL 904650, at *22 (S.D.N.Y. Mar. 7, 2014).

assistance is substantial or not is measured, in turn, by whether 'the action of the aider and abettor proximately caused the harm on which the primary liability is predicated.'"  Id. (quoting In re WorldCom, Inc. Sec. Litig., 382 F. Supp. 2d 549, 560-61 (S.D.N.Y. 2005)).  In other words, plaintiffs "must allege also that their injury was 'a direct or reasonably foreseeable result of the [aider and abettor's] conduct.'"  Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 371 (S.D.N.Y. 2007) (quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 202 (S.D.N.Y. 2006)).

**B.**     **Analysis**

**1.**     **Hilti's Aiding and Abetting Claim Against Hammer and 8-31**

Hammer argues that Hilti has not pled sufficient facts to demonstrate that he had knowledge of the art fraud scheme.  (Hammer Br. (Hilti Dkt. No. 92) at 7-9)  This Court discussed the pleaded facts relevant to this issue at length in connection with Plaintiffs' RICO claims, and will not repeat that discussion here.  These facts demonstrate that Hammer had knowledge of the art fraud scheme.

Hammer and 8-31 also argue that Hilti has not adequately alleged that they provided substantial assistance to the fraud scheme.  (Hammer Br. (Hilti Dkt. No. 92) at 5-7; Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 17)  These defendants assert that Hilti has not cited any actions they took prior to Hilti's purchase of the forged Rothko, and has not pled any facts showing that they caused Hilti to purchase the painting.  (Id.)

Here, Hammer, and through Hammer, 8-31, "affirmatively assisted" the fraud on Hilti in a number of ways.  First, Hammer and 8-31 authorized Freedman to use the Knoedler Gallery – "one of the most established and reputable art galleries in the world" (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 48) – to sell paintings – including Hilti's Rothko – that they must have

known were not authentic.  The illegitimacy of the "Rothko" should have been apparent to Hammer from, inter alia, the price at which it was consigned by Rosales, who herself was an art dealer.

Hilti has also alleged that Hammer increased Freedman's profit-sharing percentage from 16% to 25% in 2002.  (Id. ¶ 270)  Given that Knoedler received a huge mark-up on every Rosales Painting that was sold, increasing Freedman's profit percentage gave her a strong motive to sell more fraudulent Rosales Paintings at the Gallery, including the "Rothko" that Freedman sold to Hilti.

As noted above, Hilti also alleges that Hammer helped build an "aura of authenticity" around the Rothko by exhibiting the work at reputable venues, preparing a viewing sheet listing Rothko experts who had seen the work, and concealing the ownership history of the work from Hilti.  (Id. ¶¶ 7, 11, 121, 126-27, 129, 135)

These allegations are sufficient to support Hilti's aiding and abetting fraud claim against Hammer and 8-31.  Their motions to dismiss this claim are denied.

### 2.      White's Aiding and Abetting Claim Against Hammer

Hammer argues that White's aiding and abetting claim must be dismissed, because her allegations do not demonstrate that he had "actual knowledge" of the art fraud scheme.  (Hammer Br. (White Dkt. No. 73) at 9-10)  White has pleaded sufficient facts to demonstrate that Hammer had "actual knowledge" that the "Pollock" she purchased from Knoedler was not authentic, however.

As an initial matter, White alleges that Hammer knew "that the amount Knoedler agreed to pay to Rosales if the [w]ork w[as] purchased was substantially below the amount that

would be paid for a similar authentic work by Jackson Pollock." (Am. Cmplt. (White Dkt. No. 37) ¶ 140)

   White also alleges that Hammer knew that (1) Rosales and Carlos Bergantinos Diaz had brought the painting to Knoedler, that the painting came with no documentation, and that Diaz had previously been connected with the sale of forged artworks; (2) the work was not included in the Pollock catalogue raisonné; and (3) the "Pollock" was one of many "previously undiscovered" works by famous Abstract Expressionist artists that Rosales had access to, all of which she was willing to sell at prices far below market value and all of which shared the same undocumented provenance. (Id. ¶¶ 30, 37, 131, 150) White further alleges that Hammer knew of the "suspiciously high profits earned from the sale of the Rosales Collection paintings" (id. ¶ 30), and that such profits were highly unusual by industry standards for consigned works and works bought and sold in a short period of time. (Id. ¶¶ 96-97) White also alleges that Hammer was personally informed of each sale of a Rosales Painting by Freedman (id. ¶ 30), reviewed Knoedler's sales figures and financials (id. ¶ 100), and "knew of Knoedler's failed attempts to confirm the provenance of the [Rosales Paintings]." (Id. ¶ 150) Taken together, the allegations in White's Amended Complaint create a strong inference of Hammer's actual knowledge that the "Pollock" sold to White was fraudulent.

   Hammer also argues that White has not demonstrated that he provided "substantial assistance" to the fraud scheme, and that "[n]o allegation exists of any act by Mr. Hammer that proximately caused the Whites to buy the [Pollock]." (Hammer Br. (White Dkt. No. 73) at 7) White alleges that Hammer provided substantial assistance to the fraud scheme in a number of ways, including by "using [his] position as owner of Knoedler to condone and encourage the use of Knoedler's name and reputation in aid of the misrepresentations and

omissions [made by Freedman]"; by allocating to Freedman a large percentage of the profit associated with the sale of Rosales Paintings; and by giving Freedman raises "as a reward for implementing fraudulent sales."  (Am. Cmplt. (White Dkt. No. 37) ¶ 141)

Hammer argues that the allegation that he "condon[ed] and encourage[ed] the use of Knoedler's name and reputation" is conclusory, and that, in any event, mere inaction does not constitute substantial assistance in the absence of a confidential or fiduciary relationship. (Hammer Br. (White Dkt. No. 73) at 8)  White has pled more than passive acquiescence, however.  Given Hammer's supervisory and ownership position at Knoedler; the fact that the Knoedler platform was a key element in the fraud scheme; Hammer's alleged close focus on sales, expenses, and profits at Knoedler; his knowledge of the background concerning the Rosales Painting and the "Pollock" in particular; his discussions with Freedman about the sale of this painting and other Rosales Paintings; and Hammer's decision to incentivize Freedman to sell more Rosales Paintings at Knoedler, White has alleged more than simple inaction on Hammer's part.[25]

Hammer's motion to dismiss White's aiding and abetting fraud claim is denied.

### 3.  The Taubmans' Aiding and Abetting Claim Against Hammer

Hammer argues that the Taubmans' aiding and abetting fraud claim should be dismissed, because they have not adequately alleged that he had knowledge of, or provided substantial assistance to, the fraud scheme.  (Hammer Br. (Taubman Dkt. No. 62) at 4-11)

---

[25]  Hammer cites Pension Comm. of Univ. of Montreal Pension Plan, 446 F. Supp. 2d at 203, and Beach v. Citigroup Alternative Investments LLC, No. 12 Civ. 7717 (PKC), 2014 WL 904650, at *22 (S.D.N.Y. Mar. 7, 2014), which involve "clearing brokers" and "affiliated entities" operating in the financial industry.  These cases shed little light on the proper application of aiding and abetting law in the circumstances here.

The Taubmans allege that Hammer had actual knowledge of the fraud by virtue of his (1) review of the IFAR report, which called into question the authenticity and provenance of the Rosales Paintings; (2) review of documents demonstrating Knoedler's inability to substantiate the purported provenance of the Rosales Paintings; and (3) contemporaneous awareness of Knoedler's acquisition and sale of each Rosales Painting, including the price Knoedler paid to Rosales, the price Knoedler charged its customer, and the resulting profit. (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 213)

This Court concludes that the Taubmans have pleaded sufficient facts to create a strong inference that Hammer had actual knowledge of the fraud.  As an initial matter, Taubman has pleaded facts demonstrating that Hammer was directly responsible for Knoedler's operations; closely followed Knoedler's financial condition, sales and profits; was contemporaneously aware of every sale of a Rosales Painting; was aware that the Rosales Paintings were newly discovered works with no established provenance; was aware that Knoedler's efforts to substantiate the provenance that had been provided were unsuccessful; and was aware that Knoedler's mark-ups on Rosales Paintings averaged 275%, whereas gallery commissions on consigned works are typically in the 10-20% range.  Rosales's continued willingness to sell these Abstract Expressionist masterworks to Knoedler for a fraction of their value on the open market – considered together with the other facts and circumstances noted above – are sufficient to create a strong inference that Hammer had actual knowledge that the Rosales Paintings, including the Still purchased by the Taubmans, were not authentic.

Hammer also argues that the Taubmans have not shown that Hammer provided "substantial assistance" to the fraud scheme, noting that "[n]o allegation exists of any act by Mr. Hammer that proximately caused [the Taubmans] to buy the [Still]."  (Hammer Br. (Taubman

Dkt. No. 62) at 5)  The Taubmans allege that Hammer provided substantial assistance to the

fraud scheme by (1) condoning Freedman's use of Knoedler's name and reputation in aid of her

fraudulent misrepresentations and omissions, (2) rewarding and incentivizing Freedman's

fraudulent sales by increasing her profit share percentages, (3) not disclosing the IFAR report to

prospective purchasers of Rosales Paintings, and (4) directing the concealment of the fraudulent

scheme once it came under investigation.  (Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 214, 225, 238)

              Hammer argues that the allegation that he "condoned" the use of the Knoedler

name in connection with the fraud scheme constitutes a claim of mere inaction, which does not

constitute substantial assistance in the absence of a confidential or fiduciary relationship.

(Hammer Br. (Taubman Dkt. No. 62) at 6)  The Taubmans have pled more than passive

acquiescence, however.  Given Hammer's supervisory and ownership position at Knoedler; the

fact that the Knoedler platform was a key element in the fraud scheme; Hammer's alleged close

focus on sales, expenses, and profits at Knoedler; his knowledge of the background concerning

the Rosales Paintings; his discussions with Freedman about the sale of this painting and other

Rosales Paintings; his decision to suppress the IFAR report; and his decision to incentivize

Freedman to sell more Rosales Paintings at Knoedler, the Taubmans have alleged more than

simple inaction on Hammer's part.

              Hammer's motion to dismiss the Taubmans' aiding and abetting fraud claim is

denied.

## IX.     CONSPIRACY TO COMMIT FRAUD

              Hammer argues that Plaintiffs' conspiracy to commit fraud claims must be

dismissed, because they have not alleged facts demonstrating that Hammer (1) actually knew the

information provided to Plaintiffs was false or misleading; (2) entered into an agreement to

defraud Plaintiffs; (3) committed an overt act in furtherance of the fraud; or (4) was aware of the

fraud when the Rosales Paintings were sold to Plaintiffs.  (Hammer Br. (Hilti Dkt. No. 92) at 9-

11; Hammer Br. (White Dkt. No. 73) at 11-14; Hammer Br. (Taubman Dkt. No. 62) at 12-14)

        8-31 argues that Hilti's conspiracy to commit fraud claim must be dismissed

because Hilti has not alleged facts showing that (1) 8-31 actually knew the information provided

to Hilti was false or misleading, and has not otherwise directly connected 8-31 to the other

defendants' allegedly fraudulent conduct; (2) 8-31 entered into an agreement to engage in a

common scheme or plan to defraud Hilti; or (3) 8-31 committed an overt act in furtherance of the

fraud.  (Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 18-19)  8-31 also argues that it is not plausible

that members of the purported conspiracy would have added 8-31 as a member of the conspiracy

long after the conspiracy was initiated.[26]  (Knoedler/8-31 Br. (Hilti Dkt. No. 94) at 19)

**A.**    **Applicable Law**

        "To make a prima facie factual showing of a conspiracy, 'a plaintiff must allege

the primary tort[ – here, fraud – ]and four elements:  (a) a corrupt agreement between two or

more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional

participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury.'"  In

---

[26]  In White, 8-31 moves to dismiss Plaintiff's "fraud claims" on the basis that White "fails to adequately allege that she justifiably relied on the allegedly material omissions that she pleaded in support of her fraud claim."  (Knoedler/8-31 Br. (White Dkt. No. 75) at 16)  In support of this argument, 8-31 states that it "adopt[s] the arguments set forth in . . . Freedman['s] [brief] with respect to the failure to plead justifiable reliance. . . ."  (Id.)  White does not assert a fraud conspiracy claim against Freedman, however.  See Am. Cmplt. (White Dkt. No. 37) ¶¶ 147-60.  Accordingly, 8-31 has set forth no argument as to why the fraud conspiracy claims asserted it by White should be dismissed.

In Taubman, although the table of contents in 8-31's brief states that "the fraud claims should be dismissed because Plaintiffs do not plead justifiable reliance," their brief omits the relevant pages.  See Knoedler/8-31 Br. (Dkt. No. 64) at i, 15-18.  Accordingly, 8-31 has set forth no basis for this Court to grant any motion to dismiss the fraud conspiracy claim.

re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 339 (S.D.N.Y. 2000) (quoting Chrysler Capital

Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991)); see also Kashi v.

Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986).

     **B.**     **Analysis**

     **1.**     **Hilti and Taubman's Fraud Conspiracy Claims**

     For the reasons discussed above, this Court finds that the Hilti and Taubman

Amended Complaints allege facts that create a strong inference of Hammer and 8-31's actual

knowledge that the Rosales Paintings were forged, and that the sales of these paintings were

fraudulent.  These complaints also adequately allege that Hammer, 8-31, and Knoedler, among

others, entered into a corrupt agreement with Freedman.  See Eaves v. Designs for Fin., Inc., 785

F. Supp. 2d 229, 257-58 (S.D.N.Y. 2011) ("allegations of 'intimate business relationship

between' defendant and third-party, '[defendant's] knowledge of [third party's] unlawful acts,'

and fraudulent misrepresentations 'constitute sufficient facts from which a trier of fact could

infer an agreement'") (quoting First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel,

Dixon & Co., 629 F.Supp. 427, 444 (S.D.N.Y.1986)).  As to the overt act requirement, it is not

necessary that Hammer commit an overt act.  All that is necessary is that a member of the

conspiracy commit an overt act, Chrysler Capital Corp., 778 F. Supp. at 1267 (fraud conspiracy

requires "at least one overt act by one of the conspirators in furtherance of the unlawful plan"),

and here the complaints allege countless overt acts committed by members of the conspiracy,

including Freedman.  In any event, the complaints' allegations that Hammer and 8-31 – acting

through Hammer – raised Freedman's profit sharing percentage in order to incentivize her to sell

the forged Rosales Paintings constitutes an act in furtherance of the alleged fraud conspiracy.[27]
These complaints also adequately allege that Hammer and 8-31, acting through Hammer, knowingly and intentionally participated in the fraudulent scheme, that their intentional and knowing participation began before the Rosales Paintings were sold to Hilti and the Taubmans, and that the conspiracy caused injury to Hilti and the Taubmans.

Hammer and 8-31's motions to dismiss the Taubmans' and Hilti's fraud conspiracy claims are denied.

## 2. White's Fraud Conspiracy Claim

For the reasons discussed above, White's Amended Complaint alleges facts that create a strong inference of Hammer and 8-31's actual knowledge that the "Pollock" sold to White was forged and that the sale was fraudulent. White has also adequately alleged that Hammer, 8-31, and Knoedler entered into a corrupt agreement with Freedman, among others. See Eaves, 785 F. Supp. 2d at 257-58. The overt act requirement is also satisfied for the same reasons discussed above. See also Am. Cmplt. (White Dkt. No. 37) ¶¶ 101, 141, 173) Accordingly, Hammer and 8-31's motions to dismiss White's fraud conspiracy claims are denied.

---

[27] The Taubman Amended Complaint alleges that Hammer committed an overt act by (1) condoning Freedman's use of Knoedler's name and reputation in aid of her fraudulent misrepresentations and omissions, (2) rewarding and incentivizing Freedman's fraudulent sales by profit sharing increases, (3) directing that Knoedler share the IFAR report with Mirvish but no other prospective purchaser of Rosales Paintings, and (4) directing the concealment of the fraudulent scheme after its conclusion. (Am. Cmplt. (Taubman Dkt. No. 39) ¶ 225)

## X.   *ALTER EGO* LIABILITY

White asserts claims of fraud, fraudulent concealment, and conspiracy to commit fraud against Hammer and 8-31 under an alter ego theory of liability.[28]  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 125, 134, 157)  Hammer and 8-31 have moved to dismiss these claims to the extent they are based on an alter ego theory.

Hilti likewise asserts claims of fraud and fraudulent concealment against Hammer and 8-31 under an alter ego theory.[29]  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 402-03, 430-31)  Only Hammer has moved to dismiss the Hilti alter ego claims.[30]

### A.   **Applicable Law**

Under Delaware law,[31] "a limited liability company (or 'LLC'), formed by one or more entities and/or individuals as its 'members,' . . . provides 'limited liability akin to the corporate form.'"  NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 176 (2d Cir.

---

[28]  White alleges that 8-31 is the sole owner and alter ego of Knoedler, and that Hammer is the sole owner and alter ego of 8-31.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 12, 113, 125, 134, 157, 200, 209, 218, 225, 232, 242)  Although White also pleads alter ego liability for its breach of warranty, mistake and New York General Business Law §§ 349-350 claims (see id. ¶¶ 200, 209, 218, 225, 232, 242), as discussed above, those claims will be dismissed as untimely.

[29]  Hilti pleads alter ego liability for its breach of warranty, mistake and New York General Business Law §§ 349-350 claims.  As discussed above, those claims will be dismissed as untimely.  (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 394-95, 460-61, 468-69, 475-76)

[30]  The Taubmans have also asserted alter ego claims against 8-31 (see Am. Cmplt. (Taubman Dkt. No. 39) ¶¶ 190, 205), which 8-31 has not challenged in its motion to dismiss.  See 8-31 Br. (Taubman Dkt. No. 64).  The Taubmans have not asserted alter ego claims against Hammer.

[31]  "It is well-settled that New York's choice-of-law rules dictate that 'the law of the state of incorporation determines when the corporate form will be disregarded.'"  Jonas v. Estate of Leven, No. 14 Civ. 3369 (SHS), 2015 WL 4522763, at *13 (S.D.N.Y. July 27, 2015) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  "This principle applies to LLCs as well as corporations."  Allison v. Clos-ette Too, LLC, No. 14 Civ. 1618 (LAK) (JCF), 2014 WL 4996358, at *4 (S.D.N.Y. Sept. 15, 2014) report and recommendation adopted sub nom. Ellison v. Clos-ette Too, LLC, No. 14 Civ. 1618 (LAK), 2014 WL 5002099 (S.D.N.Y. Oct. 7, 2014).  Here, Knoedler is a Delaware LLC and 8-31 is a Delaware corporation.  (Am. Cmplt. (White Dkt. No. 37) ¶¶ 11, 13; Am. Cmplt. (Hilti Dkt. No. 46) ¶ 48)

2008) (quoting <u>Elf Atochem North America, Inc. v. Jaffari</u>, 727 A.2d 286, 287 (Del. 1999)).

"The shareholders of a corporation and the members of an LLC generally are not liable for the

debts of the entity . . . ." <u>Id.</u>  However, "Delaware law permits a court to pierce the corporate

veil 'where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego

of its owner.'"  <u>NetJets Aviation, Inc</u>, 537 F.3d at 176 (quoting <u>Geyer v. Ingersoll Publications

Co.</u>, 621 A.2d 784, 793 (Del. Ch. 1992)).  The central question is whether "the individual [or

parent corporation] has 'complete domination and control' over the entity such that it 'no longer

ha[s] legal or independent significance of [its] own."  <u>Carotek, Inc. v. Kobayashi Ventures, LLC</u>,

875 F. Supp. 2d 313, 350 (S.D.N.Y. 2012) (quoting <u>Wallace ex rel. Cencom Cable Income

Partners II, L.P. v. Wood</u>, 752 A.2d 1175, 1183 (Del. Ch. 1999)).  Under the <u>alter ego</u> theory of

piercing the corporate veil, a plaintiff must demonstrate "a mingling of the operations of the

entity and its owner plus an 'overall element of injustice or unfairness.'"  <u>Id.</u> (quoting <u>Harco Nat.

Ins. Co. v. Green Farms, Inc.</u>, Civ. A. No. 1131, 1989 WL 110537, at *5 (Del. Ch. Sept. 19,

1989)).  The Second Circuit "has stated this as a two-pronged test focusing on (1) whether the

[dominant shareholder and the corporation] in question operated as a single economic entity, and

(2) whether there was an overall element of injustice or unfairness."  <u>NetJets Aviation, Inc.</u>, 537

F.3d at 177 (2d Cir. 2008) (citing <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1457 (2d Cir. 1995)).

   Courts consider the following factors in determining whether a corporation and its

dominant shareholder operate as a "single economic entity":

> "[W]hether the corporation was adequately capitalized for the corporate
> undertaking; whether the corporation was solvent; whether dividends were paid,
> corporate records kept, officers and directors functioned properly, and other
> corporate formalities were observed; whether the dominant shareholder siphoned
> corporate funds; and whether, in general, the corporation simply functioned as a
> facade for the dominant shareholder."

Atex, 68 F.3d at 1458 (quoting Harco, 1989 WL 110537, at *4).  In addition, "a plaintiff must allege injustice or unfairness that is a result of an abuse of the corporate form.  In other words, the corporation effectively must exist as a sham or shell through which the parent company perpetrates injustice." Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 975 F. Supp. 2d 392, 406 (S.D.N.Y. 2013); see also TradeWinds Airlines, Inc. v. Soros, No. 08 Civ. 5901 (JFK), 2012 WL 983575, at *6 (S.D.N.Y. Mar. 22, 2012) ("This 'injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit[.]'") (quoting NetJets, 537 F.3d at 183)).

Courts generally apply the same analysis whether the dominant shareholder is an individual or another corporation.  See Tradewinds Airlines, Inc. v. Soros, No. 08 Civ. 5901 (JFK), 2015 WL 1454495, at *8 (S.D.N.Y. Mar. 31, 2015) (applying tests set forth in Atex to individual dominant shareholder); Wilson v. Thorn Energy, LLC, 787 F. Supp. 2d 286, 297 (S.D.N.Y. 2011) ("To hold Huggins personally liable for the obligations of the Defendant Entities, Plaintiffs must first show that Huggins and the Defendant Entities operated as a single economic unit.") (citing NetJets Aviation, 537 F.3d at 177); Jet Star Enterprises, Ltd. v. Soros, No. 05 Civ. 6585 (HB), 2006 WL 2270375, at *6 (S.D.N.Y. Aug. 9, 2006) (applying same tests set forth in Atex to individual dominant shareholder).  "These principles are [also] generally applicable . . . [when] one of the entities in question is an LLC," but "[i]n the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required." NetJets Aviation, Inc., 537 F.3d at 178.

B.   **Analysis**

1.   **White's *Alter Ego* Claim**

White alleges, <u>inter alia</u>, that Hammer, 8-31, Knoedler, and Hammer Galleries "ignored the formal corporate distinctions among them"; that "Hammer and 8-31 treated Knoedler as a mere instrumentality" and exercised "complete dominion and control over Knoedler"; that "Hammer and others acting under his direction have consistently disregarded the corporate formalities of 8-31 and Knoedler"; that 8-31 and Knoedler shared employees, who were paid by 8-31, used Knoedler email addresses, and shared a telephone system; that 8-31 and Knoedler shared offices, but 8-31 paid no rent; and that 8-31 and Knoedler "nominally maintain[ed] separate bank accounts but indiscriminately shared funds without properly documenting loans and transfers between the two entities."  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶¶ 103-106, 110, 113, 125)  White further alleges that Knoedler did not have its own board of directors; did not maintain financial records independent from 8-31's records; and did not pay its own taxes, file its own tax returns, or pay its employees directly.  (<u>Id.</u> ¶ 110)  White also alleges that 8-31 and Knoedler wholly disregarded the Management Agreement they entered into in 2001.  (<u>Id.</u> ¶ 111)  For example, 8-31 never billed or otherwise charged a contractually-agreed-upon 101% service fee for services it provided to Knoedler.  (<u>Id.</u>)  Where "two entities with common ownership 'fail[] to follow legal formalities when contracting with each other it [is] tantamount to declaring that they are indeed one in the same.'"  <u>NetJets Aviation, Inc.</u>, 537 F.3d at 178 (quoting <u>Trustees of Village of Arden v. Unity Construction Co.</u>, Civ. A. No. 15025, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000)).

White further alleges that "whenever Hammer or 8-31 needed money, Knoedler, at Hammer's or 8-31's direction[,] would transfer funds to a single bank account (in which funds

from various 8-31 subsidiaries were commingled)."  (Am. Cmplt. (<u>White</u> Dkt. No. 37) ¶ 107)

These transfers – which Hammer and 8-31 called "interdivisional receivables" – were made

without any loan documentation or interest charged, were not repaid, and were used to cover 8-

31's expenses, including Hammer's salary and "travel and entertainment" expense

reimbursements and expenses incurred by other 8-31 subsidiaries.  (<u>Id.</u> ¶¶ 107-08)  Between

2001 and 2012, 8-31 and Hammer's debts to Knoedler grew to more than $23 million.  (<u>Id.</u>

¶ 108)  In 2010, however – after the Government began its investigation of Knoedler's sale of the

Rosales Paintings – 8-31 unilaterally "reclassified" more than $20 million of "interdivisional

receivables" that 8-31 owed to Knoedler as a "dividend" to 8-31, thereby effectively forgiving

the loan.  (<u>Id.</u> ¶ 109)  White alleges that this "reclassification" was done for the purpose of

shielding Knoedler's profits from sales of the Rosales Paintings.  (<u>Id.</u>)  In sum, White alleges that

"Hammer effectively used 8-31's funds and Knoedler's funds as his personal funds, moving

funds between the entities and to himself and his other galleries as he liked, without proper

documentation."  (<u>Id.</u> ¶ 107)

       Finally, White claims that Hammer and 8-31 disregarded corporate and

contractual formalities in connection with Knoedler's closing in November 2011.  White

contends that Hammer and 8-31 ignored the provision in Knoedler's liquidation plan requiring

Knoedler to reserve funds for potential liabilities resulting from legal actions against Knoedler.

(<u>Id.</u> ¶ 112)  Instead, Hammer, 8-31, and Knoedler removed more than $20 million in assets from

Knoedler's books.  (<u>Id.</u>)

These allegations are sufficient to permit a reasonable inference that Knoedler, 8-31, and Hammer operated as a single economic entity.[32]  Moreover, the allegation that Hammer and 8-31 raided Knoedler's assets after the federal investigation began – declaring a "dividend" of more than $20 million – sufficiently pleads an injustice or unfairness that is a result of an abuse of the corporate form.

White has offered a sufficient evidentiary basis for piercing the corporate veil and imposing alter ego liability on 8-31 and Hammer for fraud, fraudulent concealment, and conspiracy to commit fraud.[33]

## 2.   Hilti's *Alter Ego* Claim

To establish an alter ego claim against Hammer, Hilti must allege that "[Hammer] ha[d] complete domination and control over [Knoedler] such that [Knoedler] 'no longer ha[d] legal or independent significance of [its] own.'"  Carotek, 875 F. Supp. 2d at 350 (internal quotation marks and citation omitted).  Although the Hilti Amended Complaint alleges facts demonstrating 8-31's domination and control of Knoedler[34] (see, e.g., Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 271-87), it is largely devoid of such allegations with respect to Hammer.  Hilti alleges that "Hammer is the sole owner of 8-31" and "controlled 8-31's decision-making with respect to

---

[32]  8-31 argues that, "[b]ecause neither Knoedler nor 8-31 existed when [White] was purportedly injured, no alter ego liability exists and the claims against 8-31 based on alter ego liability should be dismissed."  (Knoedler/8-31 Br. (White Dkt. No. 75) at 17; Knoedler/8-31 Reply Br. (White Dkt. No. 81) at 13-14)  This argument is unavailing because, as discussed above, this Court finds that White has adequately alleged (1) successor liability as against Knoedler, and (2) that 8-31 is the alter ego of Knoedler.  Accordingly, to the extent that 8-31 is contending that alter ego liability is improper because it did not exist at the time White was defrauded, this argument does not warrant dismissal of White's alter ego claims at this time.

[33]  Having concluded that White has sufficiently pleaded a basis for alter ego liability as to 8-31, this Court does not reach 8-31's arguments that White has failed to plead a basis for respondeat superior liability.  (Knoedler/8-31 Br. (White Dkt. No. 81) at 13-16)  This Court will, if necessary, address this issue at summary judgment.

[34]  8-31 has not challenged Hilti's alter ego claims.  See 8-31 Br. (Hilti Dkt. No. 94).

its sole ownership of Knoedler," but he has not alleged that Hammer has ignored or abused the corporate form as to 8-31. (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 288-89) Even assuming that 8-31 is Knoedler's alter ego, however, Hilti has not alleged that Hammer is the alter ego of 8-31. "The shareholders of a corporation . . . are not liable for the debts of the entity" absent allegations warranting veil-piercing. NetJets Aviation, Inc., 537 F.3d at 176. Accordingly – having not alleged that Hammer is the alter ego of 8-31 – Hilti's allegations that 8-31 was Knoedler's alter ego are insufficient to establish that Hammer himself can be held liable for Knoedler's actions on the theory that he is Knoedler's alter ego.

Hilti also alleges that Hammer was "directly responsible for the operations of Knoedler at the relevant times"; that "Hammer unilaterally made the key decisions" for Knoedler related to the conduct at issue in this case, such as increasing Freedman's salary, "whitewashing the IFAR Report," and firing Freedman; and that "Knoedler's participation in the Scheme was fully known and directed by and through Hammer." (Am. Cmplt. (Hilti Dkt. No. 46) ¶¶ 290-93) Hilti simultaneously alleges, however, that Hammer was the "Chairman" of Knoedler at all relevant times, and all of these actions would be within the purview of the senior officer of Knoedler. (Id. ¶ 283) Hilti has not alleged that Hammer undertook these actions in his capacity as the ultimate beneficial owner of Knoedler, rather than in his capacity as Chairman of Knoedler. Accordingly, Hilti has not demonstrated that Hammer exercised control over Knoedler in a manner constituting an abuse of the corporate form.

The sole allegation in the Hilti Amended Complaint evincing Hammer's abuse of the corporate form is the claim that Hammer "convey[ed] Knoedler's ill-gotten profits to 8-31, Hammer Galleries, and himself" by reclassifying "interdivisional receivables" as "dividends." (Id. ¶ 292) The remaining actions which allegedly demonstrate abuse of the corporate form – for

example, on-demand money transfers from Knoedler to cover expenses (id. ¶ 275), transfers made without written loan agreements or repayments (id.), and "commingl[ing] [of] assets" (id. ¶ 281) – are all attributed to 8-31.  See id. ¶¶ 272-87; see also TradeWinds Airlines, 2015 WL 1454495, at *8 (in context of alter ego claim against individual, "observ[ance of] corporate formalities" and "commingled funds" factors in alter ego analysis).[35]  The allegation that 8-31 and Hammer reclassified the "interdivisional receivables" as "dividends" is not enough – standing alone – to warrant piercing of the corporate veil.  NetJets Aviation, Inc., 537 F.3d at 177 ("'[N]o single factor c[an] justify a decision to disregard the corporate entity, but . . . some combination of them [i]s required. . . .'") (quoting Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990)); TradeWinds Airlines, 2015 WL 1454495, at *8 (in context of alter ego claim against individual, "[s]ome combination of these factors is required because none is alone sufficient to disregard the corporate form").  Moreover, Hilti has not alleged the amount of the dividend that was funneled to Hammer, and, indeed, alleges elsewhere in the Amended Complaint that "8-31 'reclassified' its 'interdivisional receivable' debt to Knoedler . . . as a 'dividend' to 8-31."  (Am. Cmplt. (Hilti Dkt. No. 46) ¶ 279)  Accordingly, Hilti's allegations do not demonstrate that Hammer so dominated Knoedler as to hold him liable as Knoedler's alter ego.

Hammer's motion to dismiss Hilti's alter ego claims is granted.

---

[35] By contrast, the White Amended Complaint, as described above, alleges Hammer's direct involvement in each of these actions in his capacity as the beneficial owner of Knoedler.  See, e.g., Am. Cmplt. (White Dkt. No. 37) ¶¶ 107-08.  The White Amended Complaint, moreover, alleges both that 8-31 is the alter ego of Knoedler and that Hammer is the alter ego of 8-31. (Id. ¶¶ 12, 113, 125, 134, 157, 200, 209, 218, 225, 232, 242)

**CONCLUSION**

Knoedler, Hammer, 8-31, and Freedman's motions to dismiss in <u>Hilti</u>, <u>White</u>, and <u>Taubman</u> are granted in part and denied in part as set forth above.  Hammer Galleries's motion to dismiss (<u>Hilti</u> Dkt. No. 95) is granted.

The Clerk is directed to terminate the following motions:  <u>Hilti</u>, 13 Civ. 657 (Dkt. Nos. 91, 93, 95, 104); <u>White</u>, 13 Civ. 1193 (Dkt. Nos. 72, 74, 85); <u>Taubman</u>, 13 Civ. 3011 (Dkt. Nos. 61, 63, 70).

Dated:  New York, New York  
      September 30, 2015

SO ORDERED.

Paul G. Gardephe  
United States District Judge

99