UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE MARTIN HILTI FAMILY TRUST,

                            Plaintiff,

            - against -

KNOEDLER GALLERY, LLC d/b/a
KNOEDLER & COMPANY et al.,

                            Defendants.

FRANCES HAMILTON WHITE,

                            Plaintiff,

            - against -

ANN FREEDMAN et al.,

                            Defendants.

**MEMORANDUM
OPINION & ORDER**

13 Civ. 0657 (PGG)

13 Civ. 1193 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

              Plaintiffs in these actions are the Martin Hilti Family Trust (the "Trust") and

Frances Hamilton White.  These actions arise from Plaintiffs' purchase of forged paintings from

the Knoedler Gallery, an art gallery in Manhattan.  The Defendants that are the subject of this

opinion are Knoedler Gallery, LLC ("Knoedler LLC"), the owner of the gallery; 8-31 Holdings,

Inc. ("8-31"), Knoedler LLC's sole member; and Michael Hammer, 8-31's sole shareholder

(collectively, "Defendants").  The operative complaints assert claims under the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), and state law causes of action for fraud,

fraudulent concealment, aiding and abetting fraud, conspiracy to commit fraud, and conspiracy

to commit fraudulent concealment.  (Second Am. Cmplt. ("SAC") (<u>Hilti</u> Dkt. No.163); Am. Cmplt. (<u>White</u> Dkt. No. 37))

Defendants have moved for summary judgment.  (<u>Hilti</u> Dkt. Nos. 212, 214, 216; <u>White</u> Dkt. Nos. 165, 167, 169)  Hammer seeks summary judgment on all claims against him (Def. Hammer Br. (<u>Hilti</u> Dkt. No. 213) at 8);[1] 8-31 seeks summary judgment on the RICO claims against it in <u>Hilti</u>, and on all claims against it that are based on an <u>alter ego</u> theory of liability (Def. 8-31 Br. (<u>Hilti</u> Dkt. No. 215) at 10); and Knoedler LLC seeks summary judgment on all claims against it in <u>White</u>, and on the RICO claims alleged against it in <u>Hilti</u>.  (Def. Knoedler Br. (<u>Hilti</u> Dkt. No. 217) at 7)  In a March 31, 2019 Order, this Court granted in part and denied in part Defendants' motions.  (<u>Hilti</u> Dkt. No. 246, <u>White</u> Dkt. No. 196)  The purpose of this opinion is to explain the Court's reasoning.

## BACKGROUND[2]

### I.    FACTS

The Knoedler Gallery (the "Gallery") was founded by Michael Knoedler in 1846 and operated continuously for the next 165 years.  (Hammer Decl. (<u>Hilti</u> Dkt. No. 219-45) ¶ 2) Until it closed in 2011, the Gallery was one of New York City's most venerable and respected art galleries.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1196)

---

[1]  With the exception of deposition and hearing transcripts, all references to page numbers in this Memorandum Opinion & Order are as reflected in this District's Electronic Case Filing system. Citations to deposition and hearing transcripts reflect the page numbers assigned by the court reporter.

[2]  Familiarity with this Court's prior orders in <u>Hilti</u> and <u>White</u> (<u>Hilti</u> Dkt. No. 132; <u>White</u> Dkt. No. 108) is assumed.  The Court likewise assumes familiarity with its decision at summary judgment in a related case, <u>De Sole v. Knoedler Gallery, LLC</u>, 139 F. Supp. 3d 618 (S.D.N.Y. 2015).

In 1971, the Gallery was purchased by Armand Hammer, the grandfather of Defendant Hammer, and since that time the Hammer family has been directly responsible for the operations of the Gallery. (Id. ¶ 1379) The Gallery is owned by Defendant Knoedler LLC, a Delaware limited liability corporation. (Cert. of Formation (Hilti Dkt. No. 218-181)) Defendant 8-31, a Delaware corporation, is the sole member of Knoedler. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 865; Cert. of Formation (Hilti Dkt. No. 218-79)) Defendant Hammer is the president, chief executive officer, chairman, and sole owner of 8-31, and became the sole manager of Knoedler LLC in 2011. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 857; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1104, 1106; Hammer Decl. (Hilti Dkt. No. 219-45) ¶ 1)

A.     **The "Rosales Paintings"**

In the mid-1990s, Ann Freedman – then the sole manager and president of the Gallery[3] – was introduced to a Long Island art dealer, Glafira Rosales. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 1) Rosales claimed to represent the son of a wealthy deceased art collector whom she referred to as "Mr. X." Rosales told Freedman that Mr. X was a "a wealthy businessman who [had] lived in both Mexico and Switzerland, was connected with the art world in the mid-20th century[,] and had acquired works out of artists' studios of that era." (Id. ¶ 6) Mr. X had, in particular, purchased works by certain well-known Abstract Expressionist artists. (Id. ¶ 7; Andrade Dep. (Hilti Dkt. No. 218-14) at 335:19-21; see Freedman Dep. (Hilti Dkt. No. 219-4) at 260:11-25, 472:13-16) "According to Rosales, the collector stored the works for

---

[3]  Ann Freedman joined the Gallery in 1977 as the director of contemporary art. (Freedman Dep. (Hilti Dkt. No. 219-5) at 42:9-15) In or about January 1995, she "assume[d] leadership of the gallery," and began reporting directly to "the owner of the gallery, Michael Hammer." (Id. at 42:18-43:9) Between 2001 and October 2009, Freedman was the president and sole manager of Knoedler LLC and a director of 8-31. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 198; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1408)

decades. When he died the works were bequeathed to his son. The son was not an art collector and was not interested in keeping the works, so he engaged his family friend, Rosales, to sell them in a discrete manner." (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 7) Rosales told Freedman that Mr. X's son wished to remain anonymous, and she provided Freedman with only vague background information concerning him and his family. (Id. ¶ 5)

Over the next fifteen years, Rosales provided the Gallery with dozens of previously undiscovered works by well-known Abstract Expressionist artists (the "Rosales Paintings"), and the Gallery sold these paintings to its customers. (Rosales Painting List (Hilti Dkt. No. 219-104)) All of these paintings were forgeries. (Sept. 16, 2013 Rosales Plea Tr. at 27:11-18, United States v. Rosales, No. 13 Crim. 518 (KPF) (S.D.N.Y. Sept. 16, 2013), Dkt. No. 23 (guilty plea allocution).[4]

### 1. Provenance

As the Gallery sold Rosales Paintings, Freedman and her staff conducted research into the provenance of these works.[5] (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 15; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1006) In her deposition, Freedman referred to this undertaking as "the project." (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 998, 1000)

In 2000, Freedman retained E.A. Carmean – a noted art historian – to lead an effort to determine the provenance of the Rosales Paintings. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 11, 15; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1006-07) "Carmean helped a group within [the Gallery] to come up with [a] purported link" between Mr. X and Alfonso

---

[4] The Court may take judicial notice of adjudicative facts pursuant to Fed. R. Civ. P. 201.

[5] The Merriam-Webster dictionary defines "provenance" as "the history of ownership of a valued object or work of art or literature." Merriam Webster, http://www.merriam-webster.com/dictionary/provenance (last visited March 15, 2019).

Ossorio, a well-known Filipino-American artist and early collector of the paintings of Abstract Expressionist artists, including Jackson Pollock.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1011-13; Freedman Dep. (<u>Hilti</u> Dkt. No. 219-4) at 261:12-17; IFAR Rpt. (Dkt. No. 219-95) at 6; Carmean Dep. (Dkt. No. 219-11) at 117:9-18)  When asked whether there was a connection between Mr. X and Ossorio, Rosales represented to Freedman that Mr. X had known Ossorio. (Freedman Dep. (<u>Hilti</u> Dkt. No. 219-4) at 257:16-17; 259:10-12)

Thereafter, Freedman and the Gallery represented to clients that at least some of the Rosales Paintings were originally purchased with Ossorio's assistance.  (<u>See</u>, <u>e.g.</u>, IFAR Rpt. (<u>Hilti</u> Dkt. No. 219-95))  Freedman viewed as "significant" to provenance information suggesting that a well-known art figure such as Ossorio facilitated the sale of art to a collector. (Freedman Dep. (<u>Hilti</u> Dkt. No. 219-4) at 305:20-22)

In 2003, however, the International Foundation for Art Research ("IFAR") prepared a report (the "IFAR Report") concerning a Rosales Painting – a work purportedly created by Jackson Pollock – and concluded that the Ossorio connection posited by the Gallery was "inconceivable."[6]  (IFAR Rpt. (<u>Hilti</u> Dkt. No. 219-95) at 7)  After this report was released, Freedman and the Gallery began representing that David Herbert – another well-known figure in the art world – was the advisor who aided Mr. X in amassing his collection, instead of Ossorio. (Freedman Dep. (<u>Hilti</u> Dkt. No. 219-4) at 303:6-304:9)  Rosales "confirmed" this purported connection between Mr. X and Herbert.  (<u>Id.</u> at 304:7-17)

Freedman told Hammer that she was conducting research concerning the provenance of the Rosales Paintings, and that she had retained Carmean to assist in that research. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1002-03, 1008)  Freedman kept Hammer

---

[6] The IFAR Report is discussed in greater detail below.

apprised of the results of her research "as it was developing," and she "did not conceal anything from" Hammer regarding this research.  (Id. ¶¶ 1009-10)  Freedman testified, however, that she did not mention Glafira Rosales to Hammer in writing, and does not recall speaking with Hammer about Rosales.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 261-63)

During the years that the Gallery was selling the Rosales Paintings, Freedman's share of the Gallery's profits grew significantly:  from 10% to 15% in 1998; to 25% in 2002; to 30% in 2008.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1040-41, 1044-46)  Hammer approved each increase in Freedman's share of the Gallery's profits.  (Id. ¶ 1041)

### 2.  **White Purchase**

In March 2000, Plaintiff Frances White and her then-husband, Harvey White, purchased four paintings from the Gallery, including a purported Jackson Pollock that had been brought to the Gallery by Rosales.  The Whites paid $5 million for the four paintings.[7]  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 41-42, 44)  Freedman told the Whites that the Pollock was owned by an unknown art collector in Switzerland.  (Id. ¶¶ 51-52)  The April 2000 invoice for the Whites' purchase includes the following provenance for the Pollock:  "Private Collection, Switzerland."  (Id. ¶ 74)

The Whites had purchased at least nine paintings from the Gallery before their purchase of the purported Pollock.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1395)  The Whites knew Freedman, who had invited them to visit the Gallery sometime before their March 2000 visit.  (Id. ¶¶ 1399-1400)

---

[7]  The record does not disclose how much of the $5 million is attributable to the purported Pollock.

The Whites divorced in 2001, and ownership of the purported Pollock passed to Plaintiff White.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 76)

### 3.    The Trust's Purchase

Plaintiff Martin Hilti Family Trust is a foreign trust organized under the laws of Liechtenstein and located in Liechtenstein.  (Id. ¶ 77)  The Trust purchases and owns fine art, which is exhibited at the Hilti Art Foundation in Liechtenstein.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1201-02)

In October 2002, Michael Hilti – a representative of the Trust – visited the Gallery.  (Id. ¶ 1203)  Freedman told Hilti that she had an "exceptional Rothko for sale," but that it was not available for viewing at that time.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 99-100, 102)  Freedman provided Hilti with a photograph of the painting and a written description of the work and its provenance.[8]  (Id. ¶ 102)  Freedman told Hilti that the painting came from a private collection.  (Id. ¶ 111)

Freedman offered to deliver the painting to the Trust in Liechtenstein, so that it could be viewed before a purchase decision was made.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1207)  In November 2002, the purported Rothko was delivered to the Trust in Liechtenstein.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 118)  The Trust decided to purchase the

---

[8]  At this time, the Gallery's files contained at least two iterations of the purported Rothko's provenance.  The first presents the provenance as follows:  "The Artist.  Private Collection, Switzerland (acquired directly from the artist through Alfonso Ossorio).  By descent to current owner."  (Rothko Provenance No. 1 (Hilti Dkt. No. 219-67) at 3)  In the second, the provenance is presented as:  "The Artist.  Private Collection, Switzerland (acquired directly from the artist).  By descent to current owner."  (Rothko Provenance No. 2 (Hilti Dkt. No. 219-77) at 4)  The record does not disclose whether the Trust was given one of these descriptions of the painting's provenance, or a third version.

painting, and it did so by transferring $5.5 million from its bank account in Liechtenstein to Knoedler's bank account in New York.  (Id. ¶ 130)

### 4. **IFAR Report**

In late 2001, Freedman and Knoedler sold a purported Jackson Pollock (the "Green Pollock") to Jack Levy for $2 million.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 151-52)  Knoedler had purchased this work from Rosales for $750,000.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1027)  Knoedler included in the provenance of the painting a reference to Ossorio.  (IFAR Rpt. (Hilti Dkt. No. 219-95) at 3)

Levy's purchase of the Green Pollock was conditioned on a favorable review of the work's provenance and authenticity by IFAR.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 152)  On October 9, 2003, IFAR issued its report concerning the Green Pollock.  (IFAR Rpt. (Hilti Dkt. No. 219-95) at 2)  The IFAR Report rejects the Gallery and Rosales' claim that Ossorio had been involved in the acquisition of the Green Pollock, and notes that there are "disturbing" differences between the materials used to create the Green Pollock and the materials used to create a known Pollock from the same year.[9]  (Id. at 4-7, 8, 10)  The report also states that "IFAR's own extensive archival and other research has turned up no documentary material of any kind linking the painting to Pollock, or Ossorio."  (Id. at 3)  The conclusion of the IFAR Report reads:  "[G]iven the several strongly negative opinions [from Pollock experts about the

---

[9]  In addition to issues regarding the materials used in the "Green Pollock," certain Pollock experts challenged the authenticity of Pollock's signature on the painting:  "serious enough disagreements [among the experts] arose concerning [the signature's] authenticity to make it suspect."  (IFAR Rpt. (Hilti Dkt. No. 219-95) at 11)  The IFAR Report also states that the painting's "technique and style provoked the most negative comments by IFAR's team of specialists[,] . . . and those who were negative were strongly so.  The fact that the same concerns were voiced by so many of the experts even, in certain cases, by those who accepted the painting, was troubling."  (Id. at 11-12)

authenticity of the work] and the lack of information as to prior ownership, and with no documentation or other evidence to override the concerns of those who do not accept it as a work by Pollock, we cannot currently support its addition to the artist's <u>oeuvre</u>."  (<u>Id.</u> at 13)

In December 2003, Freedman told Hammer that – based on the IFAR Report – Levy wanted to return the Green Pollock and obtain a refund of the $2 million purchase price.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 153)  Hammer read the IFAR report and discussed it with Freedman and other Gallery executives.  (<u>Id.</u> ¶¶ 156-70)

### 5.    Knoedler's Profits

In September 2006 and November 2006 memoranda, Peter Sansone – 8-31's chief financial officer – informed Hammer that Knoedler's gross profits had increased, even while its sales had decreased.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1084, 1089)  One of Sansone's memos discloses that the Gallery had made a 363% profit on one painting.  (<u>Id.</u> ¶ 1087)  This painting was a Rosales Painting, although the memo does not say as much.  (<u>Id.</u>; Def. R. 56.1 Cntrstmt. (<u>Hilti</u> Dkt. No. 232-1) ¶ 1087)

### 6.    Internal Investigation and Criminal Investigation

On August 31, 2009, 8-31's board of directors passed a resolution forming a special committee to investigate the purchase and sale of Rosales Paintings by the Gallery.[10] (Board Resolution (<u>Hilti</u> Dkt. No. 219-216))  On September 17, 2009, Hammer requested and obtained a "complete list of the Rosales paintings with date acquired, cost, date sold, selling price, etc."  (Rosales Painting List (<u>Hilti </u>Dkt. No. 219-104))  According to Hammer, he was not

---

[10]  The parties' Rule 56.1 statements do not discuss the facts and circumstances leading to formation of the special committee.

aware of any issues regarding the authenticity of the Rosales Paintings until this time. (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 193)

On September 22, 2009, Knoedler was served with a grand jury subpoena that sought information related to the Rosales Paintings.[11] (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1065) In October 2009, Hammer put Freedman on administrative leave. (<u>Id.</u> ¶¶ 1067, 1072-73) Freedman subsequently resigned from her position at the Gallery. (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 294; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1071)

On October 27, 2009, Hammer sent a letter to Knoedler clients stating, with no explanation, that Freedman had "resigned." (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1070; Oct. 27, 2009 Ltr. (<u>Hilti</u> Dkt. No. 219-91)) Hammer states: "I wish . . . to let you know that I have every confidence in a vibrant and vital future for the gallery." (Oct. 27, 2009 Ltr. (<u>Hilti</u> Dkt. No. 219-91))

In 2010, Knoedler's interdivisional receivables due from 8-31 – amounting to more than $13 million – were reclassified as distributions to 8-31. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1142, 1144; Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 578)

### 7.   <u>The Knoedler Gallery Closes</u>

On November 30, 2011, Hammer announced that the Gallery would close that same day.[12] (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1196; Knoedler Resolution & Liquidation Plan (<u>Hilti</u> Dkt. No. 219-101)) In connection with the closing of the Gallery, 8-31 and Hammer approved a "liquidation plan" for the Gallery, which Hammer signed on behalf of both 8-31 and Knoedler LLC. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1188; Knoedler

---

[11] The grand jury subpoena is not part of the record.
[12] The parties' Rule 56.1 statements do not discuss the facts and circumstances surrounding Hammer's decision to close the 165-year-old Gallery.

Resolution & Liquidation Plan (<u>Hilti</u> Dkt. No. 219-101) at 3)  Pursuant to the liquidation plan, Knoedler LLC was required to, <u>inter alia</u>, "make reasonable provision for the satisfaction of[] all legally enforceable claims and obligations of [Knoedler LLC], including . . . all conditional, contingent, or unmatured claims known to [Knoedler LLC] and all claims which are known to [Knoedler LLC] but for which the identity of the claimant is unknown."  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1189; Knoedler Resolution & Liquidation Plan (<u>Hilti</u> Dkt. No. 219-101) at 4)

Ruth Blankschen – 8-31 and Knoedler LLC's chief financial officer at this time – testified that "she was not informed the 'liquidation plan' existed and did not otherwise know that such a reserve was called for."  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1192) Michael Hammer testified that he did not have personal knowledge of who was implementing the plan of liquidation.  (<u>Id.</u> ¶ 1195)

On December 1, 2011 – the day after Hammer announced that he was closing the Gallery effective immediately – Pierre Lagrange filed a lawsuit in this District alleging that the purported Pollock he had purchased from Knoedler for $15.3 million was a forgery.  <u>Lagrange v. Freedman</u>, No. 11 Civ. 8757 (PGG) (S.D.N.Y. Dec. 1, 2011), Dkt. No. 1 (Cmplt.)[13]  On December 2, 2011, a <u>New York Times</u> article reported on the F.B.I.'s investigation of Knoedler and the abrupt closing of the Gallery.  Patricia Cohen, <u>Possible Forging of Modern Art is Investigated</u>, Dec. 2, 2011, https://www.nytimes.com/2011/12/03/arts/design/federal-inquiry-into-possible-forging-of-modernist-art.html (last visited March 13, 2019).

---

[13]  The Gallery's profit on the purported Pollock sold to Lagrange was $14.35 million.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1075)

Rosales has since admitted that all of the works she sold to Knoedler were "fakes created by an individual residing in Queens."[14]  United States v. Rosales, No. 13 Cr. 518 (KPF) (S.D.N.Y.), Dkt. No. 23 (Sept. 16, 2013 Plea Tr.) at 27:17.  Rosales has further admitted that she "agreed with others" to sell the forged works and "to make false representations as to the authenticity and provenance of those works."  Id. at 26:16-20.

### B.    Corporate Structure

In connection with Defendants' motions for summary judgment, the parties make a number of arguments concerning the corporate structure of, and dealings between, Knoedler LLC and 8-31, and about Hammer's relationship with these entities.  For example, Knoedler LLC argues that it cannot be held liable for White's injuries, because White purchased her painting in 2000 – a year before Knoedler LLC was formed.  (Def. Knoedler LLC (Hilti Dkt. No. 217) at 13)  White argues, however, that Knoedler LLC is responsible for her injuries under a successor liability theory.  (Pltf. White Br. (White Dkt. No. 172) at 18, 23)  Moreover, Plaintiffs

---

[14]  Rosales was charged with conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, money laundering, subscribing to false tax returns, and failing to file reports of foreign bank and financial accounts.  United States v. Rosales, No. 13 Cr. 518 (KPF) (S.D.N.Y.), Dkt. No. 14 (Aug. 14, 2013 Superseding Indictment).

On September 16, 2013, Rosales pled guilty to these charges.  At the plea hearing, Rosales allocuted as follows:

> From in or around the 1990s through 2009, I was engaged in the business of dealing fine arts personally and through Glafira Rosales Fine Arts, LLC.  This entity was formed under the laws of the State of New York and conducted business within the Southern District of New York.  During that period, I agreed with others to sell works of art claimed to be created by various expressionist artists, including Mark Rothko, Jackson Pollock, and Robert Motherwell, and to make false representations as to the authenticity and provenance of those works.  These works of art were actually fakes created by an individual residing in Queens.

United States v. Rosales, No. 13 Crim. 518 (KPF) (S.D.N.Y.), Dkt. No. 23 (Sept. 16, 2013 Plea Tr.) at 26:11-21.

argue that – under an <u>alter</u> <u>ego</u> theory of liability – Hammer can be held responsible for 8-31's actions, and 8-31 can be held liable for Knoedler LLC's actions. (Pltf. Jt. Br. (<u>Hilti</u> Dkt. No. 222) at 86-87) Claims premised on theories of successor liability and <u>alter</u> <u>ego</u> liability call for fact-intensive inquiries. Here, analysis of the parties' arguments must begin with a discussion of the corporate structure of and dealings between Knoedler LLC and 8-31, and Hammer's relationship with these entities. Accordingly, the Court considers below the formation of Knoedler LLC and 8-31; the relationship between Knoedler LLC and 8-31; and Hammer's relationship with these entities.

### 1.     Pre-2001 Corporate Structure:  Knoedler-Modarco and 8-31

Prior to 2001, the Gallery was operated by the M. Knoedler & Co. division of Knoedler-Modarco, Inc. (Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 30) Knoedler-Modarco had three divisions:  M. Knoedler & Co., Hammer Galleries, and Knoedler Publishing. (<u>Id.</u> ¶ 30) Knoedler-Modarco was originally owned by Michael Hammer's grandfather – who owned 74.1 percent of its shares – and Morris Liebowitz – who owned 24.9 percent of its shares. (<u>Id.</u> ¶¶ 30-32) After Hammer's grandfather died in 1990, his shares in Knoedler-Modarco were transferred to a charitable trust, and then to the Maccabee Group, a Caymans Island not-for-profit entity. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1380, 1384; Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 32)

Michael Hammer purchased Liebowitz's shares in 1992. (Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 31) Hammer testified that – from 1992 on – he has been the sole decision-maker for Knoedler-Modarco. The other shareholder in Knoedler-Modarco – the Maccabee Group – has not participated in making decisions for the company. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1393; Hammer Dep. (<u>Hilti</u> Dkt. No. 219-28) at 478-79)

In 2001, Hammer incorporated 8-31, and formed Knoedler LLC, Hammer Galleries LLC, and Knoedler Publishing LLC – all under Delaware law. (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 856, 858, 861-64) Hammer is the sole shareholder of 8-31, and 8-31 is the sole member of each LLC. (<u>Id.</u> ¶¶ 857, 865-66, 868; Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 33) In a series of asset purchase agreements in 2001, the three LLCs purchased certain assets and liabilities from Knoedler-Modarco's three divisions. (Knoedler Gallery LLC asset purchase agreement (<u>Hilti</u> Dkt. No. 219-124); Hammer Galleries LLC asset purchase agreement (<u>Hilti</u> Dkt. No. 219-132))

Knoedler LLC purchased the assets and some liabilities of the M. Knoedler & Co. division for $14,008,000, which was comprised of $7 million in real property and a note for $7,008,000.[15] (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 884; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1403; Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 35) The purchase price for the M. Knoedler & Co. division was based on a valuation by Ernst & Young. (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 887; Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 36) Ernst & Young prepared this valuation in connection with a "review of reorganization options" for Knoedler-Modarco's shareholders, and cautioned that its work "should not be used as a basis to get a transaction price." (Pltf. R. 56.1 Cntrstmt. (<u>Hilti</u> Dkt. No. 219) ¶ 885)

Sansone executed the asset purchase agreement on behalf of Knoedler-Modarco, and Freedman executed the asset purchase agreement on behalf of Knoedler LLC. (Knoedler Gallery LLC asset purchase agreement (<u>Hilti</u> Dkt. No. 219-124) at 103) Knoedler-Modarco and Knoedler LLC were represented by the same law firm. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1439-41)

---

[15] The Knoedler LLC asset purchase agreement is the only LLC transaction that is relevant here.

With respect to this transaction, Sansone testified that: (1) he is not aware of anyone having negotiated its terms; (2) he does not recall discussing the asset purchase agreement with Freedman; (3) he did not read the asset purchase agreement before he signed it; and (4) he did not ask anyone to summarize the asset purchase agreement before he signed it. (Id. ¶¶ 1432-34)  Sansone viewed this transaction as a "reorganization."  (Sansone Dep. (Hilti Dkt. No. 219-33) at 418:23)

With respect to this transaction, Freedman testified that (1) she did not read the asset purchase agreement before she signed it; (2) she did not participate in any negotiations regarding this transaction; and (3) she signed the agreement because she "was asked to," although she could not remember by whom.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1435-37)

Neither Hammer nor Sansone could recall this transaction being discussed at a Knoedler-Modarco board meeting.  (Id. ¶¶ 1442-46)

There was significant overlap between the board of directors and executive officers of Knoedler-Modarco, 8-31, and Knoedler LLC at the time of the asset sale.  Knoedler-Modarco's board of directors consisted of Michael Hammer, his wife Dru Hammer, Peter Sansone, Ann Freedman, and Richard Lynch.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1407)  8-31's board of directors consisted of Michael Hammer, Sansone, Freedman, and Lynch.[16]  (Id. ¶ 1408)  Michael Hammer was the president of both Knoedler-Modarco and 8-31. (Id. ¶¶ 1414-15)  Sansone was the chief financial officer of Knoedler-Modarco, 8-31, and Knoedler LLC.  (Id. ¶¶ 1412-13)  Freedman was the president of the M. Knoedler & Co. division of Knoedler-Modarco, and the president and sole manager of Knoedler LLC.  (Id. ¶ 1411)

---

[16]  Dru Hammer joined 8-31's board in 2003.  (Id. ¶ 1409)

After the asset purchase agreements with Knoedler LLC, Hammer Galleries LLC, and Knoedler Publishing LLC were consummated, Knoedler-Modarco held the following assets: (1) the Gallery's archives; (2) about 150 paintings; and (3) two promissory notes – the $7,008,000 promissory note from Knoedler LLC, and a $5,886,000 note from Hammer Galleries LLC.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 896-97, 905, 907, 920-21, 924)  In March 2007, after the Knoedler LLC and Hammer Galleries LLC promissory notes held by Knoedler-Modarco were paid in full, Knoedler-Modarco was dissolved.  (<u>Id.</u> ¶¶ 926-27; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1428)  At that time, Knoedler-Modarco had two board members: Michael Hammer and Dru Hammer.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1429)

After the asset purchase agreement between Knoedler-Modarco and Knoedler LLC was consummated, the Gallery's operations, location, personnel, and telephone number did not change.  (<u>Id.</u> ¶¶ 1452-57; Freedman Dep. (<u>Hilti</u> Dkt. No. 219-4) at 690:9-691:14)  Invoices issued by the Gallery before and after the transaction reflect the same trade name – Knoedler & Company – and state that the Gallery was established in 1846.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1397-98, 1458)

### 2. Post-2001 Corporate Structure:  8-31, Knoedler LLC, and Michael Hammer

#### a. Relationship Between 8-31 and Knoedler LLC

8-31 is a holding company for Knoedler LLC, Hammer Galleries LLC, and Knoedler Publishing LLC, and has no operations or revenue of its own.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 458-59)  8-31 holds board and shareholder meetings, has enacted by-laws, has elected officers and directors, and appoints sole managers for the three LLCs.  (<u>Id.</u> ¶¶ 487-90)  8-31 and Knoedler LLC maintain separate bank accounts, general ledgers, and financial statements.  (<u>Id.</u> ¶¶ 490, 492-93)

8-31 and Knoedler LLC shared employees, however.  For example, Sansone –
and later, Ruth Blankschen – served as vice president, secretary, treasurer, and chief financial
officer of both 8-31 and Knoedler LLC.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1101-
02)  Similarly, Freedman was vice president and director of 8-31, and the sole manager and
president of Knoedler LLC.[17]  (Pltf. R. 56.1 Cntrstmt. (<u>Hilti</u> Dkt. No. 219) ¶ 463; Pltf. R. 56.1
Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1107)  8-31 also shared accounting and administrative staff
with Knoedler LLC and the two other LLCs[18] (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶
1111-13), and 8-31 and Knoedler LLC shared office space and a telephone number.  (Pltf. R.
56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1115, 1121)  Moreover, no 8-31 employee had an 8-31
email address; 8-31 employees used Knoedler LLC and Knoedler Publishing e-mail addresses.
(<u>Id.</u> ¶¶ 1116-21)

On April 1, 2001, 8-31 and Knoedler LLC entered into a Management
Agreement.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 498; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt.
No. 220) ¶ 1135)  The Management Agreement provides that 8-31 will charge Knoedler LLC
"101% of the actual costs incurred by [8-31] on behalf of [Knoedler LLC] for salaries, wages,
benefits, guaranteed draws and other employment[-]related expenses incurred in connection with
the delivery of . . . [s]ervices."  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 499; Pltf. R. 56.1 Add.

---

[17]  Defendants initially asserted that Hammer was 8-31's only employee.  (Def. R. 56.1 Stmt.
(<u>Hilti</u> Dkt. No. 218) ¶ 463)  In Defendants' response to Plaintiffs' Rule 56.1 Statement, however,
they admit that 8-31 had additional employees.  (Def. R. 56.1 Cntrstmt. (<u>Hilti</u> Dkt. No. 232-1) ¶¶
1101-02, 1107)  In addition to the 8-31 employees discussed above, Dru Hammer and Richard
Lynch were both vice presidents and directors of 8-31.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No.
220) ¶ 1107)

[18]  Defendants admit that "[c]ertain . . . Knoedler [LLC] and Hammer Galleries employees
performed accounting and bookkeeping services for 8-31 and its subsidiaries," but maintain that
these individuals were not employees of 8-31.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 471-
72)

Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1138, 1140)  The Management Agreement indicates that the services 8-31 will provide to Knoedler LLC will include accounting, IT, legal, administrative and operational support, payroll, and human resources.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 500)

According to Defendants, 8-31 never provided the services listed in the Management Agreement, and the Management Agreement was never implemented.  (<u>Id.</u> ¶¶ 501, 510)  Plaintiffs contend, however, that 8-31 did provide the services listed in the Management Agreement – or arranged for outside professionals to provide such services – but that the 101% fee term set forth in the Management Agreement was not observed.  (Pltf. R. 56.1 Cntrstmt. (<u>Hilti</u> Dkt. No. 219) ¶¶ 501, 510; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1138)

According to Plaintiffs, Knoedler LLC – and Hammer Galleries LLC and Knoedler Publishing LLC – regularly transferred funds to 8-31 "unrelated to any need by [Knoedler LLC] or service performed for Knoedler [LLC] by 8-31."  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1128; <u>see id.</u> ¶ 1126; Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 514)  These transfers occurred when 8-31 needed money.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1128)  The funds 8-31 needed were transferred from the account of whichever LLC had cash available at the time.[19]  (<u>Id.</u> ¶ 1129)  According to Defendants, 8-31 used those funds to pay business expenses for 8-31 and the three LLCs, such as taxes, profit sharing, salaries,[20] directors' fees, accounting fees, charitable gifts, insurance, automobile expenses, and executive credit card bills.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 515, 522)  According to Plaintiffs, however,

---

[19]  "When asked how he determined which of the LLCs to transfer funds out of, Sansone, the former CFO of 8-31[] and the LLCs, said, 'I just decided.'"  (<u>Id.</u> ¶ 1130)

[20] 8-31 was the "common paymaster" for the employees of Knoedler LLC, Hammer Galleries LLC, and Knoedler Publishing LLC.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 518)

much of the cash transferred from the three LLCs to 8-31 was used to pay Hammer's personal expenses, including bills related to Hammer's automobiles and credit cards. (Pltf. R. 56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 515)

"Prior to 2009, each transfer of cash from Knoedler [LLC] to 8-31 other than for payroll was recorded on Knoedler's general ledger and financial statements as an interdivisional receivable and on 8-31's general ledger and financial statements as an interdivisional payable." (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 525) Sansone and Blankschen both testified, however, that they did not expect that 8-31 would ever repay Knoedler LLC for the funds it transferred to 8-31.[21] (Id. ¶¶ 532-33)

In 2010, Knoedler LLC's interdivisional receivables from 8-31 amounted to $13.5 million (according to Plaintiffs) or $14.6 million (according to Defendants). (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1142, 1144; Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 578) After Knoedler LLC received the grand jury subpoena in 2010, 8-31 reclassified the Knoedler LLC receivables as "distributions" to 8-31. (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1142) Defendants argue that Hammer was not involved in this accounting change, while Plaintiffs contend that Hammer directed the reclassification. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 572; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1142)

**b.** **Relationship Between 8-31 and Hammer**

At all relevant times, Michael Hammer lived in California, did not regularly visit the Gallery, and did not maintain an office at Knoedler's building in Manhattan. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 464-65, 469)

---

[21] In an email to an outside accountant, however, Blankschen referred to 8-31's payables to Knoedler LLC as "liabilities." (Pltf. R. 56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 545)

Hammer describes his role at 8-31 as follows:  "[I engaged in] regular efforts to support and expand the brand recognition of the three [LLC] subsidiaries and thereby improve and increase their revenue.  As part of that, I sought out and met regularly with high net worth collectors of art in multiple locations around the country and outside the United States.  I also met with directors of galleries and museums."  (Hammer Decl. (<u>Hilti </u>Dkt. No. 218-3) ¶ 8)  Hammer contends, however, that he was not involved in Knoedler's acquisition or sale of art, the marketing of any specific work of art, the pricing of any work of art, the decision to exhibit any work of art, or "any communications with purchasers about a sale of a work of art."  (Def. R. 56.1 Stmt. (<u>Hilti </u>Dkt. No. 218) ¶¶ 205, 245, 247, 250; Hammer Decl. (<u>Hilti </u>Dkt. No. 218-3) ¶ 17)  Although Hammer testified that he met with people in order to promote the LLCs (Hammer Dep. (<u>Hilti </u>Dkt. No. 219-28) at 827:16-837:3), he could not recall whether any of these individuals – or anyone referred by these people – had ever purchased anything from Knoedler LLC or the other LLCs.  (<u>Id.</u> at 837:14-840:19)

Hammer regularly used a corporate credit card to pay for his business expenses and his personal expenses.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti </u>Dkt. No. 220) ¶ 1208)  He also provided corporate credit cards to his ex-wife, Dru Hammer, and to his sons, Viktor and Armie Hammer, all of whom used these credit cards to pay for both business and personal expenses.  (<u>Id.</u> ¶¶ 1209-10)  In total, the Hammers charged $2.7 million to their corporate cards between 2005 and 2014.  (Hammer Decl. (<u>Hilti </u>Dkt. No. 218-3) ¶ 51)

Hammer and his staff reviewed the corporate credit card statements monthly, categorizing each charge as a business or personal expense.  (Def. R. 56.1 Stmt. (<u>Hilti </u>Dkt. No. 218) ¶¶ 585-92; Pltf. R. 56.1 Add. Stmt. (<u>Hilti </u>Dkt. No. 220) ¶ 1213)  Hammer reimbursed 8-31 for the charges he categorized as personal expenses, which amounted to $1.1 million.  (Def. R.

56.1 Stmt. (Hilti Dkt. No. 218) ¶ 961)  Hammer did not provide 8-31 with any information about the purpose of his business expenses, however.  For example, if he categorized a dinner as a business expense, he did not disclose who attended the dinner, or what the business purpose of the dinner was.  Moreover, no one at 8-31 asked Hammer about his business expenses or otherwise reviewed his claimed business expenses.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1215)

The Hammers' alleged business expenses include, inter alia, meals, drinks, airfare on private and commercial flights, hotels, and car shows.  (Id. ¶¶ 1218-20, 1226-27, 1243, 1286)  Hammer does not recall the business purpose of certain charges he categorized as business expenses, and he did not maintain records concerning these charges.  (See, e.g., id. ¶ 1229 ($2,565 charge from Barney's); id. ¶ 1247 ($1,649 charge from Le Beach Club's health and beauty spa); id. ¶¶ 1266-67 (Dru Hammer charges from two hotels, a liquor store, a home furnishing store, and a grocery store))

According to Plaintiffs, Hammer sometimes identified a charge as a business expense, and later identified a refund of that charge as a personal refund.  (Id. ¶¶ 1234, 1278-79)  For example, in February 2010, Hammer categorized a $3,176 charge from a hotel in Bora Bora as a business expense, but in March 2010, he categorized a refund of that same charge as a personal refund.  (Id. ¶¶ 1278-79; Feb. 2010 Stmt. (Hilti Dkt. No. 219-174) at 6; March 2010 Stmt. (Hilti Dkt. No. 219-175) at 2)  Hammer concedes that there were occasions where he (1) charged an expense as a business expense with the intent to later categorize it as personal expense, but did not do so (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1275 (more than $10,000 in airfare associated with his son's trip to New Zealand charged as a business expense)), and (2) mistakenly categorized charges as business expenses that he now recognizes were

personal in nature (id. ¶¶ 1259-62 (Dru Hammer's personal expenses associated with two trips to Paris); Hammer Decl. (Hilti Dkt. No. 218-3) ¶ 63 (acknowledging that the Paris charges were personal expenses)).

Dru Hammer testified that a number of charges on her corporate credit card that were categorized as business expenses were actually personal in nature.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1221-22, 1236, 1259-62)  For example, 8-31 paid for several meals that had no business purpose.  (Dru Hammer Dep. (Hilti Dkt. No. 219-10) at 175:10-178:25)  Dru Hammer also disagreed with the categorization of several expenses that Michael Hammer had defended as legitimate business expenses.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1236, 1238-39, 1245-46)  For example, in October 2006, the Hammers traveled to Barcelona. According to Dru Hammer, the purpose of the trip was to visit their son, and there was no business purpose.  (Id. ¶ 1236)  Michael Hammer maintains, however, that he conducted business on this trip, and that the $17,500 in airfare, hotel, and food expenses was properly classified as a business expense.  (Def. R. 56.1 Cntrstmt. (Hilti Dkt. No. 232-1) ¶ 1236)

Between 2001 and 2010, 8-31 paid for at least seven luxury vehicles purchased by Hammer.[22]  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1300)  Hammer testified that

---

[22]  In 2005, 8-31 reimbursed Hammer $95,000 for a Jaguar.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 714)  Eight months later, he donated the car to Tinerino Ministries, and 8-31 took a charitable deduction for the donation.  (Id. ¶¶ 717-18; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1312)

In 2007, 8-31 reimbursed Hammer $143,000 for a Mercedes Benz S550, including $38,000 in customizations.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 723; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1355)  Once the car was fully depreciated, Hammer gave the car to Mark Alfano. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 730)  Defendants contend that Alfano was a consultant for 8-31 (id. ¶ 730), while Plaintiffs assert that Alfano was an auto shop employee who worked on Hammer's cars (Pltf. R. 56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 730).  Also in 2007, 8-31 reimbursed Hammer $482,000 for a Rolls Royce.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 736) Hammer sold the car five months later and kept the proceeds.  (Pltf. R. 56.1 Add. Stmt. (Hilti

he used the cars for business purposes to meet with high net worth individuals
interested in purchasing expensive art or to otherwise promote the Gallery business,
and that "[i]t was important for the image to arrive and meet [potential clients] on
the level that they like, that they're used to."

(Id. ¶ 1301)

---

Dkt. No. 220) ¶ 1314)  After 8-31 personnel became aware of this transaction, the proceeds were
reported to the IRS as 2008 income to Hammer.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 746;
Pltf. R. 56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 746)  The IRS disallowed 8-31's claimed losses and
deductions for the Rolls Royce, because of

[t]he type of Automobile, the nature of the Taxpayer's business, along with the
handwritten notes document[ing] the fact the transaction was executed in the name of
the Taxpayer's one hundred (100%) owner, Mr. Michael Hammer.  There was no
evidence that the property was ever titled in the name of the Taxpayer, nor to indicate
that title was transferred to the company or that the automobile was used in
Taxpayer's business."

(Pltf. R. 56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 712)

In 2008, 8-31 reimbursed Hammer $226,000 for a Porsche Turbo, including $41,000 in
customizations.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 758; Pltf. R. 56.1 Add. Stmt. (Hilti
Dkt. No. 220) ¶ 1327)  Eleven months later, Hammer traded in the car at a loss.  (Def. R. 56.1
Stmt. (Hilti Dkt. No. 218) ¶ 762; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1313)

Hammer used the proceeds from the Porsche to purchase a Ford Woody for $140,725.  (Pltf. R.
56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 787)  Hammer had the car customized to read "Hammer
Galleries" on the door.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 791)  Hammer later sold the
car for $160,000, and kept the proceeds.  (Id. ¶¶ 791, 793)  After 8-31's chief financial officer
learned about this transaction (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1339), Hammer
issued a promissory note to 8-31 for $160,000, plus 0.83% interest.  (Def. R. 56.1 Stmt. (Hilti
Dkt. No. 218) ¶ 794; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1342)  When the note
matured on August 29, 2012, Hammer executed an amended note that was due "on demand."
(Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1342, 1344)  Hammer signed the amended note
on behalf of both 8-31 and himself.  (Id. ¶ 1344)  8-31's chief financial officer had no role in
negotiating or preparing the note or the amended note.  (Id. ¶ 1345)  Hammer repaid the note one
month before his deposition in the instant action.  (Id. ¶¶ 1348-49)

In 2009, 8-31 purchased a Mercedes Benz SLR for $553,000.  (Def. R. 56.1 Stmt. (Hilti Dkt. No.
218) ¶ 772)  8-31 took depreciation on this vehicle and reported a loss to the IRS when it was
sold.  (Id. ¶¶ 782-83)

In 2010, 8-31 purchased a Mercedes SL65 for $279,135.  (Id. ¶ 803)

As the president of 8-31, Hammer decides how many vehicles he needs for business purposes.[23]  (Id. ¶ 1302)  Hammer does not recall discussing any vehicle purchase with 8-31's chief financial officer – or anyone else – before making the purchase.[24]  (Id. ¶ 1353) Hammer typically used his own funds to purchase the vehicles and customizations, and later obtained reimbursement from 8-31.  (Id. ¶ 1303)  Hammer generally obtained titles for the cars in his own name, or his name and the name of 8-31.  (Id. ¶ 1304)  Other than Hammer, no one associated with 8-31 or the LLCs drove the cars.  (Id. ¶ 1311)  On one occasion in which Hammer requested reimbursement for a car, he told 8-31's chief financial officer that the reimbursement was for "work and improvements on the 'company' [car]."  (Id. ¶ 1307)

## II.    PROCEDURAL HISTORY

Hilti was filed on January 29, 2013, and White was filed on February 21, 2013. (Cmplt. (Hilti Dkt. No. 1); Cmplt. (White Dkt. No. 1))  Defendants moved to dismiss Plaintiffs' Amended Complaints (Hilti Dkt. No. 91, 93; White Dkt. No. 72, 74), and on September 30, 2015, this Court granted in part and denied in part Defendants' motions.  Martin Hilti Family Trust v. Knoedler Gallery, LLC, 137 F. Supp. 3d 430 (S.D.N.Y. 2015), Hilti Dkt. No. 132, White Dkt. No. 108.

---

[23]  Hammer also personally owned many cars.  In 2008, for example, he owned twenty-seven cars, twelve of which were each worth more than $600,000.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 818-19)

[24]  8-31's outside auditors determined that the car purchases were reasonable.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 705-06)  Each year, 8-31 "reported a portion of Mr. Hammer's use of the cars owned by 8-31 to the IRS as income to Mr. Hammer."  (Def. R. 56.1 Stmt. Hilti Dkt. No. 218) ¶ 809)  These reports may not have been accurate, however, because Hammer did not keep records of his business use of these vehicles.  (Pltf. R. 56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 809)

In a December 22, 2015 order, this Court granted the Trust permission to re-plead its <u>alter ego</u> theory of liability as to Hammer in a second amended complaint (Dec. 22, 2015 Order (<u>Hilti</u> Dkt. No. 161), and on December 28, 2015, the Trust filed a Second Amended Complaint ("SAC").  (SAC (<u>Hilti</u> Dkt. No. 163))  The SAC pleads the following causes of action:

(1)     substantive RICO and RICO conspiracy as against all Defendants;

(2)     fraud and fraudulent concealment as against all Defendants;

(3)     conspiracy to commit fraud and conspiracy to commit fraudulent concealment as against Hammer and 8-31; and

(4)     aiding and abetting fraud and aiding and abetting fraudulent concealment as against Hammer and 8-31.

(<u>Id.</u>)[25]

White's Amended Complaint (Am. Cmplt. (<u>White</u> Dkt. No. 37)) pleads the following clauses of action:

(1)     substantive RICO and RICO conspiracy as against all Defendants;

(2)     fraud and fraudulent concealment as against all Defendants;

(3)     conspiracy to commit fraud as against Hammer and 8-31;

(4)     aiding and abetting fraud as against Hammer and 8-31.

(<u>Id.</u>)

Defendants have now moved for summary judgment.  As discussed above, Hammer seeks summary judgment on all claims against him (Def. Hammer Br. (<u>Hilti</u> Dkt. No.

---

[25]  The Trust's SAC adds new allegations concerning <u>alter ego</u> liability, but also re-alleges five state law claims that this Court dismissed in its September 30, 2015 Order.  Because the Trust was not given leave to re-plead the dismissed state law causes of action, those claims – for deceptive trade practices and false advertising, breach of warranty, unilateral mistake of fact, mutual mistake of fact, and unjust enrichment – will be dismissed.

213) at 8); 8-31 seeks summary judgment on the RICO claims against it in <u>Hilti</u>, and on all claims against it that are based on an <u>alter ego</u> theory of liability (Def. 8-31 Br. (<u>Hilti</u> Dkt. No. 215) at 10); and Knoedler LLC seeks summary judgment on all claims against it in <u>White</u>, and on the RICO claims alleged against it in <u>Hilti</u>.  (Def. Knoedler Br. (<u>Hilti</u> Dkt. No. 217) at 7).

<b><u>DISCUSSION</u></b>

## I.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is warranted when a moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  <u>Beyer v. Cnty. of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008) (citing <u>Guilbert v. Gardner</u>, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'"  <u>Lesavoy v. Lane</u>, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting <u>Bay v. Times Mirror Magazines, Inc.</u>, 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009) (quoting <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (quoting <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451,

1456 (2d Cir. 1995)).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Eviner v. Eng, No. 13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

## II.    RICO CLAIMS

### A.    Hammer's Liability

In De Sole v. Knoedler Gallery, LLC, 139 F. Supp. 3d 618 (S.D.N.Y. 2015) – which also involves (1) forged Rosales Paintings sold by the Gallery, and (2) many of the same causes of action alleged here against Hammer, 8-31, and Knoedler LLC – this Court found that Hammer was entitled to summary judgment on the RICO claims against him.  Id. at 655.  No different result is appropriate here, given that Plaintiffs have offered much less evidence of Hammer's knowledge of the ongoing alleged fraud at the Gallery related to the sale of the Rosales Paintings.

#### 1.    Legal Standard

To sustain a private cause of action under RICO, a plaintiff must establish: "(1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and alteration omitted); see also 18 U.S.C. § 1964(c) (providing a cause of action for "[a]ny person injured in his business or property by reason of a violation" of Section 1962).

18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Thus, in addition to injury and

causation, "[t]o establish a civil RICO claim pursuant to § 1962(c), 'a plaintiff must establish:
(1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern"
(4) of "racketeering activity" (5) directly or indirectly . . . participates in (6) an "enterprise"
(7) the activities of which affect interstate or foreign commerce.'" <u>Valenti v. Penn Mut. Life Ins.
Co.</u>, 850 F. Supp. 2d 445, 450 (S.D.N.Y. 2012) (quoting <u>cra Institute of Science v. Neschis</u>, 229
F.Supp. 2d 234, 254-55 (S.D.N.Y. 2002) (citation omitted)), <u>aff'd,</u> 511 F. App'x 57 (2d Cir.
2013); <u>see</u> <u>also</u> <u>Crawford v. Franklin Credit Mgmt. Corp.</u>, 758 F.3d 473, 487 (2d Cir. 2014) ("To
establish a violation of § 1962(c), a plaintiff must show that the defendant conducted, or
participated in the conduct[] of[,] a RICO enterprise's affairs through a pattern of racketeering
activity.")

   "To establish a <u>conspiracy</u> to violate the civil RICO statute pursuant to 18 U.S.C.
§ 1962(d) . . . plaintiff must prove (1) that there existed a conspiracy to commit acts that, if
successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join
in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of
the conspiracy in some manner (although not necessarily by the commission of any RICO
predicate acts himself)." <u>City of New York v. Chavez</u>, 944 F. Supp. 2d 260, 268-69 (S.D.N.Y.
2013) (emphasis in original) (citing <u>Valenti,</u> 850 F.Supp.2d at 450-51); <u>see</u> <u>also</u> <u>Crawford</u>, 758
F.3d at 487 ("To establish a violation of § 1962(d), a plaintiff must show that the defendant
agreed with at least one other entity to commit a substantive RICO offense.")

  2. **Analysis**

   In <u>De Sole</u>, this Court granted Hammer summary judgment on the RICO claims
against him, finding that the <u>De Sole</u> plaintiffs had not offered sufficient evidence that he
knowingly participated in the alleged RICO enterprise. The Court's reasoning in <u>De Sole</u> is
directly applicable here, because the evidentiary record concerning Hammer is less developed

than in <u>De Sole</u>, but the arguments premised on that record are largely the same.  Accordingly,

set forth below is the Court's reasoning in granting Hammer summary judgment on the <u>De Sole</u>

plaintiffs' RICO claims:

> Hammer contends that he is entitled to summary judgment on Plaintiffs' RICO claims because there is no evidence that he had "some part in directing [the enterprise's] affairs."  <u>See</u> <u>Reves</u>, 507 U.S. at 179[]; Hammer Br. (<u>De Sole</u> Dkt. No. 239; <u>Howard</u> Dkt. No. 282)[].  Hammer argues that the undisputed evidence shows that [he] "did not make any . . . request or recommendation or coordinate anyone's efforts to commit fraud related to the sale of any painting acquired from Rosales."  (Hammer Br. (<u>De Sole</u> Dkt. No. 239; <u>Howard</u> Dkt. No. 282) at 19)  Hammer further maintains that he "did not play any part in the marketing or selling of any of the paintings sold by Knoedler," and "did not direct or encourage anyone to purchase, sell, or paint a forged painting."  ([<u>Id.</u>] at 18)  In sum, Hammer argues that the undisputed evidence shows that he did nothing to direct the alleged enterprise's affairs.  ([<u>Id.</u>] at 19)

> Hammer has stated that his family has been "directly responsible for the operations of [the Gallery]" since the 1970s.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1031; Hammer Decl. in Opp. to TRO (<u>De Sole</u> Dkt. No. 236), Ex. 46 ¶ 2)  Moreover, as president, CEO, chairman, and sole owner of 8-31 Holdings, Inc. – the sole member of Knoedler – Hammer had the right to exercise complete control over Knoedler's operations.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶¶ 1033, 1995, 2003; Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 57)

> The evidence demonstrates, however, that Hammer's contact with Knoedler was sporadic.  Hammer lived in California (Def. R. 56.1 Stmt. ([<u>De Sole</u>] Dkt. Nos. 219[,] 220) ¶ 761), and rarely visited Knoedler (Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 37; <u>see also</u> Del Deo Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 13 at 40–41 (Hammer visited the gallery "very infrequently")).  Hammer typically spoke by telephone with Freedman "every three or four weeks."  (Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 35-36)  There is no evidence that Hammer was the day-to-day manager of Knoedler, and his testimony that he played no role in the selling of paintings at Knoedler is unrebutted.  (Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 195-96, 214, 215, 216-17, 371-72)  Indeed, there is no evidence that Hammer ever had any contact with a Knoedler customer who bought a Rosales Painting.

> There is also no evidence that Hammer was aware of the outlandish profits Knoedler made on each Rosales Painting.  Hammer testified that, on an annual basis, he saw "a summary of the 'numbers' [for Knoedler,] which would include sales, expenses, et cetera."  (Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 58)  There is no evidence that Hammer was ever shown the profit margin for any sale of a Rosales Painting or any collection of Rosales Paintings, however, nor is there any evidence that he was made aware that all of Knoedler's profits were derived from sales of Rosales Paintings.

While Freedman testified that she had a "general recollection" that she informed Hammer of each sale of a Rosales Painting (Pltf. R. 56.1 Count. Stmt. (De Sole Dkt. No. 232) ¶¶ 777-81; Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 432, 613; Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1036-37) – because she deemed "every sale" of a Rosales Painting to be a sale of an "important [A]bstract [E]xpression[ist] work[ ]" (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 613) – she did not testify that she told Hammer what the profit margin was on any Rosales Painting, or on any collection of Rosales Paintings. Freedman's testimony that "Hammer was interested to know what[]transacted" (id. at 137), was "aware of sales in general," and "oftentimes [saw] paperwork regarding sales" ([id.] at 137, 334) does not demonstrate that Hammer was aware of the outlandish profits Knoedler made on the sale of Rosales Paintings. Similarly, Freedman's testimony that Hammer spoke with Knoedler's chief financial officer about financial matters at the gallery (id. at 136-37) does not demonstrate that Hammer was informed of the profit margins associated with sales of Rosales Paintings.

Hammer denies any knowledge of Knoedler's profit margin on Rosales Paintings. (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 131-34, 214, 218)  Hammer testified that the financial information he received about Knoedler was never broken down into individual sales, but instead "would be one number for sales, one number for cost of sales, gross profit and then all of these expenses. It was just a summary. . . . [W]e never had serious detailed information." ([id.] at 133-34)  In sum, there is no evidence that Hammer was aware of Knoedler's profit margins on the sale of any particular Rosales Painting, or on any collection of Rosales Paintings.  Accordingly, Hammer's knowledge of the underlying fraud scheme cannot be premised on an awareness that Knoedler was making outlandish profits on the sale of Rosales Paintings.

As to Hammer's knowledge concerning the source and provenance of the Rosales Paintings, Freedman testified that Hammer knew that Rosales was the source of the works, that the works were "newly discovered," that Knoedler was researching the provenance of the works, and that Knoedler did not know the identity of the owner. (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 334-39)  There is no evidence, however, that Hammer was aware of (1) Rosales' shifting provenance stories; (2) Rosales' inconsistent accounts of the size and scope of Mr. X's collection; (3) Rosales' unwillingness to sign forms confirming the authenticity of the Rosales Paintings; or (4) the issues raised concerning the Diebenkorns Rosales brought to Knoedler early on. There is likewise no evidence that Hammer ever met Rosales or ever discussed the Rosales Paintings with her.  Finally, to the extent that Freedman was making misrepresentations to Knoedler customers about the provenance of the Rosales Paintings, there is no evidence that Hammer knew that she was making those misrepresentations. There is likewise no evidence that Freedman ever told Hammer that there was reason to question the authenticity or provenance of the Rosales Paintings.  Freedman's conclusory testimony that she "would have told Michael Hammer what [she] knew [about how the Mexican collector came to own the Rosales Paintings]" ([id.] at 338-39) is not sufficient to create a material issue of fact as to whether Hammer understood that the paintings were forgeries.

Hammer testified that he never discussed with Freedman or any other Knoedler employee a connection between David Herbert and Mr. X, and that he doesn't know who David Herbert is. (Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 201) Hammer "never got involved in the purchases and sales, so [he] didn't even know who most of the artists were." (<u>Id</u>. at 215) Although Freedman testified that "it was explained [to Hammer] that there was an owner and that we did not know the identity and that the owner owned works of art" (Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 339), this testimony does not demonstrate that Hammer understood that the Rosales Paintings were not authentic.

Hammer did review "very carefully" the IFAR Report concerning the "Green Pollock" purchased by Jack Levy. (Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 170-71) As discussed above, the IFAR report rejects Knoedler and Rosales' claim that Ossorio had been involved in the acquisition of the Green Pollock, and notes that there are "disturbing differences" between the materials used to create the Green Pollock and the materials used to create a known Pollock from the same year. (IFAR Report (<u>De Sole</u> Dkt. No. 236), Ex. 140 at 8, 14) The report also states that "IFAR's own extensive archival and other research has turned up no documentary material of any kind linking the painting to Pollock, or Ossorio." (<u>Id</u>. at 1) The conclusion of the IFAR report reads: "given the several strongly negative opinions [from Pollock experts about the authenticity of the work] and the lack of information as to prior ownership, and with no documentation or other evidence to override the concerns of those who do not accept it as a work by Pollock, we cannot currently support its addition to the artist's <u>oeuvre</u>." (<u>Id</u>. at 10) Based on the IFAR Report, Levy returned the Green Pollock to Knoedler in late 2003, and the Gallery refunded his full purchase price of $2 million. (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1256)

Hammer discussed the IFAR Report with Freedman, directed her to refund Levy's purchase price, and to "do whatever research she needed to do to answer the[] questions [raised in the report]." (Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 187-90) Hammer testified that Freedman told him that the IFAR report was "inconclusive" and "not right" and that she "didn't believe in [it]." (<u>Id</u>. at 186) Hammer and Freedman did not discuss Mr. X, Alfonso Ossorio, or anything else related to the provenance of the Green Pollock. (<u>Id</u>. at 168, 186) Moreover, Freedman did not tell Hammer that Knoedler had sold other paintings from the same source that had b[r]ought the Green Pollock to Knoedler. (<u>Id</u>. at 188) When Hammer asked Freedman if there was any problem with the Green Pollock, she told him "absolutely not." (<u>Id</u>. at 188) Hammer nonetheless directed Freedman to share the IFAR Report with an individual who was preparing to invest in the Green Pollock. (<u>Id</u>. at 193-94) Hammer did not direct Freedman to share the IFAR Report with any customer preparing to purchase a Rosales Painting, however.

The IFAR Report – standing alone – is not sufficient to demonstrate that Hammer knew that all of the Rosales Paintings – including those purchased by Plaintiffs – were forgeries. Plaintiffs have not shown that Hammer should have realized that the IFAR Report cast doubt on the authenticity and provenance of all of the Rosales Paintings. Moreover, Plaintiffs have not cited evidence demonstrating that – over the more than ten

years that Rosales Paintings were sold at Knoedler – any other issue concerning the authenticity of a Rosales Painting was brought to Hammer's attention.

Because a reasonable jury could not conclude that Hammer was aware of an ongoing fraud scheme at Knoedler, the actions of Hammer cited by Plaintiffs – such as regularly increasing Freedman's compensation – cannot be viewed as acts in furtherance of the racketeering enterprise.  Moreover, the fact that Hammer received a share of Knoedler's profits does not demonstrate that he was a knowing participant in a fraud scheme at Knoedler

De Sole, 139 F. Supp. 3d at 651-55 (footnotes omitted).

Plaintiffs argue that "evidence obtained in discovery in [the instant] cases, including evidence not available or not relied upon in [De Sole], warrant[s] a different decision here" than in De Sole.  (Pltf. Jt. Br. (Hilti Dkt. No. 222) at 114)  Plaintiffs' arguments are not persuasive.

First, Plaintiffs argue that "Hammer knew of and authorized the 'Project' of research into newly-discovered works from Rosales."  (Id.)  As discussed above, however, the Court considered in De Sole Freedman's testimony that Hammer (1) knew about Knoedler's acquisition of "newly discovered" works; (2) knew that Rosales was the source of these works; and (3) knew that Knoedler was conducting research concerning the provenance of these works.  The evidentiary record here establishes no more than what this Court found insufficient in De Sole.

Plaintiffs also contend that Hammer "knew of the profits generated by sales of" the Rosales Paintings.  (Id.)  There is evidence that Sansone wrote two memoranda in 2006 explaining that Knoedler's gross profits had increased while its gross sales had decreased, and one of these memos states that Knoedler made a 363% profit on a single painting.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1084, 1089, 1091)  But there is no evidence that Hammer was ever shown data setting forth Knoedler's profits on a particular Rosales Painting, or on all sales

of Rosales Paintings.  For example, with respect to the memorandum discussing a 363% profit on a single painting, there is no evidence that Hammer was told that this painting was a Rosales Painting.  (Def. R. 56.1 Cntrstmt. (Hilti Dkt. No. 232-1) ¶ 1087)

Again, there is no significant difference between the proof as to profits offered in De Sole and the evidence here.  While the evidence here shows that, at least by 2006, Hammer had access to information indicating that the Gallery was generating large profits, it does not show that he "was aware of the outlandish profits Knoedler made on each Rosales Painting."  De Sole, 139 F. Supp. 3d at 655.  In sum, Plaintiffs have not proffered new evidence as to the Gallery's profits that would justify altering the decision made in De Sole.

Finally, Plaintiffs contend that Hammer "ignored and concealed the IFAR report when, based on his knowledge of the 'Project,' he also knew that the painting addressed in the IFAR report was part of a larger collection of work."  (Pltf. Jt. Br. (Hilti Dkt. No. 222) at 114) Again, this is not new information, and Plaintiffs do not make a new argument.  In De Sole, this Court discussed in detail Hammer's knowledge of the IFAR Report, and whether he knew that the painting that was the subject of the IFAR Report was part of a larger collection of paintings that had been sold by the Gallery.  De Sole, 139 F. Supp. 3d at 654-55.  Plaintiffs have not offered new evidence that would give the Court a basis for altering the conclusion in De Sole.

Accordingly, as in De Sole, Hammer is entitled to summary judgment on Plaintiffs' substantive RICO and RICO conspiracy claims.

B.     **Whether The Trust Has Demonstrated a "Domestic Injury"**

Defendants argue that the Trust's RICO claims fail as a matter of law because a RICO plaintiff must demonstrate that it suffered a "domestic injury," and the Trust's injury occurred in Liechtenstein.  (Def. Knoedler Br. (Hilti Dkt. No. 217) at 7; Def. Hammer Br. (Hilti Dkt. No. 213) at 41; Def. 8-31 Br. (Hilti Dkt. No. 215) at 45)

1.      **Legal Standard**

In RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090 (2016), the Supreme

Court considered whether RICO's substantive provisions and private right of action apply

extraterritorially.  Id. at 2101.  The Court concluded that (1) RICO's substantive provisions apply

extraterritorially only to the extent the predicate acts underlying the RICO claim at issue apply

extraterritorially, id. at 2105; and (2) "[i]rrespective of any extraterritorial application of [RICO's

substantive provisions], . . . [RICO's private right of action] does not overcome the presumption

against extraterritoriality.  A private RICO plaintiff therefore must allege and prove a domestic

injury to its business or property," id. at 2106 (emphasis in original); see also id. at 2111

("Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to

business or property and does not allow recovery for foreign injuries") (emphasis added)).  In so

holding, the Supreme Court emphasized that "the presumption against extraterritoriality must be

applied separately to both RICO's substantive prohibitions and its private right of action."  (Id. at

2108)  Because the plaintiffs in RJR Nabisco stipulated that they had not suffered a "domestic

injury," the Court did not address the meaning of this term.  Id. at 2111.

In Bascuñán v. Elsaca, 874 F.3d 806 (2d Cir. 2017), however, the Second Circuit

addressed what constitutes a "domestic injury" for purposes of extraterritorial application of

RICO.  Id. at 814.  The court

> conclude[d] that an injury to tangible property is generally a domestic injury only if the
> property was physically located in the United States, and that a defendant's use of the
> U.S. financial system to conceal or effectuate his tort does not, on its own, turn an
> otherwise foreign injury into a domestic one.

Id. at 819.  Accordingly, where a plaintiff suffers an injury to tangible property – including

money[26] – "absent some extraordinary circumstance, the injury is domestic if the plaintiff's

property was located in the United States when it was stolen or harmed, even if the plaintiff

himself resides abroad."  Id. at 820-21.  The court stressed that the focus of the domestic injury

analysis is on the location of the plaintiff's property when it is harmed, and not on the location of

the defendant when wrongful conduct was committed.  Id. at 819 ("[I]mportantly, the only

domestic connections alleged here were acts of the defendant." (emphasis in original)).

In this District, courts have interpreted RJR Nabisco as requiring a domestic

injury without considering whether there is an extraterritorial application of RICO's substantive

provisions.  Accordingly, these courts analyze – as an initial matter – whether a RICO plaintiff

has sustained a domestic injury.  Where a domestic injury has not been shown, the RICO claim is

dismissed.  There is no analysis as to whether RICO's substantive provisions are being applied

extraterritorially.[27]  See, e.g., Dandong Old N.E. Agric. & Animal Husbandry Co. v. Hu, No. 15

_____

[26] "The fact that the property at issue [is] money, rather than real property or chattels, is of no
moment."  Id. at 822.

[27] It is not obvious to this Court that RJR Nabisco's "domestic injury" requirement was intended
to apply to a case such as this, where RICO's substantive prohibitions are not being applied
extraterritorially in the first place.

In RJR Nabisco, the Court found that two of the five predicate statutory violations underlying
plaintiffs' RICO claims involved an extraterritorial application.  The Court then went on to state
that "the presumption against extraterritoriality must be applied separately to both RICO's
substantive prohibitions and its private right of action.  It is not enough to say that a private right
of action must reach abroad because the underlying law governs conduct in foreign countries."
RJR Nabisco, 136 S. Ct. at 2108 (emphasis added).  This language suggests that a "domestic
injury" is required where RICO's substantive provisions are being applied to "conduct in foreign
countries."  Similarly, the Court states that it must "separately apply the presumption against
extraterritoriality to RICO's cause of action despite [its] conclusion that the presumption has
been overcome with respect to RICO's substantive prohibitions" – suggesting that the "domestic
injury" analysis is necessary where RICO's substantive prohibitions are being applied to
extraterritorial conduct.  Id. at 2106.  Later, the Court notes that "providing a private civil

Civ. 10015 (KPF), 2017 WL 3328239, at *15 (S.D.N.Y. Aug. 3, 2017) ("Plaintiff did not

sufficiently prove that it suffered a domestic injury from the alleged price-inflation scheme; in

consequence, the claims under 18 U.S.C. § 1962(d) against each Defendant must be

dismissed."); Yanchukov v. Finskiy, No. 15 Civ. 8128 (JPO), 2017 WL 3491965, at *8

(S.D.N.Y. Aug. 14, 2017) (dismissing RICO claim because plaintiffs did not suffer a domestic

injury, without considering whether RICO's substantive provisions were being applied

extraterritorially); City of Almaty, Kazakhstan v. Ablyazov, 226 F. Supp. 3d 272, 288 (S.D.N.Y.

2016) (same).

---

remedy for foreign conduct creates a potential for international friction," again suggesting that a
"domestic injury" is necessary where plaintiff requests a "remedy for foreign conduct."  Id.
(emphasis added).  The Court goes on to express concern about potential forum shopping where
courts apply U.S. "remedies to . . . conduct taking place abroad."  Id. (emphasis added).

This language suggests that the Court may not have envisioned the "domestic injury"
requirement being applied to a case such as this, where Defendants' alleged fraudulent conduct
took place in the United States.  Indeed, it is undisputed here that RICO's substantive provisions
are not being applied extraterritorially.  (Def. Knoedler Br. (Hilti Dkt. No. 217) at 25-30)

Moreover, Bascuñán appears to leave some room for application of RICO where the injured
property was at one point in the United States and where there was a "preexisting connection"
between a foreign plaintiff and the United States:

> . . . [i]mportantly, the only domestic connections alleged here were acts of the
> defendant.  Bascuñán and his relevant property always remained abroad, and
> these injuries did not arise from any preexisting connection between Bascuñán
> and the United States.  To allow such a plaintiff to recover treble damages would
> thus "unjustifiably permit [foreign] citizens to bypass their own [nation's] less
> generous remedial scheme."

Bascuñán, 874 F.3d at 819 (quoting RJR Nabisco, 136 S.Ct. at 2106-07).

RJR Nabisco will not brook flexibility on this point, however, because – as discussed above – the
Court instructs that foreign injury will not suffice.  RJR Nabisco, 136 S.Ct. at 2111 ("Section
1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or
property and does not allow recovery for foreign injuries").

2.    **Analysis**

Here, Hilti learned about the purported Rothko when he visited the Gallery in Manhattan and was provided with false information about the painting. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 98-102, 111)  The purported Rothko was not available to be shown, however, and Hilti was merely given a photograph of the painting. (Id. ¶ 102-03)  Accordingly, as a courtesy, the Gallery delivered the painting to the Trust in Liechtenstein, so that the Trust could view the painting before deciding whether to purchase it. (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1207; Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 118)  The Trust decided to purchase the painting after it was delivered to the Trust in Liechtenstein. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 118)  There is no evidence that any trustee, beneficiary, or representative of the Trust was in the United States when the Trust's purchase of the purported Rothko was consummated. Instead, the Trust's purchase of the painting occurred when it transferred $5.5 million from its bank account in Liechtenstein to Knoedler's bank account in New York. (Id. ¶¶ 126, 130)

Defendants contend that, under Bascuñán, the Trust did not suffer a "domestic injury." (Def. Knoedler Br. (Hilti Dkt. No. 217) at 29)  In Bascuñán, the court identified four injuries:  two involved the theft of money from foreign bank accounts, which was subsequently transferred to accounts in the United States. Bascuñán 874 F.3d at 818.  The Second Circuit held that these were not "domestic injuries," explaining that "a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one." Id. at 819.  The two other injuries involved the theft of money and "bearer shares" located in the United States. Id. at 818-19.  The Second Circuit concluded that these were "domestic injuries" under RJR Nabisco, because the property was inside the United States when it was stolen. Id. at 824.

Here, Defendants argue that the Trust was injured in Liechtenstein when the funds constituting the purchase price for the purported Rothko were transferred from the Trust's Liechtenstein bank account to Knoedler LLC's bank account in New York. (Def. Knoedler Br. (Hilti Dkt. No. 217) at 29) According to Defendants, Knoedler LLC's use of a bank account in the United States is not relevant to the question of where the Trust suffered an injury. (Id.)

The Trust argues, however, that Defendants' focus on the financial transaction is misplaced. (Pltf. Hilti Br. (Hilti Dkt. No. 221) at 13-14) The Trust contends that its injury is that "it owns a fake work of art that was created in the United States." (Id.) According to the Trust, this case is not like Bascuñán, because the Trust

> parted with its money voluntarily in the belief that it was acquiring a genuine work of art through a United States marketplace, and from a very important and reputable dealer within that market. The fact that [the Trust's] property was worthless because of the corrupt activities of Knoedler and others in the U.S. renders [the Trust's] injury "domestic," not "foreign."

(Id. at 5)

As discussed above, however, the "domestic injury" analysis turns on the location of the plaintiff's property when it was harmed, not on the location where the defendant's misconduct took place. Bascuñán, 874 F.3d at 819; see also City of Almaty, Kazakhstan v. Ablyazov, No. 15 Civ. 5345 (AJN), 2018 WL 3579100, at *2 (S.D.N.Y. July 25, 2018) ("[T]he 'appropriate subject of the inquiry' is not the location of the injurious conduct but 'the location where the injury itself arose.'") (quoting City of Almaty, 226 F. Supp. 3d at 282); Newman v. Jewish Agency for Israel, No. 16 Civ. 7593 (WHP), 2017 WL 6628616, at *5 (S.D.N.Y. Dec. 28, 2017) (it is "improper[ to] turn[] the focus" of the domestic injury analysis "on the location of the Defendants, and not . . . on the location of Plaintiffs' property or financial interests"); Elsevier Inc. v. Pierre Grossmann, IBIS Corp., No. 12 Civ. 5121 (KPF), 2017 WL 5135992, at *4 (S.D.N.Y. Nov. 2, 2017) ("To determine whether a plaintiff has satisfied [the domestic injury]

requirement, courts in this District have adopted a 'locus-of-effects approach,' which 'focus[es] on where the plaintiff felt the effects of the injury' rather than 'where the defendant committed the injury-inducing acts.'" (quoting Dandong, 2017 WL 3328239, at *11); Yanchukov, 2017 WL 3491965, at *5 ("[C]ourts in this district have consistently held that determining the location of a RICO injury depends on where the plaintiff suffered the injury – not where the injurious conduct took place."); see also Humphrey v. GlaxoSmithKline PLC, 905 F.3d 694, 702 (3d Cir. 2018) ("[T]here is a general consensus among the courts that have had to apply RJR Nabisco that the location of a RICO injury depends on where the plaintiff 'suffered the injury' – not where the injurious conduct took place."); cf. Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp., 885 F.3d 1090, 1094 (7th Cir. 2018) ("[T]he Supreme Court directs us to focus on where the injury is suffered. . . . It is well understood that a party experiences or sustains injuries to its intangible property at its residence, which for a corporation like Armada is its principal place of business."); Cevdet Aksut Ve Ogullari Koll.Sti v. Cavusoglu, No. 18-1303, 2018 WL 6016549, at *3 (3d Cir. Nov. 16, 2018) ("Because its injury is not felt in the United States, [plaintiff] has not suffered a domestic injury."). Accordingly, evidence that Defendants' "corrupt activities" took place in the United States does not demonstrate that the Trust suffered a "domestic injury."[28]

---

[28] Akishev v. Kapustin, No. CV 13-7152(NLH)(AMD), 2016 WL 7165714 (D.N.J. Dec. 8, 2016), cited by the Trust (Pltf. Hilti Br. (Hilti Dkt. No. 221) at 10-12), is not persuasive. In that case, plaintiffs in Europe purchased cars from a website operated by defendants in the United States. Id. at *1. The website sold cars that either did not exist or were in worse condition than advertised. Id. Plaintiffs wired money from Europe to the United States, and either did not receive a car, or received a car that they had not ordered. Id. Plaintiffs brought a RICO claim against the defendants, and the court concluded that they had suffered a "domestic injury": "The key to this case is that plaintiffs suffered their injuries the moment they clicked the computer mouse – on a United States-based website representing United States-based car dealerships – and ordered and paid for a car whose condition was materially misrepresented or did not even exist at

The Court concludes that the Trust's injury occurred where it relinquished control over its property. Because the Trust relinquished control over its money in Liechtenstein – when it authorized a transfer of funds from its Liechtenstein bank account to Knoedler's New York account – the Trust's injury was suffered in Liechtenstein. See Bascuñán, 874 F.3d at 820-21 (money is "property that can be fairly said to exist in a precise location"; "[w]hile money is, of course, ultimately fungible, the money allegedly stolen as a result of this scheme was situated in a specific geographical location at the time of injury such that we can treat it as tangible property for purposes of this inquiry"; held that plaintiff suffered a "domestic injury" where stolen money was located in the United States); Elsevier Inc., 2017 WL 5135992, at *1, *4 (defendant represented that it was purchasing academic journals from plaintiff for "valid personal use" – and thus paid a discounted price – when in fact it was doing so "on behalf of institutions that would have otherwise paid significantly higher prices"; held that plaintiff's property was harmed where plaintiffs "relinquished control" of that property under false pretenses).[29]

Because the Trust has not demonstrated a "domestic injury," Defendants are entitled to summary judgment on the Trust's RICO claims.

---

all." Id. at *7. Because this analysis does not consider the location where the plaintiffs' property was harmed, it is not persuasive here.

[29] The Trust argues that it is "unjust and illogical . . . to peel away [its] civil RICO claim simply because [it] wired its payment from abroad, whereas numerous other civil RICO plaintiffs who were duped by the exact same U.S.-based scheme paid from accounts in the U.S." (Pltf. Hilti Br. (Hilti Dkt. No. 221) at 13 (emphasis in original)) As a matter of fairness, this argument has appeal. But it is, of course, the same argument Justice Ginsberg made in her dissent in RJR Nabisco:

> The Court hems in RICO out of concern about establishing a "double standard." But today's decision does just that. U.S. defendants commercially engaged here and abroad [will] be answerable civilly to U.S. victims of their criminal activities, but foreign parties similarly injured [will] have no RICO remedy.

RJR Nabisco, 136 S. Ct. at 2115-16 (Ginsberg, J., dissenting). That argument did not prevail.

## III.    FRAUD CLAIMS

Hammer has moved for summary judgment on the common law fraud claims against him.  (Def. Hammer Br. (Hilti Dkt. No. 213) at 42-44)  In Hilti and White, Plaintiffs allege fraud, conspiracy to commit fraud, and aiding and abetting fraud; in Hilti, the Trust also alleges aiding and abetting fraudulent concealment and conspiracy to commit fraudulent concealment; and in White Plaintiff alleges fraudulent concealment.

In De Sole, this Court granted Hammer summary judgment on the common law fraud claims against him.  De Sole, 139 F.Supp.3d at 658-59 (aiding and abetting fraud; conspiracy to commit fraud).  Plaintiffs have not proffered evidence that would justify a different result here.

### A.    Legal Standards

#### 1.    Fraud

Under New York law, a fraud claim requires "'(1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance.'"  Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275, 286 (S.D.N.Y. 1998)).

#### 2.    Fraudulent Concealment

"The elements of a fraudulent concealment claim under New York law are:  (1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages."  Woods v. Maytag Co., 807 F. Supp. 2d 112, 124 (E.D.N.Y. 2011) (citing Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 582 (2d Cir. 2005)); see also Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (New York recognizes a duty to

disclose by a party to a business transaction in three situations: "first, where the party has made a partial or ambiguous statement . . . second, when the parties stand in a fiduciary or confidential relationship with each other . . . and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge") (citations omitted).

### 3. Aiding and Abetting Fraud and Fraudulent Concealment

Aiding and abetting fraud has three elements: "'(1) that an independent wrong exist[s]; (2) that the aider or abettor know[s] of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong.'" Adelphia Recovery Trust v. Bank of Am., N.A., 624 F. Supp. 2d 292, 312 (S.D.N.Y. 2009) (quoting Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 162-163 (3d Cir. 1973)).

### 4. Conspiracy to Commit Fraud and Fraudulent Concealment

Conspiracy requires "'(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury.'" In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 339 (S.D.N.Y. 2000) (quoting Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991)); see also Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986).

### B. Analysis

For the reasons set forth above in connection with Plaintiffs' substantive RICO and RICO conspiracy claims, Hammer is entitled to summary judgment on Plaintiffs' fraud, fraudulent concealment, aiding and abetting fraud, aiding and abetting fraudulent concealment, conspiracy to commit fraud, and conspiracy to commit fraudulent concealment claims. Plaintiffs have not demonstrated that Hammer (1) had actual knowledge of an ongoing fraud scheme at the

Gallery; (2) agreed to commit fraud at the Gallery; or (3) knowingly and intentionally provided substantial assistance to those allegedly defrauding the Gallery's customers. Accordingly, Hammer is entitled to summary judgment on Plaintiffs' common law fraud claims.

## IV.   SUCCESSOR LIABILITY

White purchased the forged Pollock in 2000, when the Knoedler Gallery was owned by Knoedler-Modarco. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 41; Hammer Decl. (Hilti Dkt. No. 218-3) ¶ 30) Defendant Knoedler LLC argues that it cannot be held liable for a transaction that occurred prior to its formation in 2001, and 8-31 argues that it cannot be held liable as Knoedler LLC's alter ego. (Def. Knoedler Br. (Hilti Dkt. No. 217) at 13; Def. 8-31 Br. (Hilti Dkt. No. 215) at 10 n.2) White argues that Knoedler LLC can be held liable as Knoedler-Modarco's successor-in-interest, and that 8-31 can be held liable as Knoedler LLC's alter ego. (Pltf. White Br. (White Dkt. No. 172) at 7; Pltf. Jt. Br. (Hilti Dkt. No. 222) at 86, 101)

### A.   Applicable Law

"In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." Manning Int'l Inc. v. Home Shopping Network, Inc., 152 F. Supp. 2d 432, 436 n.3 (S.D.N.Y. 2001). "Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." Forest Park Pictures v. Univeral Tel. Network, Inc., 683 F.3d 424, 433 (2d Cir. 2012). Where an actual conflict exists, "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997) (citing Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1030 (2d Cir. 1996)); see also Forest Park Pictures, 683 F.3d at 433.

In ruling on Defendants' motions to dismiss, this Court concluded that "[i]t is not necessary to resolve the issue of which state's law applies to the successor liability issue . . . because New York and Delaware law are generally in agreement, and to the extent they differ, that difference has no bearing on resolution of the successor liability issue here." Martin Hilti Family Trust, 137 F. Supp. 3d at 456. As discussed below, that analysis remains accurate.

"To state a claim based on successor liability, a plaintiff must plead enough facts for the Court to infer that one of the exceptions to 'the general rule finding that a business entity acquiring the assets from another business generally results in no successor liability.'" New York v. Town of Clarkstown, No. 11 Civ. 0293 (KMK), 2015 WL 1433299, at *16 (S.D.N.Y. Mar. 30, 2015) (quoting City of Syracuse v. Loomis Armored US, LLC, 900 F. Supp. 2d 274, 288 (N.D.N.Y. 2012)); Hayden Capital USA, LLC v. Northstar Agri Indus., LLC, No. 11 Civ. 594 (DAB), 2012 WL 1449257, at *4 (S.D.N.Y. Apr. 23, 2012) ("[B]oth New York and Delaware recognize that when one company sells or transfers all of its assets to another company, the acquiring company generally does not become liable for the debts or liabilities of the seller/transferor."). "Both Delaware and New York [] recognize that there are [four] exceptions to this rule: (1) where the buyer expressly assumed the debt at issue; (2) where the transaction amounted to a fraud; (3) where the transaction constitutes a de facto merger; or (4) where the successor is a mere continuation of the predecessor." Hayden Capital USA, LLC, 2012 WL 1449257, at *4 (citations omitted). Only the latter two exceptions are at issue here. (Def. Knoedler Br. (Hilti Dkt. No. 217) at 19, 24; Pltf. White Br. (White Dkt. No. 172) at 18, 23)

Under New York law, the hallmarks of a de facto merger include:

> (1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the

business of the acquired corporation; and (4) a continuity of management, personnel, physical location, assets, and general business operation.

Societe Anonyme Dauphitex v. Schoenfelder Corp., No. 07 Civ. 489 (RWS), 2007 WL 3253592, at *3 (S.D.N.Y. Nov. 2, 2007) (citing Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 46 (2d Cir. 2003)). Moreover, "there is significant support in the case law for the notion that 'not all [of] these elements are necessary to find a de facto merger.'" Id. (quoting Fitzgerald v. Fahnestock & Co., Inc., 286 A.D.2d 573, 574-75 (1st Dep't 2001)).

Under Delaware law, a de facto merger requires the following elements:

(1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock in that corporation, the transferee agreeing to assume all the debts and liabilities of the transferor.

SungChang Interfashion Co. v. Stone Mountain Accessories, Inc., No. 12 Civ. 7280 (ALC) (DCF), 2013 WL 5366373, at *14 (S.D.N.Y. Sept. 25, 2013) (quoting Magnolia's at Bethany, LLC v. Artesian Consulting Eng'rs Inc., No. S11 C04013, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept.19, 2011)).

Although under both New York and Delaware law a plaintiff attempting to demonstrate a de facto merger must allege continuity of ownership between the selling and acquiring corporations, the two states interpret this element differently. Under New York law, it is sufficient to allege that "shareholders of the selling corporation hold even an indirect interest in the assets." Id. (citing In re New York City Asbestos Litig., 15 A.D.3d 254, 256 (1st Dep't 2005) ("The first criterion, continuity of ownership, exists where the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation as the result of the successor's purchase of the predecessor's assets, as occurs in a stock-for-assets transaction.")). "In contrast, under Delaware law, the 'continuity of ownership' element is only

met if shareholders of the predecessor corporation acquire a <u>direct</u> ownership interest in the successor corporation." <u>Id.</u> at *15 (emphasis in original) (citations omitted). As discussed below, the Court need not resolve whether New York or Delaware law should be applied to the <u>de facto</u> merger issue, because Knoedler LLC has not demonstrated that it is entitled to summary judgment on White's successor liability claim to the extent that claim is premised on a "mere continuation" theory.

As to the "mere continuation" exception, under both New York and Delaware law, the "exception . . . is only available where 'it is not simply the business of the original corporation which continues, but the corporate entity itself.'" <u>Id.</u> at *16 (quoting <u>Colon v. Multi–Pak Corp.</u>, 477 F.Supp.2d 620, 626-27 (S.D.N.Y. Mar. 7, 2007) (citations omitted)). "[Because] there is no actual conflict between Delaware and New York law on the mere continuation exception, [this Court] will apply New York law." <u>Id.</u>

"The mere continuation exception applies where 'it is not simply the business of the original corporation which continues, but the corporate entity itself[,]' and there is a 'common identity of directors, stockholders, and the existence of only one corporation at the completion of the transfer.'" <u>Silverman Partners LP v. Verox Grp.</u>, No. 08 Civ. 3103 (HB), 2010 WL 2899438, at *5 (S.D.N.Y. July 19, 2010) (quoting <u>Colon</u>, 477 F. Supp. 2d at 626-27) (internal quotation marks and citation omitted). Accordingly, where there is a common identity of directors and stockholders, and where the predecessor entity transfers not only assets, but also business location, employees, management and good will to the successor, this exception is applicable. <u>McDarren v. Marvel Entm't Group, Inc.</u>, No. 94 Civ. 910 (LMM), 1995 WL 214482, at *8 (S.D.N.Y. Apr. 11, 1995). "'[T]he underlying theory of the exception is that [ ] if [a] corporation goes through a mere change in form without a significant change in substance, it

should not be allowed to escape liability.'" Silverman Partners LP, 2010 WL 2899438, at *5 (quoting Societe Anonyme, 2007 WL 3253592, at *6) (second and third alterations in original).

"'The successor issue is "highly fact-specific" and typically cannot be determined as a matter of law.'" In re General Motors LLC Ignition Switch Litig., No. 14 MD 2543 (JMF), 2017 WL 6509256, at * 7 (S.D.N.Y. Dec. 19, 2017) (quoting Commercial Lubricants, LLC v. Safety-Kleen Sys., Inc., 14-CV-7483 (MKB), 2017 WL 3432073, at *21 (E.D.N.Y. Aug. 8, 2017) (quoting Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 703 (2d Cir. 2009))) (alterations in original).

**B.** **Analysis**

Knoedler LLC contends that White cannot prove successor liability under the "mere continuation" exception, because Knoedler-Modarco continued to exist for six years after Knoedler LLC, Hammer Galleries LLC, and Knoedler Publishing LLC entered into asset purchase agreements with Knoedler-Modarco. (Def. Knoedler Br. (Hilti Dkt. No. 217) at 25-26) Because the "mere continuation" exception requires that only one corporation exist at the end of the transaction, Knoedler LLC argues that White's claim fails as a matter of law. (Id. at 25)

Courts in this District have repeatedly held, however, that the continued existence of the predecessor corporation is not dispositive of a mere continuation claim. See, e.g., In re General Motors LLC Ignition Switch Litig., 2017 WL 6509256, at *17-18 (denying summary judgment on a mere continuation successor liability claim where the predecessor corporation co-existed with the successor corporation for two years); McDarren, 1995 WL 214482, at *8 (denying summary judgment on mere continuation successor liability claim where predecessor corporation still existed at the time of litigation); Societe Anonyme, 2007 WL 3253592, at *5-7 (denying motion to dismiss mere continuation successor liability claim where the predecessor corporation still existed at the time of litigation); Kidz Cloz, Inc. v. Officially For Kids, Inc., No.

00 Civ. 6270 (DC), 2002 WL 1586877, at *5 (S.D.N.Y. July 17, 2002) (denying motion to dismiss mere continuation successor liability claim where the predecessor corporation survived the asset transfer); Tommy Lee Handbags Mfg. Ltd. v. 1984 Corp., 971 F. Supp. 2d 368, 380 (S.D.N.Y. 2013) (denying motion to dismiss mere continuation successor liability claim where plaintiff did not allege dissolution of the predecessor corporation); Time Warner Cable, Inc. v. Networks Grp., LLC, No. 09 Civ. 10059 (DC), 2010 WL 3563111, at *7 (S.D.N.Y. Sept. 9, 2010) (denying motion to dismiss mere continuation successor liability claim where the predecessor corporation continued to exist).  Instead, a mere continuation successor liability claim can survive where there is a continuity of ownership, management, location, personnel, and good will with the predecessor business, and where the predecessor corporation is in some way fundamentally altered by the asset transfer – for example, it no longer operates as a business or is left with few or no assets.[30]  See, e.g., In re General Motors LLC Ignition Switch Litig., 2017 WL 6509256, at *8 (denying summary judgment on mere continuation claim where (1) there was continuity of "personnel, management, physical location, assets and general business operations"; (2) predecessor corporation co-existed with successor corporation for two years; but (3) predecessor company was dissolved by the time of litigation); McDarren, 1995 WL 214482, at *8 (denying summary judgment on mere continuation claim where there was continuity of "business location, employees, management and good will," and predecessor corporation was

---

[30]  Knoedler LLC contends – incorrectly – that "[t]he decisional law . . . holds without exception that absent . . . an intentional effort to shield assets from the creditors of the predecessor[,] the continued existence of the seller is fatal to a claim of successor liability based upon mere continuation."  (Def. Knoedler Reply (Hilti Dkt. No. 231) at 20; Def. Knoedler Br. (Hilti Dkt. No. 217) at 16)  While an intentional effort to shield assets is a factor that courts consider, see Societe Anonyme, 2007 WL 3253592, at *6-7; McDarren, 1995 WL 214482, at *8, it is not required.  See In re General Motors LLC Ignition Switch Litig., 2017 WL 6509256, at *8 (no discussion of intent to avoid liability); Kidz Cloz, Inc., 2002 WL 1586877 (same); Time Warner Cable, Inc., 2010 WL 3563111 (same).

"no longer actively involved in the toy business"); <u>Societe Anonyme</u>, 2007 WL 3253592, at *6-7 (denying motion to dismiss mere continuation claim where there was continuity of ownership, location, personnel and management, and predecessor existed as a "shell corporation" with no assets).

Prior to Knoedler-Modarco's execution of asset purchase agreements with the three newly created LLCs, Knoedler-Modarco owned and operated three art galleries. (Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 30) After the asset purchase agreements were executed, Knoedler-Modarco no longer operated any business. It was left with three assets – the Knoedler Gallery archives, 150 paintings, and two promissory notes, and the company was dissolved once the promissory notes were repaid. (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 896-97, 905, 907, 920-21, 924) There is no evidence that Knoedler-Modarco sold the archives or paintings before dissolving, or that it otherwise engaged in any business activity after its transactions with the three newly created LLCs. In sum, there is substantial evidence that Knoedler-Modarco was left in a sufficiently altered state such that the "existence of only one corporation" factor is satisfied.

Moreover, Knoedler-Modarco no longer existed when this litigation was commenced. (<u>Id.</u> ¶¶ 926-27; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1428) "[W]here courts have rejected successor liability on the basis of [this] factor, it has generally been because the predecessor corporation was still viable when the decision was rendered." <u>In re General Motors LLC Ignition Switch Litig.</u>, 2017 WL 6509256, at *8.

Moreover, it is undisputed that the Knoedler Gallery continued to operate in the same location and with the same personnel and management after the Knoedler-Modarco asset sale. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1452-57) Indeed, Freedman testified that nothing changed in the Gallery's operations as a result of this transaction. (Freedman Dep. (<u>Hilti</u>

Dkt. No. 219-4) at 690:9-691:14)  Before and after the transaction, the Knoedler Gallery held

itself out as a gallery that was founded in 1846, and continued to operate under the trade name

"Knoedler & Company."  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1397-98, 1458)  It is

likewise undisputed that the board of directors of Knoedler-Modarco was nearly identical to the

board of directors of 8-31 – the only difference is that Dru Hammer was not a member of 8-31's

board at the time of the Knoedler-Modarco asset sale in 2001; she joined 8-31's board in 2003.[31]

(Id. ¶¶ 1407-09)  Finally, it is undisputed that Hammer owned 24.9% of Knoedler-Modarco, and

that he is the sole shareholder of 8-31.[32]  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 857, 913)

Finally, Plaintiffs have offered evidence that the Knoedler-Modarco transaction

was one where a "'corporation [went] through a mere change in form without a significant

---

[31]  Knoedler argues that White "does not allege that 8-31 is the successor to Knoedler-Modarco[, and therefore] [a]ny identity of directors or officers between Knoedler-Modarco and 8-31[]is not relevant to whether or not Knoedler is a successor of Knoedler-Modarco."  (Def. Knoedler Reply (Hilti Dkt. No. 231) at 16-17)  As discussed below, however, there is a genuine issue of material fact as to whether Knoedler LLC is 8-31's alter ego.

[32]  As discussed above, a not-for-profit entity – the Maccabee Group – owned the remaining 75.1% of Knoedler-Modarco.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1384)  According to Hammer, neither he nor any member of his family ever owned an equity interest in the Maccabee Group.  (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 915)  According to Plaintiffs, however, Hammer is an indirect owner or beneficiary of the Maccabee Group.  (Pltf. R. 56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 913; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1362)

In support of this assertion, Plaintiffs cite to the following evidence:  (1) Dru Hammer was a director – and possibly the sole director – of the Maccabee Group, (2) the Maccabee Group is a Cayman Islands entity, and Hammer lived in the Cayman Islands when the Maccabee Group acquired its interest in Knoedler-Modarco, and (3) Hammer used the name "Maccabee" on multiple occasions, including for a company named Maccabee Productions LLC that he formed in 1999.  (Pltf. R. 56.1 Cntrstmt. (Hilti Dkt. No. 219) ¶ 913; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1362, 1386-92)  In any event, as discussed above, the Maccabee Group's interest in Knoedler-Modarco has presented no obstacle to Hammer's control over the company.  Hammer testified that – from 1992 on – he has been the sole decision-maker for Knoedler-Modarco, and that the Maccabee Group has not participated in making decisions for the company.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1393; Hammer Dep. (Hilti Dkt. No. 219-28) at 478-79)  Accordingly, a reasonable jury could conclude that Hammer effectively controls the Maccabee Group.

change in substance.'"  <u>Silverman Partners LP</u>, 2010 WL 2899438, at *5 (quoting <u>Societe</u>

<u>Anonyme</u>, 2007 WL 3253592, at *6).  Here, Sansone – the chief financial officer of Knoedler-

Modarco, Knoedler LLC, and 8-31 – referred to this transaction as a "reorganization."  (Pltf. R.

56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1412-13; Sansone Dep. (<u>Hilti</u> Dkt. No. 219-33) at

418:23)  Moreover, all parties to the Knoedler-Modarco transaction were represented by the

same law firm, and no deponent could recall discussing the transaction at a board meeting.

Indeed, the executives who signed the Knoedler-Modarco/Knoedler LLC asset purchase

agreement – Sansone for Knoedler-Modarco, and Freedman for Knoedler LLC – do not recall

reading the asset purchase agreement; negotiating the agreement; or discussing the agreement

with anyone before signing it.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1432-37, 1439-

46; Sansone Dep. (<u>Hilti</u> Dkt. No. 219-33) at 418:23)  And, as discussed above, Freedman

testified that there was no change in the Gallery's operations as a result of the Knoedler-

Modarco/Knoedler LLC transaction.  (Freedman Dep. (<u>Hilti</u> Dkt. No. 219-4) at 690:9-691:14)

 The Court concludes that a reasonable jury could find that the Knoedler-

Modarco/Knoedler LLC transaction was a "mere change in form."  Accordingly, Knoedler LLC

"'should not be allowed to escape liability.'"  <u>Silverman Partners LP</u>, 2010 WL 2899438, at *5

(quoting <u>Societe Anonyme</u>, 2007 WL 3253592, at *6).

 Because there is a genuine issue of material fact as to whether Knoedler LLC can

be found liable under a "mere continuation" theory of successor liability, Knoedler LLC's

motion for summary judgment on this issue will be denied.

## V. *ALTER EGO* LIABILITY

 The Trust asserts claims of fraud and fraudulent concealment against Hammer

and 8-31 under an <u>alter</u> <u>ego</u> theory of liability.  (SAC (<u>Hilti</u> Dkt. No. 162))  White likewise

asserts claims of fraud, fraudulent concealment, and conspiracy to commit fraud against Hammer

and 8-31 under an <u>alter ego</u> theory of liability.  (Am. Cmplt. (<u>White</u> Dkt. No. 37))  Hammer and

8-31 have moved for summary judgment on these claims to the extent they are based on an <u>alter</u>

<u>ego</u> theory of liability.  (Def. Hammer. Br. (<u>Hilti</u> Dkt. No. 213) at 6; Def. 8-31 Br. (<u>Hilti</u> Dkt. No.

215) at 7)

A.      **Applicable Law**

Under Delaware law,[33] "a limited liability company (or 'LLC'), formed by one or

more entities and/or individuals as its 'members,' . . . provides 'limited liability akin to the

corporate form.'"  <u>NetJets Aviation, Inc. v. LHC Commc'ns, LLC</u>, 537 F.3d 168, 176 (2d Cir.

2008) (quoting <u>Elf Atochem North America, Inc. v. Jaffari</u>, 727 A.2d 286, 287 (Del. 1999)).

"The shareholders of a corporation and the members of an LLC generally are not liable for the

debts of the entity. . . ."  <u>Id.</u>  However, "Delaware law permits a court to pierce the corporate veil

'where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of

its owner.'"  <u>Id.</u> at 176 (quoting <u>Geyer v. Ingersoll Publications Co.</u>, 621 A.2d 784, 793 (Del. Ch.

1992)).  The central question is whether "the individual [or parent corporation] has 'complete

domination and control' over the entity such that it 'no longer ha[s] legal or independent

significance of [its] own."  <u>Carotek, Inc. v. Kobayashi Ventures, LLC</u>, 875 F. Supp. 2d 313, 350

(S.D.N.Y. 2012) (quoting <u>Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood</u>, 752

A.2d 1175, 1183 (Del. Ch. 1999)).

---

[33] "It is well-settled that New York's choice-of-law rules dictate that 'the law of the state of
incorporation determines when the corporate form will be disregarded.'"  <u>Jonas v. Estate of</u>
<u>Leven</u>, No. 14 Civ. 3369 (SHS), 2015 WL 4522763, at *13 (S.D.N.Y. July 27, 2015) (quoting
<u>Fletcher</u>, 68 F.3d at 1456).  "This principle applies to LLCs as well as corporations."  <u>Allison v.</u>
<u>Clos-ette Too, LLC</u>, No. 14 Civ. 1618 (LAK) (JCF), 2014 WL 4996358, at *4 (S.D.N.Y. Sept.
15, 2014) <u>report and recommendation adopted sub nom.</u> <u>Ellison v. Clos-ette Too, LLC</u>, No. 14
Civ. 1618 (LAK), 2014 WL 5002099 (S.D.N.Y. Oct. 7, 2014).  Here, Knoedler LLC is a
Delaware limited liability corporation, and 8-31 is a Delaware corporation.  (Def. R. 56.1 Stmt.
(<u>Hilti</u> Dkt. No. 218) ¶¶ 858, 862)

Under the <u>alter</u> <u>ego</u> theory of piercing the corporate veil, a plaintiff must demonstrate "a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'" <u>NetJets Aviation</u>, 537 F.3d at 176 (quoting <u>Harco Nat. Ins. Co. v. Green Farms. Inc.</u>, Civ. A. No. 1131, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)). The Second Circuit "has stated this as a two-pronged test focusing on (1) whether the [dominant shareholder and the corporation] in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." <u>Id.</u> at 177 (citing <u>Fletcher</u>, 68 F.3d at 1457).

Courts consider the following factors in determining whether a corporation and its dominant shareholder operate as a "single economic entity":

> "[W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder."

<u>Fletcher</u>, 68 F.3d at 1458 (quoting <u>Harco Nat. Ins. Co.</u>, 1989 WL 110537, at *4). "'[N]o single factor c[an] justify a decision to disregard the corporate entity, but . . . some combination of them [i]s required.'" <u>NetJets Aviation</u>, 537 F.3d at 177 (quoting <u>Harper v. Del. Valley Broadcasters, Inc.</u>, 743 F.Supp. 1076, 1085 (D. Del. 1990)) (alterations in original).

In addition, "a plaintiff must allege injustice or unfairness that is a result of an abuse of the corporate form." <u>Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC</u>, 975 F. Supp. 2d 392, 406 (S.D.N.Y. 2013); <u>see</u> <u>also</u> <u>TradeWinds Airlines, Inc. v. Soros</u>, No. 08 Civ. 5901 (JFK), 2012 WL 983575, at *6 (S.D.N.Y. Mar. 22, 2012) ("This 'injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit[.]'") (quoting <u>NetJets Aviation</u>, 537 F.3d at 183)). This prong is satisfied where "the corporation was

used to engage in conduct that was 'inequitable,' 'prohibited,' or an 'unfair trade practice,' or 'illegal.'" NetJets Aviation, 537 F.3d at 177 (quoting Mobil Oil Corp. v. Linear Films, Inc., 718 F.Supp. 260, 269 (D.Del. 1989); David v. Mast, No. 1369-K, 1999 WL 135244, at *2 (Del.Ch. Mar. 2, 1999); Martin v. D.B. Martin Co., 10 Del.Ch. 211, 219 (Del. Ch. 1913)). However, "the plaintiff need not prove that the corporation was created with fraud or unfairness in mind. It is sufficient to prove that it was so used." NetJets Aviation, 537 F.3d at 177 (citing Martin, 10 Del.Ch. at 219; Sonne v. Sacks, No. CIV.A. 4416, 1979 WL 178497, at *2 (Del. Ch. June 12, 1979)).

Courts generally apply the same analysis whether the dominant shareholder is an individual or another corporation. See TradeWinds Airlines, Inc., 2015 WL 1454495, at *8 (applying Fletcher test to individual dominant shareholder); Wilson v. Thorn Energy, LLC, 787 F. Supp. 2d 286, 297 (S.D.N.Y. 2011) ("To hold Huggins personally liable for the obligations of the Defendant Entities, Plaintiffs must first show that Huggins and the Defendant Entities operated as a single economic unit.") (citing NetJets Aviation, 537 F.3d at 177); Jet Star Enterprises, Ltd. v. Soros, No. 05 Civ. 6585 (HB), 2006 WL 2270375, at *6 (S.D.N.Y. Aug. 9, 2006) (applying Fletcher test to individual dominant shareholder). "These principles are [also] generally applicable . . . [when] one of the entities in question is an LLC," but "[i]n the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required." NetJets Aviation, 537 F.3d at 178.

"As a fact-specific inquiry, 'the issue of corporate disregard is generally submitted to the jury.'" Overton v. Art Fin. Partners LLC, 166 F. Supp. 3d 388, 404 (S.D.N.Y.

2016) (quoting Stahlex-Interhandel Tr. v. W. Union Fin. Servs. E. Eur. Ltd., No. 99-CV-2246, 2002 WL 31359011, at *5 (S.D.N.Y. Oct. 21, 2002)).

## B.  Whether 8-31 is Knoedler LLC's *Alter Ego*

In De Sole, this Court concluded that a reasonable jury could find that 8-31 is Knoedler LLC's alter ego.  De Sole, 139 F. Supp. 3d at 669.  Plaintiffs have not proffered evidence justifying a different result here.

### 1.  Operation as a Single Entity

#### a.  Mingling of Operations and Observance of Corporate Formalities

Here – as in De Sole – there is "substantial evidence of (1) a mingling of Knoedler [LLC] and 8-31's operations, and (2) a disregard of corporate formalities in Knoedler [LLC] and 8-31's interactions."  Id. at 666.

As to overlap in operations, the two companies had the same corporate address (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1119); 8-31 conducted its business in Knoedler LLC's offices (id. ¶ 1121); and the two companies shared a telephone system.  (Id. ¶ 1115)  Moreover, 8-31 employees did not have 8-31 e-mail addresses.  For example, 8-31 and Knoedler LLC's chief financial officer, Ruth Blankschen, used a Knoedler LLC e-mail address and an 8-31 e-mail signature.  (Id. ¶¶ 1116-18; Blankschen e-mail (Hilti Dkt. No. 219-100) at 2)  8-31 and Knoedler LLC also shared an accounting department.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1111)  "This significant mingling of office space and infrastructure weighs in favor of finding that Knoedler [LLC] and 8-31 operate as a single economic entity."  De Sole, 139 F. Supp. 3d at 666  (citing Soroof Trading Dev. Co. v. GE Fuel Cell Systems, 842 F. Supp. 2d 502, 522 (S.D.N.Y. 2012) (denying summary judgment on alter ego claim under Delaware law where, inter alia, two entities shared office space, one of the entities "did not lease its office space,"

"office space did not have a plaque or other sign indicating the presence" of more than one entity; and there was evidence of significant "mingling of the operations")).

8-31 argues that – because it is a holding company – "notions of infrastructure and office space in this circumstance do not constitute indicia of overlap or absence of corporate formalities." (Def. 8-31 Br. (Hilti Dkt. No. 215) at 13) While 8-31 may make this argument to a jury, it does not warrant summary judgment in its favor on the alter ego issue.

"There is also evidence that 8-31 and Knoedler [LLC] have a significant overlap in personnel." De Sole, 139 F. Supp. 3d at 666. For example, Sansone and Blankschen each served as a vice president, secretary, treasurer, and chief financial officer of both 8-31 and Knoedler LLC. (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1101-02) Freedman was both Knoedler LLC's sole manager and president, and a vice president and director of 8-31. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 198; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1107) Hammer was the president, chief executive officer, chairman, and sole owner of 8-31, and became the sole manager of Knoedler LLC in 2009. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 857; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶¶ 1104, 1106; Hammer Decl. (Hilti Dkt. No. 219-45) ¶ 1) Moreover, Hammer's family has been "directly responsible for the operations of Knoedler" since the 1970's. (Hammer Decl. (Hilti Dkt. No. 219-45) ¶ 2)

Finally, there is evidence that 8-31 and Knoedler LLC disregarded corporate formalities in their dealings with each other. In 2001, for example, Knoedler LLC and 8-31 entered into a Management Agreement to govern the services 8-31 would provide to Knoedler LLC. This agreement includes payroll and accounting services. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶ 498; Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1135) In return for these services, the Management Agreement calls for Knoedler LLC to pay 8-31 "101% of the actual costs

incurred by [8-31] on behalf of [Knoedler LLC]." (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 499) It is undisputed that this agreement was never implemented, and that no other agreement governing the relationship between 8-31 and Knoedler LLC was ever entered into. (<u>Id.</u> ¶ 510; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1138) Instead, Knoedler LLC simply and regularly transferred money to 8-31 whenever 8-31 needed money and Knoedler LLC had cash on hand. (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 514; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1126, 1128) These transfers were unrelated to any services performed by 8-31 for Knoedler LLC. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1128)

Defendants argue that the Management Agreement was not implemented because 8-31 did not perform the services contemplated in the agreement. (Def. 8-31 Br. (<u>Hilti</u> Dkt. No. 215) at 18-19; Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 501, 510) However, Defendants also argue that the money Knoedler LLC transferred to 8-31 was used to pay Knoedler LLC's business expenses (Def. 8-31 Br. (<u>Hilti</u> Dkt. No. 215) at 25-26; Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 515, 522), including payroll and accounting – two services that are referenced in the Management Agreement.

In sum, there is substantial evidence that Knoedler LLC and 8-31 disregarded the Management Agreement and "'failed to follow legal formalities when contracting with each other.'" <u>NetJets Aviation</u>, 537 F.3d at 178 (quoting <u>Trustees of Village of Arden v. Unity Construction Co.</u>, No. C.A. 15025, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000)). Where two entities fail to follow legal formalities in their dealings with one another, this is "'tantamount to declaring that [they] are indeed one [and] the same.'" <u>Id.</u>

### b. <u>8-31's Siphoning of Funds from Knoedler</u>

A reasonable jury could conclude that – in 2010 – 8-31 siphoned more than $13 million from Knoedler LLC. It is undisputed that, in 2010, Knoedler's interdivisional

receivables due from 8-31 – worth more than $13 million – were reclassified as "distributions" to 8-31.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1142, 1144; Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 578)  On its face, this reclassification is evidence that 8-31 eliminated a significant asset of Knoedler LLC and liability of 8-31.

Defendants argue, however, that for nearly a decade the fund transfers from Knoedler LLC to 8-31 were incorrectly classified as "interdivisional receivables" on these entities' general ledgers and financial statements.  (Def. 8-31 Br. (<u>Hilti</u> Dkt. No. 215) at 28)  John Salomon, Defendants' accounting expert, testified that where "a holding company receiv[es a] transfer [that it] does not have the ability to repay[, ]and no expectation can exist that it should or would be able to make repayment, the transfer from the subsidiary should not be classified as a receivable on the subsidiary's general ledger and financial statement."  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 541)

Moreover, Sansone and Blankschen – who each served as vice president, secretary, treasurer, and chief financial officer for both 8-31 and Knoedler LLC – testified that they understood that 8-31 would not be able to repay these funds to Knoedler.  (Def. 8-31 Br. (<u>Hilti</u> Dkt. No. 215) at 28; Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 937-38)  According to Defendants, "[e]ven if this Court were to conclude that the interdivisional receivables were not actually distributions, the value of the interdivisional receivables was zero," because 8-31 was not able to repay Knoedler.  (Def. 8-31 Br. (<u>Hilti</u> Dkt. No. 215) at 32-33)  8-31 contends that the reclassification was thus proper, and did not constitute siphoning.  (<u>Id.</u> at 35-41)

The Court concludes that the parties' dispute about the propriety of the 2010 reclassification presents a jury issue.  As an initial matter, there is ample evidence that the classification of interdivisional receivables was not a mere oversight.  Knoedler LLC and 8-31

used the receivable/payable language consistently from 2001 through 2010, and under the leadership of two different chief financial officers. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1125, 1131) Indeed, it was not until Knoedler LLC came under criminal investigation that 8-31 decided that the decade-long accounting treatment of these transactions was a mistake. (<u>Id.</u> ¶ 1144) Moreover, in 2008 an outside auditor asked Blankschen to explain 8-31's interdivisional accounts in connection with an audit of 8-31's 2005 taxes. (Interdivisional Accounts E-mail (<u>Hilti</u> Dkt. No. 219-53) at 6) Blankschen provided the auditor with a detailed explanation of how 8-31 records its interdivisional receivables and payables, referring to these accounts as assets and liabilities. (<u>Id.</u>) Finally, the financial accounting policies attached to Knoedler LLC and 8-31's consolidated financial statements plainly state that "[a]ccounts receivable are stated at the amounts management expects to collect." (<u>E.g.</u>, 8-31 & LLCs' Consolidated Financial Statements (<u>Hilti</u> Dkt. No. 218-130) at 6)

While 8-31's arguments may raise an issue of fact regarding the nature of the accounting reclassification, a reasonable jury could conclude that 8-31 siphoned off more than $13 million from Knoedler LLC in 2010.

## 2. **Fundamental Unfairness**

As this Court concluded in <u>De Sole</u>:

A reasonable jury could also find an "overall element of injustice or unfairness," <u>NetJets Aviation, Inc.</u>, 537 F.3d at 177, if a corporate distinction between 8-31 and Knoedler [LLC] were recognized. As discussed above, Plaintiffs have proffered sufficient evidence for a reasonable jury to conclude that 8-31 siphoned [more than $13] million from Knoedler [LLC]. There is also evidence that the . . . distribution to 8-31 occurred shortly after federal authorities commenced an investigation into Knoedler [LLC's] activities. . . . This sequence of events gives rise to an inference that the purpose of transferring [more than $13] million from Knoedler [LLC] to 8-31 was to shield those assets from the reach of law enforcement or Knoedler [LLC's] creditors, and constitutes evidence of "injustice or unfairness that is a result of an abuse of the corporate form." See <u>Nat'l Gear & Piston, Inc.</u>, 975 F. Supp. 2d at 406.

De Sole, 139 F. Supp. 3d at 669.

*    *    *    *

Plaintiffs have proffered sufficient evidence to demonstrate that a reasonable jury could find that (1) 8-31 and Knoedler LLC operated as a single entity; and (2) the observance of corporate distinctions between these two entities under the circumstances would result in a fundamental injustice. The evidence offered by 8-31 at best raises issues of fact. Accordingly, 8-31 is not entitled to summary judgment on Plaintiffs' claims to the extent those claims rely on a theory of alter ego liability.[34]

### C.    Hammer Analysis

#### 1.    Operation as a Single Entity

##### a.    Hammer's Siphoning of 8-31's Funds

Plaintiffs contend that a reasonable jury could conclude that Hammer siphoned money from 8-31 by charging personal expenses to his corporate credit card and by purchasing luxury vehicles for his personal use.

---

[34] 8-31 also argues that it cannot be held liable for Freedman's conduct under the doctrine of respondeat superior. (Def. 8-31 Br. (Hilti Dkt. No. 215) at 43-44) As this Court held in De Sole, however,

> [g]iven the Court's findings as to the alter ego theory of liability against 8-31, a reasonable jury could also conclude that Freedman was an employee of 8-31 and was acting within the scope of her employment during the course of the alleged fraud scheme. Therefore, 8-31 is not entitled to summary judgment on Plaintiffs' claims to the extent they rely on Freedman's conduct and a respondeat superior theory of liability.

De Sole, 139 F. Supp. 3d at 669 n.51.

### i.    Use of Corporate Credit Card and
### Purchase of Luxury Vehicles

Hammer charged $2.7 million on his corporate credit card, and 8-31 paid those charges.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 961; Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 51)  Hammer charged both business and personal expenses on his corporate credit card, and later informed 8-31 which charges were business-related and which were personal.  (Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 51)  Hammer allegedly reimbursed 8-31 for the personal expenses that 8-31 had paid.  (<u>Id</u>.)  The only evidence that the expenses Hammer designated as business-related were in fact legitimate business expenses is Hammer's testimony.[35]  No one maintained records regarding the purpose of these charges, and Hammer did not submit any explanation of the alleged business-related charges to 8-31.  Moreover, no one at 8-31 regularly reviewed the charges Hammer designated as business expenses.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1215; Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 52)

There is substantial evidence that some of the charges Hammer designated as business expenses were personal in nature:  Hammer admitted that (1) he could not recall the

---

[35]  Defendants have offered credit card statements with handwritten notations.  (<u>See</u> American Express Statements (<u>Hilti</u> Dkt. Nos. 218-196-99, 218-201-02, 218-204-15))  Hammer explains the notations as follows:

> My standard practice was to review the American Express statements within days of the closing date.  Both my personal assistants and I reviewed the charges and then one of us would designate each charge with the letter "P" for personal or "B" for business.  We identified all charges in a manner that made clear which charges were personal and would be reimbursed by me.

(Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 52)  To the extent that Defendants offer these notations for the truth of the matter asserted – that is, charges marked "B" were actually business expenses – their admissibility is not clear.  Assuming that the elements for the business records hearsay exception could be established, <u>see</u> Fed. R. Evid. 803(6), there is – as discussed below – evidence that "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  <u>Id</u>.

business purpose of certain charges (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1229, 1247, 1266-67); (2) at times he intended to reimburse 8-31 for certain personal expenses, but never did so (<u>id.</u> ¶ 1275); and (3) certain charges he categorized as business expenses were actually personal in nature. (<u>Id.</u> ¶¶ 1259-62; Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 63). There is also evidence that Hammer sometimes used refunds related to charges he had designated as business expenses to offset his personal expenses. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1234, 1278-79; Feb. 2010 Stmt. (<u>Hilti</u> Dkt. No. 219-174) at 6; March 2010 Stmt. (<u>Hilti</u> Dkt. No. 219-175) at 2) Dru Hammer testified that several charges designated as business-related were in fact personal in nature. (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1221-22, 1236, 1238-39, 1245-46, 1259-62; Def. R. 56.1 Cntrstmt. (<u>Hilti</u> Dkt. No. 232-1) ¶ 1236; Dru Hammer Dep. (<u>Hilti</u> Dkt. No. 219-10) at 175:10-178:25) The Court concludes that a reasonable jury could find that a significant portion of the "business expenses" Hammer charged to his corporate credit card – charges paid by 8-31 – were personal in nature.[36]

Between 2005 and 2010, 8-31 reimbursed Hammer nearly $2 million for seven luxury vehicles. (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 714, 723, 736, 758, 772, 787, 803) Hammer alone determined how many vehicles he would purchase for business use, and he did

---

[36] There is a broader issue concerning Hammer's business expenses. Hammer asserts that his role at 8-31 was to "support and expand the brand recognition" of Knoedler LLC, Hammer Gallery LLC, and Knoedler Publishing LLC by meeting with art collectors and representatives of galleries and museums. (Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 8) Hammer could not recall the name of anyone who had purchased something from one of the LLCs after meeting with him, however. (Hammer Dep. (<u>Hilti</u> Dkt. No. 219-28) at 837:14-840:19) Moreover, Hammer claims that he had no involvement in the sale or acquisition of art; the marketing of art; the pricing of art; or the decision to exhibit works of art, and that he never communicated with purchasers of art. (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 205, 245, 247, 250; Hammer Decl. (<u>Hilti</u> Dkt. No. 218-3) ¶ 17) Accepting Hammer's testimony on these points, it is not clear how he could have been engaged in activities that "support[ed] and expand[ed] the brand recognition" of Knoedler LLC, Hammer Gallery LLC, or Knoedler Publishing LLC.

not discuss these purchases with 8-31's chief financial officer.  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1302, 1353)  Moreover, Hammer twice sold company cars and retained the proceeds.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 791, 793; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1314)  When 8-31 personnel learned what he had done, the proceeds from one car were reported to the IRS as income to Hammer (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 746; Pltf. R. 56.1 Cntrstmt. (<u>Hilti</u> Dkt. No. 219) ¶ 746), and Hammer issued a promissory note to 8-31 in the amount of the proceeds from the other car.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 794; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1339, 1342).  Hammer regularly sold cars within a year of their purchase (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶¶ 717-18, 762; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶¶ 1312-14), and sometimes at a loss.  (Def. R. 56.1 Stmt. (<u>Hilti</u> Dkt. No. 218) ¶ 762; Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1313).  He did not keep records of his business use of these vehicles.  (Pltf. R. 56.1 Cntrstmt. (<u>Hilti</u> Dkt. No. 219) ¶ 809)  He referred to one of the cars paid for by 8-31 as "the 'company' Mercedes," placing quotation marks around the word "company."  (Pltf. R. 56.1 Add. Stmt. (<u>Hilti</u> Dkt. No. 220) ¶ 1307)  In sum, a reasonable jury could find that Hammer purchased these luxury cars for personal use.

Under Delaware law, "[s]iphoning suggests 'the improper taking of funds that the owner was not legally entitled to receive.'"  <u>In re Autobacs Strauss, Inc.</u>, 473 B.R. 525, 557 (Bankr. D. Del. 2012) (quoting <u>In re The Heritage Organization</u>, 413 B.R. 438, 517 n.69 (Bankr. N.D. Tx. 2009)).  Applying Delaware law, the Second Circuit has found evidence of siphoning where – as here – a dominant shareholder and officer causes a company to pay for his personal

expenses.[37]  NetJets Aviation, 537 F.3d at 181-82.  In NetJets Aviation, the Second Circuit's

siphoning analysis emphasized that the defendant shareholder was the sole decision-maker when

it came to determining what would be an appropriate use of corporate funds, and that "[t]here

was no procedure" in place to monitor these decisions.[38]  Id. at 182.

        Hammer argues that "siphoning does not exist where 'payments were only made

[to a shareholder] while the [corporation] was profitable and did not jeopardize the

[corporation's] ability to run or grow its business."  (Def. Hammer Br. (Hilti Dkt. No. 213) at 13

(quoting In re Opus East, LLC, 528 B.R. 30, 64 (Bankr. D. Del. 2015)))  This is not an accurate

characterization of the case law, however.  Opus East – the case upon which Hammer relies –

merely holds that the regular payment of dividends does not constitute siphoning where the

corporation is in good financial health.  Opus East, 528 B.R. at 64.  While insolvency may be

relevant to the issue of siphoning – see, e.g., In re Autobacs Strauss, Inc., 473 B.R. at 557

---

[37]  Hammer cites United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96 (2d Cir. 2000) (Wetterer), for the proposition that

    where charges purportedly siphoned to an individual director "were small relative to the income, expenditures and operations" of the company and were not detrimental to the company's ability to function, then "(at worst) they represent a misappropriation of the [company's] funds rather than an identity between its director and the corporation," and do not constitute a basis for alter ego liability.

(Def. Hammer Br. (Hilti Dkt. No. 213) at 21 (quoting Wetterer, 210 F.3d at 107-08))  Wetterer was an appeal from a bench trial involving an alter ego question under New York and Guatemalan law, and therefore has no bearing here.  In any event, the alleged personal expenses at issue in Wetterer amounted to only three charges, all of which the court found to be legitimate business expenses.  Wetterer, 210 F.3d at 107.

[38]  The defendant in NetJets Aviation argued that his personal use of corporate resources was "'part of [his compensation] package' . . . and '[o]ne of the perks of being the chairman[.]'"  Id. at 182.  The Second Circuit responded:  "That may be; but for purposes of determining whether [the defendant] and [the company] were alter egos, it is pertinent that [the defendant] made all of [the company]'s financial decisions . . .; [the defendant] alone decided what his perks and package would be."  Id.

("[T]he insider was siphoning cash by requiring payments to be made under his loan at a time when the company was insolvent."); Trustees of Nat. Elevator Indus. Pension v. Lutyk, 140 F. Supp. 2d 447, 459 (E.D. Pa. 2001) ("The use of corporate funds for personal benefits – [] particularly at a time of financial distress – also supports piercing the corporate veil."), aff'd sub nom. Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188 (3d Cir. 2003) – insolvency is not a prerequisite for a finding of siphoning. Indeed, insolvency and siphoning are two separate factors in assessing whether alter ego liability should be imposed. See Fletcher, 68 F.3d at 1459 (analyzing alleged siphoning with no mention of insolvency); TradeWinds Airlines, Inc. v. Soros, 101 F. Supp. 3d 270, 282-83 (S.D.N.Y. 2015), aff'd, 637 F. App'x 53 (2d Cir. 2016) (same); Cohen v. Schroeder, 248 F. Supp. 3d 511, 520 (S.D.N.Y. 2017), aff'd, 724 F. App'x 45 (2d Cir. 2018) (same); NetJets Aviation, 537 F.3d at 181-82 (same).

### b.  Observance of Corporate Formalities

There is evidence that Hammer and 8-31 did not observe corporate formalities. For example, Hammer entered into agreements on 8-31's behalf without informing any other 8-31 director or officer. For example, in 2009, Hammer sold a corporate vehicle without informing 8-31, and kept the proceeds. (Def. R. 56.1 Stmt. (Hilti Dkt. No. 218) ¶¶ 791, 793) After this transaction came to the attention of 8-31 personnel, Hammer executed a promissory note in favor of 8-31 in the amount of the proceeds – $160,000. (Id. ¶ 794, Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1342) He signed the note for both 8-31 and himself. (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1342) Blankschen, 8-31's chief financial officer at the time, had no role in negotiating or preparing the promissory note. (Id. ¶ 1345) When the promissory note came due, Hammer executed an amended note which provided that the note would be due "on demand." (Id. ¶¶ 1342, 1344) Once again, Hammer signed for both 8-31 and himself, and Blankschen had

no involvement.  (Id. ¶ 1345)  Hammer only repaid the note shortly before his deposition in these actions.  (Id. ¶ 1348)

In 2011, Hammer adopted and approved a liquidation plan for Knoedler LLC. (Id. ¶ 1188; Knoedler Resolution & Liquidation Plan (Hilti Dkt. No. 219-101) at 3)  Once again, Hammer signed for both 8-31 and Knoedler LLC.  (Knoedler Resolution & Liquidation Plan (Hilti Dkt. No. 219-101) at 3)  Blankschen did not know that the liquidation plan existed.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1192)  The liquidation plan called for Knoedler LLC to "make reasonable provision for the satisfaction" of all claims against it, including contingent and unmatured claims.  (Id. ¶ 1189; Knoedler Resolution & Liquidation Plan (Hilti Dkt. No. 219-101) at 4)  Blankschen was not informed about this requirement, either.  (Pltf. R. 56.1 Add. Stmt. (Hilti Dkt. No. 220) ¶ 1192)  Although Hammer had approved and signed the liquidation plan, he testified that he did not know who was implementing the liquidation plan.  (Id. ¶ 1195)

As discussed above, Hammer regularly purchased "company" cars without informing anyone else at 8-31.  (Id. ¶ 1353)  And during the period between 2001 and 2010, 8-31 paid all charges on Hammer's corporate credit card, without maintaining any records or requiring any documentation of the expenses Hammer designated as business expenses.  (Id. ¶ 1215; Hammer Decl. (Hilti Dkt. No. 218-3) ¶ 52)

Based on the evidence discussed above, a reasonable jury could conclude that "corporate records [were not] kept, officers and directors [did not] function properly, and other corporate formalities [were not] observed."  NetJets Aviation, 537 F.3d at 177.

### c.    Issuance of Dividends

It is undisputed that 8-31 did not pay dividends to Hammer, its sole shareholder. (Pltf. Jt. Br. (Hilti Dkt. No. 222) at 104-05; Def. Hammer Reply (Hilti Dkt. No. 229) at 17)  The "failure to pay dividends (while instead siphoning funds . . . through other means) . . . evidences"

alter ego status.  In re Opus East, 528 B.R. at 63 (citing In re Molls Indus., Inc., 454 B.R. 574, 588 (D. Del. 2011))

  2.  **Fundamental Unfairness**

  There is evidence that Hammer initiated the reclassification of Knoedler's interdivisional receivables due from 8-31.  At his deposition, Hammer testified that he asked Blankschen about the receivables, that he "wanted to make sure that there wasn't money that was owed anywhere," and that the "terminology" regarding the receivables was subsequently "corrected."  (Hammer Dep. (Hilti Dkt. No. 219-28) at 402:6-12)  For reasons already discussed, a reasonable jury could find an "overall element of injustice or unfairness," NetJets Aviation, 537 F.3d at 177, in the reclassification of the receivables.

    \*   \*   \*   \*

  Plaintiffs have proffered sufficient evidence for a reasonable jury to conclude that (1) 8-31 and Hammer operated as a single entity; and (2) the observance of corporate distinctions between them would result in a fundamental injustice.  At best, the evidence offered by Hammer raises issues of fact.  Accordingly, Hammer is not entitled to summary judgment on Plaintiffs' claims to the extent those claims rely on a theory of alter ego liability.[39]

---

[39]  Because the evidence discussed above is sufficient to create a material issue of fact as to whether Hammer and 8-31 operated as a single economic entity, the Court does not reach the parties' arguments concerning 8-31's capitalization and solvency.

## CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment were

denied in part and granted in part as set forth in this Court's March 31, 2019 Order.[40]

Dated: New York, New York
     May 8, 2019              SO ORDERED.

*Paul S. Gardephe*

Paul G. Gardephe
United States District Judge

---

[40] Defendants moved to exclude the opinions offered by Plaintiffs' forensic accounting expert, Linda MacDonald (Hilti Dkt. No. 235, White Dkt. No. 185), and Plaintiffs moved to exclude the opinions offered by Defendants' forensic accounting expert, John Salomon. (Hilti Dkt. No. 226, White Dkt. No. 176). The Court has not relied on the opinions of either expert in deciding Defendants' motions for summary judgment, and the Court's decision does not depend on the admissibility of the experts' opinions. Accordingly, the parties' motions to exclude expert testimony are denied as moot and without prejudice to renewal in the form of motions in limine.